# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JONATHAN M. ZANG, | ) | |
| | ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIDELITY MANAGEMENT & RESEARCH | ) | |
| COMPANY, FMR CO., INC., and | ) | |
| FMR LLC f/k/a FMR CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Jonathan M. Zang ("Zang"), brings this Complaint against defendants Fidelity Management & Research Company, FMR Co., Inc., and FMR LLC f/k/a FMR Corp. (collectively "Defendants" or "Fidelity") to recover for the Defendants' unlawful termination of Zang in retaliation for his providing information concerning Fidelity's violations of Securities and Exchange Commission ("SEC") rules and regulations, and other provisions of Federal securities law.

The Defendants, their registered investment companies or mutual funds, and their affiliated companies and entities hold themselves out to the investing public as "Fidelity" and "Fidelity Investments." Together, these entities form an integrated enterprise, within which are a set of interconnected, agency, and contractor relationships, and other affiliations. Fidelity is the largest mutual fund company in the country, investing approximately $1.2 trillion dollars on behalf of millions of individual and institutional investors, including residents of the Commonwealth of Massachusetts.

Zang was a successful research analyst and portfolio manager with Fidelity, with more than seven years tenure. After Zang identified and brought to his superiors' attention violations of federal securities laws and regulations concerning Fidelity's mutual funds, the Defendants retaliated against Zang and terminated him because of his whistle-blowing activities.

Defendants' termination of Zang is in violation of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Tile VIII of the Sarbanes-Oxley Act of 2002 ("SOX"), codified at 18 U.S.C. § 1514A, and is a wrongful discharge in violation of Massachusetts public policy.

## JURISDICTION AND VENUE

1.      Jurisdiction over Zang's federal claim is proper in the District of Massachusetts under 28 U.S.C. § 1331 and 18 U.S.C. § 1514A(b)(1)(B) because Zang filed a complaint with the Secretary of Labor under 18 U.S.C. § 1514A(b)(1)(A), and the Secretary of Labor has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to any bad faith on the part of Zang. Jurisdiction over Zang's state law claim is proper under 28 U.S.C. § 1367(a).

2.      Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b). This is a civil action wherein jurisdiction is not founded solely on diversity of citizenship and a substantial part of the events or omissions giving rise to Zang's claim occurred in this District.

## PARTIES

3.      Plaintiff Jonathan M. Zang is an individual residing in Boston, Massachusetts.

4.     Defendant Fidelity Management & Research Company is a Massachusetts corporation with its usual place of business at 82 Devonshire Street, Boston, MA.

5.     Defendant FMR Co., Inc. is a Massachusetts corporation with its usual place of business at 82 Devonshire Street, Boston, MA.

6.     Defendant FMR LLC is a limited liability company organized under the laws of Delaware and registered to do business in Massachusetts, with its usual place of business at 82 Devonshire Street, Boston, MA, and is on information and belief the successor to FMR Corp., a Delaware corporation registered to do business in Massachusetts.

## FACTS

### THE FIDELITY COMPANIES

7.     Defendants manage and operate the approximately 350 "Fidelity Investments" mutual funds ("Funds"), each of which is a registered investment company that, like other public companies, is required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

8.     FMR LLC is the parent company of Fidelity Management & Research Company.

9.     Fidelity Management & Research Company is the investment adviser to the Funds, pursuant to management contracts between each of the Funds and Fidelity Management & Research Company ("Management Contracts").

10.     Fidelity Management & Research Company is the parent company of FMR Co., Inc.

11.     FMR Co., Inc. is an investment sub-adviser to certain of the Funds, pursuant to sub-advisory contracts between Fidelity Management & Research Company and FMR Co., Inc.

12.     The Defendants and the Funds, representing various Fidelity companies, subsidiaries and affiliates, collectively operate and hold themselves out as Fidelity and Fidelity Investments.

13.     Fidelity Management & Research Company and FMR Co., Inc. are contractors and/or subcontractors of the Funds within the meaning of 18 U.S.C. § 1514A.

14.     All day-to-day operational, investment, reporting and employment functions and decisions necessary to the operation of the Funds are made and effected by Fidelity Management & Research Company and/or FMR Co., Inc.

15.     In their capacities as contractors and/or subcontractors to the Funds, Fidelity Management & Research Company and/or FMR Co., Inc. perform, among other things, all of the management and administrative functions necessary for the operation of the Funds; furnish and pay for all of the office space, facilities and personnel necessary for managing the investments of the Funds; direct all of the investments of the Funds; trade in securities on behalf of the Funds; hire and pay all personnel performing research related to the Funds and their investments; and prepare and submit all public reports, prospectuses and regulatory filings on behalf of the Funds as required for the Fund's existence, including the Funds' filings with the SEC as required by Section 15(d) of the Securities Exchange Act of 1934.

16.     FMR Co., Inc. was formed in 1999 specifically for the purpose of becoming the sub-adviser to the Funds, and on information and belief, all or substantially all of its activities are performed for and on behalf of the Funds.

17.     Fidelity Management & Research Company and FMR Co., Inc., as investment advisers to registered investment companies, regularly file reports with the SEC on behalf of the registered investment companies they manage, pursuant to their management contracts and the Securities Exchange Act of 1934.

18.     Fidelity is a covered employer under the whistleblower provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, since the Funds, like other public companies, are required to file reports under section 15(d) of the Securities Exchange Act of 1934.

## ZANG'S EMPLOYMENT

19.     Zang began his career at Fidelity in 1997 as an equity research analyst, and, in addition to his responsibilities as an equity research analyst, began various assignments as portfolio manager of certain Fidelity Select mutual funds in 1998, and performed both of these functions until his termination in 2005.

20.     Pursuant to Zang's employment agreement with Fidelity, Zang was employed "by FMR Corp. and/or any entity which is directly or indirectly owned or controlled wholly or in part by FMR Corp."

21.     Initially, Zang's direct employer was Fidelity Management & Research Company.

22.     Without notice to Zang, in or about 2001, Fidelity changed Zang's direct employer to FMR Co., Inc., which remained Zang's employer until Zang's termination in 2005.

23.     As an equity research analyst, Zang was responsible for influencing the investment decisions and portfolio holdings of the Funds.

24.     During various periods between 1998 and 2005, Zang was the portfolio manager of the following Fidelity mutual funds: Fidelity Select Utilities Growth fund, Fidelity Select Chemicals fund, Fidelity Select Medical Delivery fund, and Fidelity Select Natural Gas fund.

25.     As portfolio manager of various Fidelity Select mutual funds, Zang selected the respective funds' investment securities; communicated with external entities about the respective funds' performance and investment strategies; and assisted in the preparation and/or review of various shareholder reports and other disclosures which were filed by Fidelity with the SEC on behalf of the respective funds.

26.     During the entire period of Zang's employment, each and every one of Zang's job responsibilities related to Fidelity's contractual obligations under the Management Contracts to provide all services necessary to the Funds for their operation and continued existence.

27.     During the entire period of Zang's employment, Fidelity evaluated Zang's job performance and compensated Zang based on his work on behalf of the Funds.

28.     In 1997, Zang began researching electric utility stocks for Fidelity on behalf of the Funds.

29.     From early in his career at Fidelity, Zang was praised for the depth and quality of his work and the accuracy of his stock picks.

30.     In 1999, Zang's research assignment was changed from utilities to the chemicals industry.

31.     In 2002, Zang's research assignment was changed from chemicals to health care services stocks.

32.     On September 15, 2004, Katherine Collins, Fidelity's Group Leader of U.S. Equity Research, who had supervisory responsibility over Zang, and Jeffrey Feingold, Fidelity's Co-Director of Equity Research and Zang's direct supervisor, informed Zang that his research assignment would be changed from health care services to oil and natural gas exploration and production.

33.     On September 27, 2004, Zang was informed that he would also be responsible for researching the U.S. coal mining industry.

34.     Although Ms. Collins initially claimed that this change in Zang's research assignment was based on Zang's demonstrated ability to do in-depth work on long-term industry trends and Fidelity's need for additional expertise of this nature in the energy sector, Ms. Collins later admitted to Zang that his transfer was also based on Fidelity's belief that researching energy companies would be a "better fit" for Zang in light of his recent diagnosis with Attention Deficit Disorder ("ADD").

35.     Fidelity encouraged Zang to take the time necessary to learn the new industries to which he was assigned, and achieve the in-depth knowledge for which Zang had been highly regarded during his prior research assignments, and which Fidelity said it required in Zang's new research assignment.

### Zang's Career Prospects Prior to His Protected Conduct

36.     Prior to his protected conduct, Zang was receiving praise from both within and outside of Fidelity for delivering outstanding returns to Fidelity's shareholders.

37.     In Zang's June 14, 2004 Merit Review, Fidelity awarded Zang a merit-based compensation increase and praised Zang's "significant efforts during this period" which "resulted in broader coverage and a higher level of impact with Fidelity's fund managers."

38.     On December 1, 2004, Fidelity awarded Zang a "High Achiever Award" bonus for his performance as portfolio manager of the Fidelity Select Medical Delivery fund for producing the highest relative return among Fidelity's 49 Select funds during a recent 12-month period.

39.     In Zang's December 6, 2004 Bonus Review, Mr. Feingold and Ms. Collins awarded Zang 95% of his maximum annual bonus attributable to their assessment of Zang's overall job performance during the year under review, and Fidelity awarded Zang a merit-based compensation increase.

40.     In a January 7, 2005 article, *Boston Business Journal* declared that "Fidelity Investments' Jonathan Zang...could be a star manager in the making...His $282 million Fidelity Select Medical returned 45% [in 2004] – second best locally – compared with an industry wide 8%."

41.     In a January 25, 2005 email to Ms. Collins, Mr. Feingold recognized Zang's initial efforts to learn about his new research assignment within the energy sector, praising Zang for "staying on top of current trends as he puts out w/ the sector specialist weekly summaries of the industry," and Mr. Feingold again commended Zang for "a lot of progress w/ PMs [portfolio managers] over the last 12 months."

## ZANG'S PROTECTED COMMUNICATIONS
## CONCERNING FIDELITY'S SECURITIES LAW VIOLATIONS

42.    On February 18, 2005, Fidelity internally distributed and transmitted to the SEC a draft of its revised registration statement for Fidelity Select Portfolios, including a revised Statement of Additional Information ("SAI"), which was to become effective April 29, 2005 (the "February 18, 2005 SAI").

43.    Fidelity Select Portfolios is a Massachusetts business trust which was comprised during the relevant period of approximately 49 mutual funds, each of which was a registered investment company, which were managed and operated by Defendants and which were marketed to their public shareholders as "Fidelity Select" mutual funds.

44.    Zang was one of the employees whom Fidelity asked to review the February 18, 2005 SAI.

45.    When Zang reviewed certain newly-required disclosures in the February 18, 2005 SAI, he believed that said disclosures contained material inaccuracies and omissions.

46.    Following the distribution of the February 18, 2005 SAI, Zang discussed with several superiors at Fidelity his concerns that certain disclosures in the February 18, 2005 SAI were inaccurate.

47.    On March 4, 2005, Zang informed Mr. Feingold that he believed certain newly-required disclosures in the February 18, 2005 SAI regarding the Select funds' portfolio managers' compensation ("Compensation Disclosures") were inaccurate.

48.    Mr. Feingold did not disagree with Zang's assessment that the Compensation Disclosures were inaccurate, but informed Zang that he would not attempt to improve the accuracy of said disclosures.

49.     On March 13, 2005, Zang sent an email memorandum to supervisors and colleagues (the "March 2005 Email Memorandum") in which he provided information to the Defendants that Fidelity's disclosures in certain of its SEC filings on behalf of the Funds, including the Compensation Disclosures, were inaccurate or otherwise constituted violations of SEC rules and regulations and/or Federal laws relating to fraud against shareholders.

50.     A true copy of the March 2005 Email Memorandum is attached hereto as Exhibit A.

Information Concerning Fidelity's False and Misleading<br>Statements About Select Fund Manager Compensation

51.     At the time of Fidelity's transmittal of the Compensation Disclosures to the SEC, Fidelity's Funds were required, pursuant to 17 C.F.R. § 274.11A and SEC Form N-1A, to describe in its Statement of Additional Information, "the structure of, and the method used to determine, the compensation of each Portfolio Manager," and "[f]or each type of compensation (*e.g.*, salary, bonus, deferred compensation, retirement plans and arrangements), [to] describe with specificity the criteria on which that type of compensation is based, for example, whether compensation is fixed, whether (and, if so, how) compensation is based on Fund pre-or after-tax performance over a certain time period, and whether (and, if so, how) compensation is based on the value of assets held in the Fund's portfolio."

52.     In his March 2005 Email Memorandum, Zang provided information to Fidelity that the Compensation Disclosures prepared by Fidelity and filed with the SEC on behalf of Fidelity Select Portfolios contained false and misleading statements or

omissions regarding Fidelity's compensation of Fidelity Select Portfolios' equity

portfolio managers.

53.     In his March 2005 Email Memorandum, Zang informed Fidelity that the

Compensation Disclosures overstated the connection between a Select fund's

performance and the compensation of the Select fund's portfolio manager.

54.     Zang informed Fidelity that the Compensation Disclosures failed to state

accurately the extent to which a Select fund's portfolio manager's compensation was

actually driven by the portfolio manager's performance as a research analyst providing

services to other Fidelity mutual funds, as evaluated by the portfolio managers of these

other Fidelity mutual funds, rather than by their performance as portfolio manager of

their respective Select funds.

55.     Zang reasonably believed that Fidelity's disclosures regarding the factors

Fidelity used in determining his and other equity Select fund portfolio managers'

compensation were misleading.

56.     Section 17(a) of the Securities Act of 1933, codified at 15 U.S.C. § 77a *et

seq.*, (the "Securities Act") provides that it is unlawful in connection with the sale of a

security to make any untrue statement of a material fact, or to omit to state a fact that is

necessary in order to make the statements made not misleading.

57.     Section 34(b) of the Investment Company Act of 1940, codified at 15

U.S.C. § 80a-1 *et seq.* (the "Investment Company Act"), provides that it is "unlawful for

any person to make any untrue statement of a material fact in any registration statement,

application, report, account, record, or other document filed or transmitted pursuant [the

Investment Company Act] or the keeping of which is required pursuant to section 31(a)

[15 U.S.C. § 80a-30(a)] [and] for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading."

58.     Section 15(c) of the Investment Company Act imposes on Fidelity, as an investment adviser to the registered investment companies comprising the Fidelity Investments mutual funds, an obligation to make available to the mutual funds' boards of directors all information "as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company."

59.     Section 36(b) of the Investment Company Act provides that Fidelity, as investment adviser to the Fidelity Investments mutual funds, has "a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company [i.e., the Funds], or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

60.     Zang reasonably believed that the Compensation Disclosures violated SEC rules and regulations and/or Federal laws related to fraud against shareholders

61.     The Compensation Disclosures violated Section 17(a) of the Securities Act, Sections 15(c), 34(b) and 36(b) of the Investment Company Act and SEC regulations pertaining to Form N-1A as required by 17 C.F.R. § 274.11A, and other securities regulations and laws related to fraud against shareholders.

Information Concerning Fidelity's
Operation of Veiled Index Funds

62.     In his March 2005 Email Memorandum, Zang also communicated to Fidelity that he was concerned that Fidelity was operating "veiled index funds."

63.     A veiled index fund is a mutual fund that purports to be actively managed, and for which the fund's investment adviser collects a management fee from the fund's shareholders based on the investment adviser's alleged active management of the fund's investments, but which in reality is largely indistinguishable from an unmanaged index of stocks.

64.     Zang reasonably believed that certain of the Funds, including the Fidelity Trend fund, were veiled index funds.

65.     Fidelity's operation of veiled index funds constituted, and Zang reasonably believed Fidelity's operation of such funds constituted, breaches of Fidelity's duties as an investment adviser to the respective investment companies and their shareholders.

66.     Zang reasonably believed that Fidelity's failure to disclose its operation of veiled index funds to the respective funds' shareholders, to the funds' boards of trustees, and in the funds' SEC filings, violated SEC rules and regulations and/or Federal laws related to fraud against shareholders.

67.     Fidelity's failures to disclose its operation of veiled index funds violated Section 17(a) of the Securities Act of 1933, Sections 15(c), 34(b) and 36(b) of the Investment Company Act of 1940, and other SEC rules and regulations and/or Federal laws related to fraud against shareholders.

Information Concerning Fidelity's Other Conflicts of Interest

68.     Throughout his 2005 Email Memorandum, Zang informed Fidelity that its operation and management of the Funds created numerous conflicts of interest, and that these conflicts and Fidelity's failure to accurately disclose them harmed the Funds' shareholders.

69.     Zang reasonably believed that Fidelity's conflicts of interest and its failure to properly disclose them violated SEC rules and regulations and/or Federal laws related to fraud against shareholders.

70.     Fidelity's conflicts of interest and its failure to properly disclose them violated Section 17(a) of the Securities Act of 1933, Sections 15(c), 34(b) and 36(b) of the Investment Company Act of 1940, and other SEC rules and regulations and/or Federal laws related to fraud against shareholders.

The March 18, 2005 Meeting

71.     On March 18, 2005, at the direction of FMR Corp. Senior Vice President and Deputy General Counsel Holly Laurent, FMR Corp. Associate General Counsel Mark Jensen met with Zang to review Zang's concerns regarding the Compensation Disclosures in the February 18, 2005 SAI.

72.     Pursuant to Section 307 of the Sarbanes-Oxley Act of 2002, in directing Mr. Jensen to meet with Zang to investigate Zang's concerns about the Compensation Disclosures, and, thereafter, in supervising Mr. Jensen's investigation into Zang's concerns, Ms. Laurent, in addition to representing Fidelity, also represented, and acted on behalf of, Fidelity Select Portfolios and its constituent mutual funds.

73.     Pursuant to Section 307 of the Sarbanes-Oxley Act of 2002, in investigating Zang's concerns about the Compensation Disclosures, Mr. Jensen, in addition to representing Fidelity, also represented, and acted on behalf of, Fidelity Select Portfolios and its constituent mutual funds.

74.     On March 18, 2005, Zang met with Mr. Jensen to assist Mr. Jensen in his investigation of Zang's concerns that the Compensation Disclosures violated SEC rules and regulations and/or Federal laws related to fraud against shareholders.

75.     When Zang met with Mr. Jensen on March 18, 2005, Zang again provided Defendants with information regarding what Zang reasonably believed were violations of SEC rules and regulations and/or Federal laws related to fraud against shareholders, including information about Zang's reasonable belief that the Compensation Disclosures were misleading.

76.     At the conclusion of their meeting, Mr. Jensen admitted to Zang that the Compensation Disclosures may need to be revised.

### Zang's Continued Protected Conduct
### Concerning Fidelity's Inaccurate Disclosures

77.     On April 4, 2005, Fidelity internally distributed a revised draft of its registration statement for Fidelity Select Portfolios, which contained no material revisions to the Compensation Disclosures.

78.     In a meeting on April 7, 2005 with FMR Co., Inc.'s Director of Human Resources, Fatima Penrose, Zang again expressed his concerns that the Compensation Disclosures were inaccurate.

79.     On April 11, 2005, Zang sent an email to the President of Fidelity Management & Research Company and FMR Co., Inc., Abigail Johnson, and other

members of Fidelity management, in which he again called attention to his concerns about the Compensation Disclosures.

80.     On April 28, 2005, Fidelity transmitted to the SEC a revised registration statement for Fidelity Select Portfolios, including a revised SAI (the "April 28, 2005 SAI"), which became effective April 29, 2005.

81.     The April 28, 2005 SAI contained revisions to the Compensation Disclosures which were made as a result of Zang's concerns.

82.     Four months after meeting with Zang, and following Fidelity's termination of Zang's employment, Mr. Jensen described in a July 25, 2005 memorandum his investigation into Zang's concerns about the Compensation Disclosures. A true copy of Mr. Jensen's memorandum is attached hereto as Exhibit B.

## FIDELITY'S RETALIATION AGAINST ZANG

83.     Two days after Zang sent the March 2005 Email Memorandum, Ms. Collins informed Zang, in a March 15, 2005 email, that his previously required attendance at a March 17, 2005 Fidelity Select Medical Delivery fund board of trustees meeting ("Board of Trustees Meeting") had been withdrawn. A true copy of Ms. Collins' email is attached hereto as Exhibit C.

84.     In the days before Zang sent the March 2005 Email Memorandum, Ms. Collins and others acting on her behalf had repeatedly instructed Zang that he was required to attend the Board of Trustees Meeting.

85.     Zang was the portfolio manager of the Fidelity Select Medical Delivery fund for eleven of the twelve months under review at the Board of Trustees Meeting, and

portfolio managers regularly attended such reviews to provide information to a fund's board of trustees during the board's review of a fund's prior year's performance.

86.     On March 15, 2005, Ms. Collins also met with Zang regarding the March 2005 Email Memorandum ("March 15, 2005 Collins Meeting").

87.     In that meeting, Ms. Collins said nothing about whether the March 2005 Email Memorandum violated any Fidelity policies, nor did she address any of the substantive issues raised in Zang's memorandum. Rather, Ms. Collins became irate and informed Zang that she viewed the March 2005 Email Memorandum as a "personal betrayal" by Zang.

88.     On March 14, 2005, Mr. Feingold, who was Zang's direct supervisor, sent Ms. Collins an email describing Zang's job performance ("March 14, 2005 Feingold Email").

89.     The March 14, 2005 Feingold email does not make any reference to any allegedly unsatisfactory job performance by Zang. A true copy of the March 14, 2005 Feingold email is attached hereto as Exhibit D.

90.     On March 16, 2005, in an apparent attempt to create a pretext for Fidelity's unlawful termination of Zang's employment, Ms. Collins sent an email to FMR Co., Inc.'s Director of Human Resources, Fatima Penrose, in which she criticized Zang's job performance ("March 16, 2005 Collins Email"). A true copy of the March 16, 2005 Collins Email is attached hereto as Exhibit E.

91.     The March 16, 2005 Collins Email falsely claimed that Ms. Collins and Mr. Feingold had been meeting frequently with Zang regarding their purported concerns about Zang's job performance.

92.     Ms. Collins' claims about Zang's job performance were unwarranted, baseless, and belied by her own evaluation of, and instructions to, Zang concerning his assignment to the energy sector, and by Mr. Feingold's email to Ms. Collins just two days prior.

93.     On March 18, 2005, Ms. Collins sent a voicemail ("March 18, 2005 Collins Voicemail") to, upon information and belief, all members of the Fidelity Equity Department stating that "in no uncertain terms the actions of one of our analysts earlier this week were completely unacceptable and unprofessional" and that Zang's conduct was "a real disservice to the vast majority of people" at Fidelity.

94.     The March 18, 2005 Collins Voicemail was directed at Zang in response to the March 2005 Email Memorandum.

95.     In a written warning drafted on March 15, 2005 and issued to Zang by Collins on March 22, 2005 ("Written Warning"), Fidelity alleged that the March 2005 Email Memorandum violated Fidelity's policies on solicitation and electronic communications, and warned Zang that "any further behavior similar to this situation will not be tolerated" and could result in the termination of Zang's employment.

96.     The March 18, 2005 Collins Voicemail made no mention of any alleged policy violations by Zang.

97.     Similarly, neither the March 14, 2005 Feingold Email nor the March 16, 2005 Collins Email made any mention of any alleged policy violations by Zang.

98.     The March 2005 Email Memorandum did not constitute a "solicitation" under Fidelity's electronic communications policies, and the March 2005 Email Memorandum did not violate any Fidelity policy.

99.     Shortly before terminating Zang's employment, but after additional retaliatory conduct towards Zang, Fidelity retracted its Written Warning.

100.     On May 10, 2005, Mr. Feingold informed Zang that Fidelity's management was unsure whether it wanted Zang to be a member of "the team." Mr. Feingold also questioned Zang about his commitment to Fidelity.

101.     On June 17, 2005, FMR Co., Inc. Senior Vice President of Equity Research and Asset Allocation, Boyce Greer, announced the winner of a semi-annual bonus regularly awarded to the Select fund manager who generated the highest relative rate of return compared to an associated internal Fidelity index over a preceding 12-month period.  The award Mr. Greer announced on June 17, 2005 recognized outstanding Fidelity Select fund relative performance for the 12 months ending March, 2005 ("Select Fund Award").

102.     Zang's performance as Select fund manager outpaced the performance of all other Fidelity Select fund managers during this period, as the funds under Zang's management generated a relative return of 20.2%.

103.     Despite Zang's superior performance, he was not awarded the bonus.

104.     Upon information and belief, Fidelity issued the Select Fund Award to a Select fund portfolio manager who had generated the second-highest relative Select fund return during the period, which was less than 10%.

### FIDELITY'S TERMINATION OF ZANG

105.     On June 27, 2005, Zang was informed by Mr. Greer and FMR Co., Inc. Human Resources Vice President Dana Lombardi that Fidelity was terminating his employment, effective July 15, 2005.

106.    Although Fidelity has a written "corrective action policy" that requires a progressive discipline approach for addressing employee performance and/or misconduct issues, Fidelity provided no explanation to Zang as to why it was disregarding its own policies in terminating Zang.

107.    Beginning in June 2005, Zang or his attorneys repeatedly requested a complete copy of his personnel record, including a copy of his 2005 Merit Review, which Mr. Greer had been scheduled to review with Zang on June 29, 2005, and any documents related to Zang's termination.

108.    It was not until November 1, 2005, months after Zang's termination, that Fidelity produced to Zang a document entitled "Termination Points" describing Fidelity's alleged justification for terminating Zang's employment, and a document purporting to be Zang's "2005 Merit Review."

109.    Fidelity never completed its 2005 Merit Review for Zang.

110.    The "Termination Points" document provided to Zang indicates that after Fidelity informed Zang it was terminating his employment, it attempted to craft a false justification for Zang's termination based on Zang's purported performance deficiencies.

111.    On June 30, 2005, Fidelity informed Zang that it was permanently prohibiting his future employment at any Fidelity-controlled company.

112.    On June 30, 2005, Fidelity also gave Zang a separation agreement which offered Zang six months of severance pay, but Fidelity then immediately rescinded its severance offer, claiming that it had been made solely due to administrative error.

113.    Fidelity terminated the employment of two portfolio managers around the same time it terminated Zang's employment.

114.     After Zang filed his whistleblower complaint with the Department of Labor, Fidelity claimed that its termination of Zang's employment occurred as a result of a review of its personnel following a May 2, 2005 management reorganization at Fidelity Management & Research Company and FMR Co., Inc., and that Zang's employment was terminated as a result of the same review which had led to the termination of the two portfolio managers.

115.     Upon information and belief, Fidelity provided severance pay to the two portfolio managers whose employment it terminated around the same time it terminated Zang's employment.

116.     Fidelity did not offer Zang any severance pay because Zang's employment was not terminated as a result of the same review which led to the termination of the two portfolio managers' employment.  Instead, Fidelity terminated Zang's employment because of Zang's protected conduct.

117.     On July 15, 2005, Fidelity terminated Zang's employment.

### ZANG'S PURSUIT OF ADMINISTRATIVE REMEDIES

118.     On September 15, 2005, Zang filed a complaint with the United States Department of Labor, Occupational Safety & Health Administration ("OSHA") in accordance with 18 U.S.C. § 1514A(b)(1)(A) and 29 C.F.R. § 1980.103.  A true copy of that complaint, which was given case number 1-0120-05-016 is attached hereto as Exhibit F.

119.     On February 1, 2007, OSHA issued its preliminary findings on behalf of the Secretary of Labor.

120.    OSHA determined that Zang was a covered employee within the meaning of 18 U.S.C. § 1514A, but found that Zang had not engaged in protected conduct and dismissed Zang's complaint.

121.    Zang timely objected to the Secretary's preliminary findings and requested a hearing before an Administrative Law Judge ("ALJ"), which was designated Case No. 2007-SOX-27.

122.    On April 3, 2007, Fidelity filed a motion for summary decision, alleging that Zang was not a covered employee within the meaning of 18 U.S.C. § 1514A, and that Zang had not engaged in protected conduct.

123.    Following Zang's opposition to Fidelity's motion for summary decision, the ALJ permitted Zang to take limited discovery concerning solely his status as a covered employee under 18 U.S.C. § 1514A.

124.    On March 27, 2008, the ALJ issued a Decision and Order Granting Summary Decision Dismissing Complaint, dismissing Zang's complaint.

125.    On April 9, 2008, Zang petitioned for review of the ALJ Decision and Order pursuant to 29 C.F.R. § 1980.110(a).

126.    On April 16, 2008, more than 180 days having passed since Zang first filed his complaint and no final decision having been issued by the Secretary of Labor, Zang gave notice, pursuant to 29 C.F.R. § 1980.114(b), of his intention to file an action in the United States District Court.  A true copy of Zang's Notice of Intent to File Sarbanes-Oxley Complaint in United States District Court is attached hereto as Exhibit G.

127.    More than fifteen (15) days after giving notice, Zang filed the complaint herein.  No further action has been taken by the Secretary of Labor and this Court may

properly hear this action *de novo*, pursuant to, among other things, 18 U.S.C. §

1514A(b)(1)(B).

## COUNT I – RETALIATION
## IN VIOLATION OF 18 U.S.C. § 1514A

128.    Zang restates and incorporates each of the foregoing allegations as if fully

alleged herein.

129.    The Plaintiff was at all relevant times an employee covered by the whistle-

blower protections of SOX, as codified at 18 U.S.C. § 1514A.

130.    The Defendants were at all relevant times contractors, subcontractors, or

agents, within the meaning of 18 U.S.C. § 1514A, of the Funds, or were integrated

entities of the Funds.

131.    The Funds are required to file reports under section 15(d) of the Securities

Exchange Act of 1934, within the meaning of 18 U.S.C. § 1514A.

132.    FMR Co., Inc. was formed for the purpose of serving as the investment

sub-adviser to certain of the Fidelity Investment mutual funds.

133.    As an investment adviser to certain of the Funds, FMR Co., Inc. regularly

prepares and files required reports with the SEC, pursuant to Section 15(d) of the

Securities Exchange Act of 1934, and each of the respective funds' management

contracts with Fidelity.

134.    All of Zang's job responsibilities were performed for and on behalf of the

Funds.

135.    Zang provided information to Fidelity's management, including its in-

house counsel, and to Fidelity Select Portfolios, as alleged above, concerning what Zang

reasonably believed to constitute violations of SEC rules and regulations and provisions of Federal law relating to fraud against shareholders.

136.     The Fidelity managers to whom Zang provided such information, as alleged above, had supervisory authority over Zang and/or had authority to investigate, discover or terminate misconduct.

137.     In providing this information to Fidelity's managers and in-house counsel, and to Fidelity Select Portfolios, Zang engaged in conduct protected by 18 U.S.C. § 1514A.

138.     Fidelity reprimanded, terminated, and otherwise retaliated against Zang in the terms and conditions of his employment because of his lawful acts in providing information to Fidelity's managers and in-house counsel, and to Fidelity Select Portfolios, as alleged herein.

139.     As a result of the Defendants' actions in violation of 18 U.S.C. § 1514A, Zang has and continues to suffer harm.

## COUNT II – WRONGFUL DISCHARGE
## IN VIOLATION OF PUBLIC POLICY

140.     Zang restates and incorporates each of the foregoing allegations as if fully alleged herein.

141.     Zang was an employee-at-will of Fidelity.

142.     Zang was discharged because he provided information to Fidelity's managers and in-house counsel, and to Fidelity Select Portfolios, who had supervisory authority over Zang and had authority to investigate, discover or terminate misconduct, concerning what Zang reasonably believed to constitute violations of SEC rules and regulations and provisions of Federal law relating to fraud against shareholders.

143.    Zang's discharge contradicted well-defined public policies of the

Commonwealth of Massachusetts, including the Commonwealth's public policy interests

in protecting investors in mutual funds and other companies issuing public securities

from fraud, and in protecting the reporting of such fraud by employees consistent with

federal whistle-blower provisions.

WHEREFORE, Plaintiff Jonathan M. Zang respectfully requests that the Court

grant the following relief:

(1) Enter an order that Defendants reinstate Zang to his prior position with the same
seniority status that he would have had absent Defendants' wrongdoing;

(2) Award Zang back pay, with interest;

(3) Award punitive damages;

(4) Award Zang compensation for special damages sustained as a result of the
Defendants' discrimination, including litigation costs, expert witness fees and
reasonable attorneys' fees; and

(5) Award such other relief the Court deems appropriate.

## JURY TRIAL DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY OF ALL ISSUES SO

TRIABLE.

JONATHAN M. ZANG
By his attorneys,

Alan D. Rose (BBO #427280)
Nicholas J. Rosenberg (BBO #643366)
ROSE, CHINITZ & ROSE
29 Commonwealth Avenue
Boston, MA  02116
Tel: 617-536-0040
Dated: May 5, 2008                     Fax: 617-536-4400