# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JONATHAN M. ZANG,

                    Plaintiff,

          v.                                      No. 08-CV-10758 DPW

FIDELITY MANAGEMENT & RESEARCH
COMPANY, FMR CO. INC., and FMR LLC f/k/a/ FMR
CORP.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND/OR REMAND

Wilfred J. Benoit, Jr. (BBO #037900)
Ethan Z. Davis (BBO #668973)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000
wbenoit@goodwinprocter.com
edavis@goodwinprocter.com

*Attorneys for defendants*

Dated:  June 6, 2008

# Table of Contents

**Page**

INTRODUCTION...................................................................................................1

ARGUMENT .........................................................................................................3

I.    Zang's SOX Claim Must Be Dismissed Because He Is Not A Covered
Employee Under SOX ...............................................................................3

    A.    Zang Should Not Be Permitted To Re-litigate The Coverage Issue........... 3

        i.    This Court Should Apply Principles of Collateral Estoppel
To The ALJ's Findings And Dismiss Zang's Complaint ............... 4

        ii.    Mandamus Relief Is An Appropriate Alternative To
Collateral Estoppel .......................................................................... 7

    B.    Even If The Court Declines To Apply Principles Of Collateral
Estoppel Or Grant Mandamus Relief, Zang's Complaint Should Be
Dismissed Because He Is Not A Covered Employee Under The
Plain Language Of SOX .................................................................... 8

II.    Zang's Complaint Must Be Dismissed Because He Did Not Engage In
Protected Activity ...................................................................................12

        i.    Zang's Comments On The Draft SAI ........................................... 15

        ii.    Zang's Cryptic Reference To Veiled Index Funds Plainly
Does Not Involve A Report Of Securities Fraud .......................... 16

        iii.    Conflict Of Interest ....................................................................... 17

III.    Zang Fails To State A Claim For Wrongful Discharge In Violation Of
Massachusetts Public Policy....................................................................18

CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

### FEDERAL AND STATE CASES

*Allen v. Stewart Enters., Inc.*,
    No. 05-CV-04033 (E.D. La. Apr. 6, 2006) ................................................................. 7

*Baez-Cruz v. Municipality of Comerio*,
    140 F.3d 24 (1st Cir. 1998) .......................................................................................... 5

*Beddall v. State Street Bank and Trust Co.*,
    137 F. 3d 12 (1st Cir. 1998) .................................................................................. 2, 14

*Clorox Co. v. Proctor & Gamble Commer. Co.*,
    228 F.3d 24 (1st Cir. 2000) ....................................................................................... 14

*Flesner v. Technical Commc'ns Corp.*,
    575 N.E.2d 1107 (Mass. 1991) .................................................................................. 19

*Gauthier v. Town of Dracut*,
    2005 Mass. Super. LEXIS 373 (Mass. Super. Ct. June 27, 2005) ............................. 19

*Kalman v. Berlyn Corp.*,
    614 F. Supp. 1327 (D. Mass. 1985) ............................................................................ 5

*Melley v. Gillette Corp.*,
    491 N.E.2d 252 (Mass. 1986) .................................................................................... 19

*Mello v. Stop & Shop Cos., Inc.*,
    524 N.E.2d 105 (Mass. 1988) .................................................................................... 19

*Rao v. Daimler Chrysler Corp.*, 2007 WL 1424220 (E.D. Mich. May 14, 2007) ................ 5-6, 10

*Rodriguez-Ortiz v. Margo Caribe, Inc.*,
    490 F.3d 92 (1st Cir. 2007) .......................................................................................... 3

*Scalli v. Citizens Fin. Group, Inc.*,
    2006 WL 1581625 (D. Mass. Feb. 28, 2006) ........................................................... 19

*Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*,
    533 N.E.2d 1368 (Mass. 1989) .............................................................................. 18, 20

*Tighe v. Career Sys. Dev. Corp.*,
    915 F. Supp. 476 (D. Mass. 1996) ............................................................................ 19

*University of Tennessee v. Elliott*,
    478 U.S. 788 (1986) ................................................................................................ 4-5

*Wright v. Shriners Hosp. for Crippled Children*,
   589 N.E.2d 1241 (Mass. 1992) .......................................................... 18-19


**REGULATORY CASES**

*Brady v. Direct Mail Mgmt.*,
   2006-SOX-00016 (ALJ Jan. 5, 2006) ....................................................9

*Deremer v. Gulfmark Offshore, Inc.*,
   2006-SOX-00002 (ALJ June 29, 2007) ................................................13

*Espinoza v. Sysco Corp.*,
   2005-SOX-00025 (ALJ Dec. 27, 2006) ................................................16

*Fleszar v. Am. Medical Ass'n*, 2007-SOX-00030 (ALJ June 13, 2007) .........9

*Goodman v. Decisive Analytics Corp.*,
   2006-SOX-00011 (ALJ January 10, 2006) .............................................9

*Kukucka v. Belfort Instrument Co.*,
   2006-SOX-00081 (ARB April 30, 2008) ................................................5

*Marshall v. Northrup Gruman Synoptics*,
   2005-SOX-00008 (ALJ June 22, 2005) ................................................13

*Minkina v. Affiliated Physician's Group*,
   2005-SOX-00019 (ALJ Feb. 22, 2005) .............................................9, 12

*Platone v. FLYi, Inc.*,
   2003-SOX-00027 (ARB Sept. 29, 2006) ..............................................13

*Reddy v. Medquist, Inc.*,
   2004-SOX-00035 (ARB Sept. 30, 2005) ..............................................14

*Richards v. Lexmark Int'l, Inc.*,
   2004-SOX-00049 (ALJ June 20, 2006) .............................................16, 18

*Roulett v. Am. Capital Access*, 2004-SOX-00078 (ALJ Dec. 22, 2004) .........9


**STATUTES**

18 U.S.C. § 1514A .................................................................... Passim

**OTHER AUTHORITIES**

29 C.F.R. § 1980.105(a)(1) .............................................................................................2

29 C.F.R. 1980.110(a) ....................................................................................................2

29 C.F.R. § 1980.112(a) .................................................................................................2

29 C.F.R. § 1980.114(a) .................................................................................................1

## INTRODUCTION

In this action against defendants Fidelity Management & Research Company, FMR Co.,

Inc., and FMR LLC (collectively "Fidelity"), brought pursuant to Section 806 of the Corporate

and Criminal Fraud Accountability Act of 2002 (CCFA), 18 U.S.C. § 1514A, also known as the

Sarbanes-Oxley Act (the "Act" or "SOX"), plaintiff Jonathan Zang, a former Fidelity Research

Analyst, seeks to relitigate in federal court a claim that was extensively litigated and ultimately

dismissed in a thoroughly-reasoned decision by an Administrative Law Judge ("ALJ").[1] In that

decision (the "ALJ Decision"),[2] the ALJ carefully considered the evidence developed during

discovery concerning the relationship between Fidelity, a private entity, and the SOX-covered

Funds. Based on her findings that Fidelity neither acted as an agent or contractor of the Funds

regarding employment matters nor operated as an integrated enterprise/single employer with the

Funds, she held that Zang is not a covered employee under SOX and dismissed his claim.

Now, Zang seeks a second bite at the apple under SOX's provision allowing a

complainant to file a claim in federal court if the Secretary of Labor has not issued a final

decision within 180 days after the filing of a SOX complaint.[3] This rule, however, plainly exists

to protect a claim from languishing before the DOL—not to allow putative whistleblowers to

fully litigate their claims before an ALJ and start anew in federal court after they lose. This

---

[1]    In his original complaint to the Department of Labor, Zang attempted to circumvent the fact that he was not employed by a public company by naming two mutual funds (the "Funds") as "nominal respondents based on their relationship to Fidelity and reports filed on their behalf by Fidelity with the Securities and Exchange Commission under Section 15(d) of the Securities and Exchange Act of 1934." Exh. F to Zang's Compl. at 1 n.1. The Funds are not named as defendants in this action.

[2]    The ALJ Decision is attached as Exh. 6 to the Affidavit Of Ethan Z. Davis Regarding Nature And Scope Of Department Of Labor Proceedings In Support Of Fidelity's Motion To Dismiss (hereinafter, "Davis Aff.").

[3]    "If the [ARB] has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that there has been delay due to the bad faith of the complainant, the complainant may bring an action at law or equity for *de novo* review in the appropriate district court of the United States, which will have jurisdiction over such an action without regard to the amount in controversy." 29 C.F.R. § 1980.114(a).

matter did not languish at the DOL to Zang's detriment. Indeed, it was Zang who sought and received more than 250 days' worth of extensions from the ALJ and used the additional time to conduct extensive discovery. [4]

Zang could have elected to proceed in federal court more than two years ago, while the Occupational Safety and Health Administration ("OSHA") was investigating his complaint. Instead, Zang made a tactical decision to wait for OSHA to render a decision, obviously hoping that OSHA would find probable cause and issue a preliminary order reinstating his employment. When, in February 2007, OSHA rejected Zang's claims,[5] again he elected not to bring his claims to federal court and instead filed a *de novo* appeal with the DOL's Office of Administrative Law Judges. The parties then engaged in several months of extensive discovery and further briefing. When the ALJ dismissed Zang's complaint because he failed to make a factual showing that SOX coverage could extend to Fidelity by virtue of its relationship to the Funds, Zang filed a petition for review with the DOL's Administrative Review Board ("ARB"), thereby blocking the ALJ Decision from becoming the final order of the Secretary of Labor.[6]

Allowing Zang's claim, which has been vigorously litigated for 2 ½ years and dismissed for lack of SOX coverage, to be relitigated afresh in federal district court would be a waste of judicial resources and would severely prejudice defendants, who have already expended

---

[4]     *See* Davis Aff. at ¶ 15.

[5]     OSHA's Regional Administrator issued a preliminary order dismissing Zang's complaint on February 1, 2007, following an extensive investigation during which the parties submitted numerous documents and more than 100 pages of position statements and legal memoranda on the issues of whether Zang was a covered employee under SOX and whether he had engaged in protected activity under SOX. (*See* Compl. ¶ 120; Davis Aff. at ¶ 3). Without turning this motion to dismiss into one for summary judgment, the Court may consider the administrative record because it is specifically referenced in Zang's complaint, (*See* Compl. ¶¶ 118-125) and is central to his claim of SOX coverage and jurisdiction. *See Beddall v. State Street Bank and Trust Co.*, 137 F. 3d 12, 17 (1st Cir. 1998).

[6]     *See* 29 C.F.R. 1980.110(a) (providing that the decision of an ALJ becomes the final order of the Secretary of Labor unless a petition for review is filed with the ARB within ten business days). A final order of the Secretary of Labor can be appealed to the United States Court of Appeals for the circuit in which the violation allegedly occurred or the circuit in which the complainant resided on the date of the violation. *See* 29 C.F.R. § 1980.112(a).

substantial time, effort and money successfully defending against Zang's SOX claim. Zang's

complaint should be dismissed pursuant to principles of collateral estoppel or, alternatively,

remanded to the ARB to review the ALJ Decision. If the Court declines either to apply

principles of collateral estoppel or to remand to the ARB, it should dismiss Zang's SOX claim

because (a) each defendant is a private company and SOX does not cover a private company's

employment decisions over its employees, and (b) even if Zang were a covered employee, he

never complained of securities fraud, nor would there have been a reasonable basis for such a

complaint. Finally, Zang's state common law wrongful discharge claim must be dismissed

because he did not engage in any conduct protected by a clearly established public policy.

## ARGUMENT

"[T]o survive a motion to dismiss, a complaint must allege 'a plausible entitlement to

relief.'" *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007) (citing *Bell Atl.*

*Corp. v. Twombly*, 127 S. Ct. 1955, 1967 (2007)). Here, Zang has no plausible entitlement to

relief on either of his claims.

**I.     Zang's SOX Claim Must Be Dismissed Because He Is Not A Covered Employee
         Under SOX**

**A.     Zang Should Not Be Permitted To Re-litigate The Coverage Issue**

Zang tries to overcome the threshold question of SOX coverage by alleging that his claim

is covered by SOX by virtue of Fidelity's relationship to the Funds. (Compl. ¶ 124). Zang

raised precisely the same theory of coverage to the ALJ and, following extensive litigation, his

claim was dismissed in a comprehensive decision with numerous factual findings based on the

voluminous submissions of both parties. Zang's attempt to manipulate the SOX procedures at

this late date in order to re-litigate his case should be rejected. The Court either should apply

principles of collateral estoppel and dismiss Zang's claims on the basis of the ALJ's factual

findings or remand the case to the ARB so that the ALJ Decision may be reviewed on the

administrative record.

> ### i. This Court Should Apply Principles of Collateral Estoppel To The ALJ's Findings And Dismiss Zang's Complaint

This case presents precisely the circumstances contemplated by the Secretary of Labor in

comments concerning the DOL's SOX regulations as appropriate for application of principles of

collateral estoppel.  As the Secretary opined:

> This provision authorizing a Federal court complaint is unique among the
> whistleblower statutes administered by the Secretary.  This statutory structure
> creates the possibility that a complainant will have litigated a claim before the
> agency, will receive a decision from an administrative law judge, and will then
> file a complaint in Federal court while the case is pending on review by the
> Board. . . . The Secretary believes that it would be a waste of the resources of the
> parties, the Department, and the courts for complainants to pursue duplicative
> litigation.  **The Secretary notes that the courts have recognized that, when a
> party has had a full and fair opportunity to litigate a claim, an adversary
> should be protected from the expense and vexation of multiple lawsuits and
> that the public interest is served by preserving judicial resources by
> prohibiting subsequent suits involving the same parties making the same
> claims.  *See Montana v. United States*, 440 U.S. 147, 153 (1979). When an
> administrative agency acts in a judicial capacity and resolves disputed issues
> of fact properly before it that the parties have had an adequate opportunity
> to litigate, the courts have not hesitated to apply the principles of issue
> preclusion (collateral estoppel) or claim preclusion (res judicata) on the basis
> of that administrative decision.  *See University of Tennessee v. Elliott*, 478
> U.S. 788, 799 (1986) (citing *United States v. Utah Construction and Mining
> Co.*, 384 U.S. 394, 422 (1966)).  Therefore, the Secretary anticipates that
> Federal courts will apply such principles if a complainant brings a new
> action in Federal court following extensive litigation before the Department
> that has resulted in a decision by an administrative law judge or the
> Secretary.** Where an administrative hearing has been completed and a matter is
> pending before an administrative law judge or the Board for a decision, a Federal
> court also might treat a complaint as a petition for mandamus and order the
> Department to issue a decision under appropriate time frames.

69 F.R. 52104-01, 2004 WL 1876043 at 18-19 (emphasis added).

Application of principles of collateral estoppel are appropriate where, as here: 1) the issue

in the two suits is identical; 2) the issue has been "actually litigated" in the first suit; 3) the issue

was necessary to the first decision; and 4) the party to be estopped had substantial control over the first litigation. *Kalman v. Berlyn Corp.*, 614 F. Supp. 1327, 1329-30 (D. Mass. 1985) (citing *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed. Cir. 1983)). The fact that Zang's first litigation was conducted before an ALJ does not affect application of principles of collateral estoppel. "[I]t is sound policy to apply principles of issue preclusion to the fact-finding of administrative bodies acting in a judicial capacity." *Univ. of Tennessee v. Elliot*, 478 U.S. 788, 797 (1986); *see also Baez-Cruz v. Municipality of Comerio*, 140 F.3d 24, 28 (1st Cir. 1998) ("Preclusive effect is given not only to state judicial proceedings, but also to facts found by a[n] ... agency acting in a judicial capacity [that] resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.") (internal quotation omitted). Here, all of the elements necessary to the doctrine of collateral estoppel are present.

The SOX coverage issue presented here is identical to the issue litigated before the ALJ. Based on ARB precedent holding that a non-public subsidiary of a public company *may* be covered by SOX if the subsidiary is an agent of the public parent, Zang argued to the ALJ that SOX might apply even where, as here, the publicly held entity is not the parent of the private company.[7] (*See* ALJ Decision at 8-9) (citing *Klopfenstein v. PCC Flow Technologies Holdings, Inc.*, ALJ No. 2004-SOX-00011 (ARB May 31, 2006) slip op. at 14-15). Zang also argued, without precedent, that the "integrated enterprise" test should be applied to determine whether

---

[7]     Fidelity is not aware of any decision extending SOX coverage to an employee of a private company where the private company is not the subsidiary of a publicly-traded parent company. The ALJ interpreted *Klopfenstein* to stand for the proposition that a private company *could* be covered by SOX if it acted as an agent or contractor of a publicly traded company "with regard to the allegedly retaliatory employment action." (ALJ Decision at 11). A recent ARB decision appears to suggest in *dicta*, that contractors, subcontractors, and agents of public companies are covered by SOX. *Kukucka v. Belfort Instrument Co.*, 2006-SOX-00081, at 5 (ARB April 30, 2008). In *Kukucka, however,* there was no evidence that the respondent was an agent, contractor, or subcontractor of a public company so the ARB did not address whether the employer had acted on behalf of a public company with regard to the claimant's employment as in *Klopfenstein. Id.* Accordingly, *Kukucka* is due no deference and does not alter the ALJ's analysis when she dismissed Zang's complaint.

Fidelity and the Funds operated as an integrated enterprise "such that the two (Fidelity and the Funds) are deemed a single employer" for purposes of SOX coverage (*Id.* at 10). Based on Zang's arguments, the ALJ permitted Zang to take discovery into the relationship between Fidelity and the Funds and submit supplemental briefing about whether an issue of fact existed on the question of whether Fidelity could be covered by SOX.[8] Thus, even if this Court adopted the same expansive interpretation of SOX as the ALJ—and it should not—SOX coverage would depend on precisely the same factual issue (*i.e.* whether Fidelity's relationship to the Funds warrants coverage under SOX) that was extensively litigated and decided by the ALJ.

Additionally, it is beyond dispute that the ALJ's resolution of the factual allegations underlying Zang's SOX coverage claim were necessary to her decision dismissing Zang's complaint. Indeed, the ALJ's factual findings were dispositive on the SOX coverage issue:

> [V]iewing all of the evidence and the factual inferences in the light most favorable to [Zang], I find that he has failed to make a showing sufficient to establish that [Fidelity] acted as an agent or contractor of [the Funds], or that the two entities operated as an integrated enterprise, in employment matters. Since [Fidelity] is not a covered employer itself, nor an agent or contractor in regard to employment matters, and Respondent Fidelity and the Funds are not an integrated enterprise, [Zang] is unable to establish that he is a covered employee under the whistleblower protection provisions of Section 806 of the Act. Consequently, I conclude that there is no genuine issue of material fact in dispute. Accordingly, the complaint must be dismissed.

(ALJ Decision at 20-21). Finally, there can be no dispute that Zang controlled the litigation in the proceedings before the ALJ because he was the sole complainant. Accordingly, Zang's complaint should be dismissed pursuant to principles of collateral estoppel.

---

[8] The parties engaged in nearly three months of discovery into the relationship between Fidelity and the Funds, during which Zang served (1) a total of more than 500 written discovery requests on Respondents; (2) five separate deposition notices pursuant to Fed. R. Civ. P. 30(b)(6) on Fidelity and the Funds; and (3) ten individual deposition notices. (Davis Aff. ¶ 9) At the close of discovery, the parties submitted a total of 84 pages of supplemental briefing on the SOX coverage issue and 755 pages of exhibits. (*See* Davis Aff. ¶ 11).

### ii.    Mandamus Relief Is An Appropriate Alternative To Collateral Estoppel

As suggested by the Secretary of Labor, quoted *supra*, Fidelity alternatively requests that

the Court grant mandamus relief and order the Secretary of Labor to issue a final ruling.  This is

exactly what the United States District Court for the District of Louisiana did in the case of *Allen*

*v. Stewart Enters., Inc.*, No. 05-CV-04033 (E.D. La. Apr. 6, 2006) (attached as Exh. 1).  In *Allen*,

just as in Zang's case, the complainants filed suit in district court after an ALJ issued an adverse

decision.  *Id.* at 3-4.  The court held that:

> Plaintiffs actively pursued and participated in the tremendous outlay of time and expense [involved in the adjudication process before the ALJ] knowing that they had the right prior to its commencement to pursue these claims directly in federal court.  Instead, they sought and obtained an administrative remedy.  While the granting of jurisdiction in this Court pursuant to SOX is clear, there is no indication that Congress intended for the above-cited rules of law – issue preclusion, collateral estoppel and the inherent right to stay an action pending an administrative decision – be suspended.  Indeed, the Department of Labor specifically stated that it did not include the preclusion principles in the regulations because "the statute did not delegate authority to the Secretary to regulate litigation in the Federal district courts".... **Clearly, to interpret the plain language of 28 U.S.C. § 1514A(b)(1)(B) to mandate a *res novo* adjudication after such extensive litigation, that is simply to re-litigate this case in its entirety, would lead to an absurd result.**

*Id.* at 6-7 (emphasis added).  The court stayed the proceedings and ordered the ARB to decide

whether to reinstate the case,[9] and, should it do so, to decide it on its merits.[10]  *Id.* at 8.

---

[9]    Prior to filing their SOX complaint in federal district court, the *Allen* plaintiffs, like Zang, petitioned the ARB for review of an ALJ decision dismissing their SOX claim.  Thereafter, the *Allen* plaintiffs submitted an appeal brief to the ARB that exceeded the page limit set forth in the ARB's briefing schedule.  The ARB issued an order requiring the plaintiffs to show cause why the ARB should not dismiss their appeal and had not ruled on the show cause order when the plaintiffs filed their action in federal district court.  *Allen*, No. 05-CV-04033, at 3-4.

[10]    A similar issue arose in *Hanna v. WCI Cmtys., Inc.*, 348 F. Supp. 2d, 1322 (S.D. Fla. 2004), a case in which OSHA issued a ruling in favor of the respondent after the 180-day deadline, and the petitioner filed a *de novo* claim in federal district court rather than appeal OSHA's decision to an ALJ.  *Id.* at 1324.  The *Hanna* court held that the removal to district court was proper under the plain language of the statute, but noted that, had an ALJ ruled on the case, re-litigation in district court would be inappropriate.  *See id.* at 1329 (internal citation omitted).

Zang could have removed this case prior to the extensive discovery and briefing before the ALJ on the SOX coverage issue. Instead, he proceeded before the ALJ and then petitioned the ARB for review of the ALJ Decision.[11]  Now, having lost, Zang wants to start over again before this Court. To permit Zang to relitigate the SOX coverage issue would give Zang, and future SOX plaintiffs, the opportunity to use the ALJ as a "test case" and then relitigate his claim in federal district court. Plainly, that result is inconsistent with the spirit and intent of SOX, as well as principles of judicial economy. The ARB is holding Zang's case in abeyance "in the interest of judicial economy" pending a ruling on the instant motion to dismiss. (*See* Davis Aff. at ¶ 16). Accordingly, Fidelity requests that the Court either dismiss Zang's SOX claim for the reasons set forth above or, alternatively, order mandamus review of Zang's appeal by the ARB.

**B.     Even If The Court Declines To Apply Principles Of Collateral Estoppel Or Grant Mandamus Relief, Zang's Complaint Should Be Dismissed Because He Is Not A Covered Employee Under The Plain Language Of SOX**

During his employment at Fidelity, Zang was employed by Fidelity Management & Research Company and then by FMR Co., Inc. until his dismissal. (Compl. ¶¶ 20-22). FMR Co., Inc. is wholly-owned by Fidelity Management & Research Company, which in turn is wholly owned by FMR LLC. All three companies are privately-held. Accordingly, neither Fidelity nor Zang is subject to SOX. SOX's plain text and the policies behind its enactment limit the protection afforded by its whistleblower provisions to employees of publicly-traded companies. The very title of SOX's whistleblower provision is "Whistleblower Protection for *Employees of Publicly Traded Companies.*"  18 U.S.C. § 1514A (emphasis added). The provision itself states in pertinent part:

---

[11]     By order dated May 6, 2008, the ARB accepted Zang's petition for review and also issued an order to show cause why Zang's appeal should not be dismissed given his notice of intent to file his SOX claim in the United States District Court. (*See* Davis Aff. at ¶ 13).

No company with a class of securities registered under section 12 of the [Exchange Act] or that is required to file reports under section 15(d) of the [Exchange Act], or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee . . . .

*Id.*

Zang alleges that Fidelity employees are covered by SOX by virtue of the various contractual services that Fidelity provides to the Fidelity Mutual Funds, "since the Funds, like other public companies, are required to file reports under Section 15(d) of the Securities Exchange Act of 1934."[12] (Compl. ¶ 18). Nothing in SOX's language or legislative history supports such an expansive interpretation, and judges have repeatedly refused to expand SOX coverage to employees of private companies that happen to have contracts under which they perform services for public companies. *See e.g., Brady v. Calyon Sec. (USA) Inc.*, 406 F. Supp.2d 307, 318 (S.D.N.Y. 2005) (rejecting claim of analyst employed by privately held broker-dealer that his complaints about alleged violations of NYSE and NASD rules were protected by SOX because his employer "acted as [an] agent and/or underwriter of numerous public companies").[13]

---

[12]    Nothing in the Act extends coverage, as Zang contends, to those individuals or entities who assist a covered company in fulfilling its filing requirements.

[13]    In dismissing plaintiff's SOX claim, the *Brady* court noted that allowing coverage of "any employer whose business involves acting in the interests of public companies" would create a "general whistleblower protection provision" far beyond what Congress intended. *Id.* This position has been echoed repeatedly by the DOL's administrative law judges. *E.g., Goodman v. Decisive Analytics Corp.*, 2006-SOX-00011, at 6 (ALJ January 10, 2006) ("The Act's language does not extend SOX whistleblower protection to the employees of the contractor, subcontractor, and agent. . . . Any other interpretation would extend SOX employee protection far beyond the applicability envisioned by Congress since any private business conducting any contractual transaction with a publicly traded company would be subject to SOX employee protection provisions."); *see also Brady v. Direct Mail Mgmt.*, 2006-SOX-00016, at 9 (ALJ Jan. 5, 2006) (dismissing claim for lack of subject matter jurisdiction where respondent was not a publicly traded company); *Minkina v. Affiliated Physician's Group*, 2005-SOX-00019, at 5 (ALJ Feb. 22, 2005) (holding that employees of a non-publicly traded contractor of a covered company are not protected by the Act, explaining that to accept otherwise "'assumes the untenable proposition that Congress did not know what it was doing when it limited coverage under [the Act]'") (quoting *Flake v. New World Pasta Co.*, 2003-SOX-00018 (ARB Feb. 25, 2004)); *Accord, e.g., Fleszar v. Am. Medical Ass'n*, 2007-SOX-00030, at 3 (ALJ June 13, 2007); *Roulett v. Am. Capital Access*, 2004-SOX-00078, 9 (ALJ Dec. 22, 2004).

As SOX's title makes clear, the phrase "an employee" refers to employees of "publicly-traded companies," *i.e.*, companies with a class of securities registered under section 12 or companies that file under section 15(d) of the Securities Exchange Act of 1934. The phrase "or any officer, employee, contractor, subcontractor, or agent of such company" lists the various actors who are prohibited from discriminating against employees of publicly-traded companies. *Id.*; *Rao v. Daimler Chrysler Corp.*, 2007 WL 1424220, *4 (E.D. Mich. May 14, 2007) ("Congress only listed employees of public companies as protected individuals under [SOX], and it is not the job of this Court to rewrite clear statutory text."). The listing of "officer, employee, contractor, subcontractor, or agent" does not expand coverage to the employees of those actors.

To read the terms "contractor" and "agent" differently, so that they bring employees of contractors and agents under SOX's protections, would conflict with basic principles of statutory construction and contort the statutory language. The terms "contractor" and "agent" appear in the midst of a list that also includes "officer," "employee," and "subcontractor"; these terms must be interpreted in light of one another. *See, e.g., Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (under the doctrine of *noscitur a sociis*, a word is known by the words with which it is associated; accordingly, the term "prospectus" in a securities statute referred to a document, like a notice, circular, advertisement, or letter, that describes a public offering of securities by an issuer or controlling shareholder, not a private agreement). No one speaks of "employees" as having "employees," nor of "officers" as having "employees." The meaning of the word "agent," moreover, is someone who acts on behalf of another; "agents" may or may not have "employees." The clause as a whole, then, cannot have been included in SOX to identify the employees covered; it can only be intended to enumerate the *actors* who may not engage in the

*conduct* that the paragraph then identifies – those actors (officers, employees, contractors, subcontractors and agents) are the persons who may not "discriminate."

Moreover, SOX's legislative history confirms that Congress meant what it said in limiting coverage to the employees of publicly traded companies. Throughout the extensive debates surrounding SOX, Congress focused exclusively on protecting the employees of public companies, not the employees of private companies that happened to do business with public companies. The text that would eventually become Section 806 was first introduced by Senator Leahy, who stated: "[T]he bill would provide whistleblower protection to *employees of publicly traded companies* . . . . Although current law protects many government employees who act in the public interest by reporting wrongdoing, there is no similar protection for *employees of publicly traded companies.* . . ." Cong. Rec. S1785, 1787-88 (Mar. 12, 2002) (emphasis added).

The Senate Judiciary Committee's Report on that bill reiterates Senator Leahy's remarks and succinctly states the whistleblower provision's scope: "This section would provide whistleblower protection to *employees of publicly traded companies.* It specifically protects *them* when *they* take lawful acts to disclose information or otherwise assist criminal investigators, federal regulators, Congress, supervisors (or other proper people within a corporation), or parties in a judicial proceeding in detecting and stopping fraud." 148 Cong. Rec. S 7418 (2002) (emphasis added). With the consent of the Senate, Senator Leahy introduced this committee report "in order to provide guidance in the legal interpretation" of SOX's whistleblower provisions. Legislative History of Title VIII of H.R. 2673: The Sarbanes-Oxley Act of 2002, 148 Cong. Rec. S 7418 (July 26, 2002) (remarks of Sen. Leahy). As Senator Sarbanes, a sponsor of the Act, stated when introducing the Senate Conference Report: "[I want to] make very clear that [the Act] applies exclusively to public companies—that is, to companies

11

registered with the Securities Exchange Commission.  It is not applicable to pr[ivat]e companies, who make up the vast majority of companies across the country." 148 Cong. Rec. S 7350, 7351 (2002).  In short, "there is nothing in the language of Sarbanes-Oxley or its legislative history that suggests that Congress intended to bring the employees of non-public contractors, subcontractors and agents under the protective aegis of [the Act]."[14]  *Minkina v. Affiliated Physician's Group*, 2005-SOX-00019 at 6 (ALJ Feb. 22, 2005).

The plain language of SOX leads to only one conclusion: SOX provides whistleblower protection only for employees of publicly-traded companies.  Because Zang was not an employee of a public company, his SOX claim must be dismissed.

## II.     Zang's Complaint Must Be Dismissed Because He Did Not Engage In Protected Activity

Zang's complaint should be dismissed for the additional and independently sufficient reason that none of his supposed whistleblowing activity related to any sort of fraud on the part of Fidelity.[15]  To establish that he engaged in protected activity under SOX, Zang must show that he provided information that "definitively and specifically" related to a violation of an

---

[14]      In his briefs before the ALJ, Zang argued that a finding that he is not covered would effectively create a "loophole" in SOX for investment advisers such as Fidelity.  There is no basis, however, for Zang's premise that in enacting SOX, Congress had the purpose of protecting employees in the mutual fund industry.  SOX was passed to address fraud by issuers of public securities, such as Enron and WorldCom.  *See, e.g.*, S. Rep. No. 107-146, at 5-10 (2002) (referring to Enron).  There is no evidence that SOX was intended to address fraud by privately-held investment advisers.  Indeed, if SOX as-written already covers privately-held investment advisers, 13 of SOX's original sponsors would not have had any reason to introduce a bill extending SOX to investment advisers.  Yet precisely such a bill was introduced in 2004.  *See* the Mutual Fund Reform Act, S. 2059, 108th Cong. § 116(b) (2004), which would have amended 18 U.S.C. § 1514A to extend coverage to employees of "an investment adviser, principal, underwriter or significant service provider . . . of an investment company which is registered under section 8 of the Investment Company Act of 1940."  The bill was never enacted.

[15]      After first holding that Fidelity was covered by SOX based on the factually inaccurate premise that the Funds "have no Board of Directors [or] Officers," OSHA's Regional Administrator went on to find that Zang had not engaged in protected activity under the Act, and that a preponderance of the evidence supported Fidelity's position that Zang was dismissed for his poor performance.  (*See* Davis Aff. Exh. 3 at 2-5).  Because the ALJ dismissed Zang's complaint based on the threshold question of SOX coverage, she did not consider whether Zang's complaint should be dismissed on the grounds that he did not engage in protected activity.

enumerated fraud statute or a regulation promulgated by the Securities and Exchange Commission relating to fraud. *Platone v. FLYi, Inc.*, 2003-SOX-00027, at 17 (ARB Sept. 29, 2006) (citing *Kester v. Carolina Power & Light Co.*, 00-ERA-00031, 02-ARB-00007, 9 (ARB Sept. 30, 2003). "The legislative history of the Act makes it clear that fraud is an integral element of a cause of action under the whistleblower provision." *Marshall v. Northrup Gruman Synoptics*, 2005-SOX-00008 at 4 (ALJ June 22, 2005). Zang must also show that a reasonable person in his position would have believed that the conduct constituted fraud. *Deremer v. Gulfmark Offshore, Inc.*, 2006-SOX-00002, at 50 (ALJ June 29, 2007) ("[U]nder subjective and objective standards, complainant must actually and reasonably believe, based on the knowledge available to a reasonable person, that Respondent intentionally acted fraudulently..."). Here, it is clear that Zang will be unable to demonstrate that he raised an issue of fraud.

Zang claims that he engaged in protected activity by sending an email on March 13, 2005, (the "March Memorandum") that allegedly expressed his concern that (1) the disclosures in a February 18, 2005 Statement of Additional Information (the "SAI") regarding the select funds' portfolio managers' compensation were inaccurate; (2) Fidelity was operating 'veiled index funds'"; and (3) Fidelity's "operation and management of the Funds created numerous conflicts of interest." (Compl. ¶¶ 47, 62, and 68). Zang alleges that he reiterated his concerns about the accuracy of the SAI during meetings with Fidelity associate general counsel Mark Jensen on March 18, 2005, and FMR Co. Inc.'s Director of Human Resources, Fatima Penrose on April 7, 2005, and again in an April 11, 2005 email (the "April Email") to the then-President of Fidelity Management & Research Company, Abigail Johnson.[16] (Compl. ¶¶ 76, 78-79).

---

[16] The April Email is attached as Exhibit 2. The April Email should be considered in ruling on the motion to dismiss because it is central to Zang's claim that he engaged in protected activity and is referenced in the complaint. *Beddall v. State Street Bank and Trust Co.*, 137 F. 3d 12, 17 (1st Cir. 1998) (holding that where a "complaint's (Continued)

The substance of Zang's communications cannot be disputed because the March Memorandum is attached to the Complaint. The only issue is the purely legal question of whether the contents of the March Memorandum and Zang's subsequent communications allegedly reiterating the concerns raised therein, constituted protected activity. Despite Zang's best efforts, his revisionist characterization of the March Memorandum and subsequent communications does not transform them into protected activity.[17] A review of the March Memorandum, the April Email, and Jensen's memorandum summarizing his meeting with Zang (the "Jensen Memo" attached as Exhibit B to the complaint) reveal that Zang never voiced any concern that Fidelity had violated an SEC rule or regulation, or any federal law pertaining to shareholder fraud.[18] *Reddy v. Medquist, Inc.*, 2004-SOX-00035, at 8-9 (ARB Sept. 30, 2005)

---

factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)").

[17]　　On a motion to dismiss, the Court need not accept conclusory allegations of the complaint where the complaint references specific documents that belie those allegations. *See Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.") (citation omitted).

[18]　　The purpose of the March Memorandum clearly was not to report securities fraud or SEC rule violations. Rather, its purpose was to "take a stand to save FMR." What was Zang's "stand"? It was, in his own words, "*I renounce the PM survey.*" Zang disagreed with Fidelity's practice of considering the views of portfolio managers ("PMs") in the performance assessment of the research analysts who supported their work. Not coincidentally, Zang's ratings from PMs were "below average." March Memorandum at 8. Tellingly, none of the nine subheadings in the March Memorandum mentions securities or shareholder fraud. To the contrary, the subheadings (*e.g.*, "Our Leadership Positions Should Last Longer than Our Analyst Positions", "This Is My Stand:  I Renounce the PM Survey", "Do We Have a Vision?") underscore that the thrust of the March Memorandum was Zang's dissatisfaction with the PM survey and his unhappiness about being required to rotate out of the healthcare sector that he had been covering as an analyst. The March Memorandum concludes with an exhortation to Zang's colleagues and superiors to "abstain from [participation in] the PM Survey." Zang attached a poster advocating the end of the PM Survey and urged employees to post it outside their offices to show their support for his call to boycott the PM Survey. The inclusion of the poster underscores that Zang's conduct was more akin to seeking open support for his views than reporting misconduct to a supervisor charged with investigating Sarbanes-Oxley issues. Finally, the March Memorandum was not directed to "a person with supervisory authority over the employee (or such other person working for the employer or has the authority to investigate, discover, or terminate misconduct)." *See* 18 U.S.C. § 1514A(a)(1)(C). Instead, Zang distributed the March Memorandum to almost 150 colleagues and superiors urging them to oppose various practices. Further, Fidelity had been addressing many of the issues Zang raised, an act that he acknowledged by stating that, "I've had conversations with many of you about the past, present and future of our department, and recognize there are many other conversations taking place. . . *This is my attempt to contribute to the process currently underway.*" (March Memorandum at 1) (emphasis added).

(reviewing complainant's relevant emails and dismissing complaint because communication that employer engaged in "Enron-type" accounting failed to provide "information she reasonably believed constituted a violation of the federal fraud statutes, or an SEC rule or regulation, or any federal law relating to shareholder fraud"). Instead, Zang's supposed whistleblowing activity was nothing more than an expression of personal views concerning internal business issues, not matters of securities fraud or any SEC regulatory violation.

### i.    Zang's Comments On The Draft SAI

Zang alleges that the March Memorandum constituted whistleblowing activity concerning "false and misleading statements or omissions regarding Fidelity's compensation of Fidelity Select Portfolios equity portfolio managers" in the draft SAI. (Compl. ¶ 52). Zang's claim is meritless. His comments concerning the "accur[acy]" of the draft SAI appeared in a single paragraph buried within the twelve-page single-spaced March Memorandum, in the context of an argument that Fidelity should change its methods of evaluating and compensating its research analyst/sector fund managers—it was not a report of fraud. (*See* March Memorandum at 6). In fact, Zang even described the language of the compensation disclosure as "technically correct." (*Id.*)

Likewise, the April Email, which allegedly reiterated Zang's concerns (Compl. ¶ 79), never raised any issue of fraud. Zang wrote:

> [The compensation] disclosures appear to outline a compensation plan for 2005 which, in my opinion, improves upon the plan in effect in 2004 by strengthening the connection between Select fund performance and Select fund manager compensation, as well as by adding two quantitative components to the PM survey to supplement the survey's ongoing, qualitative assessment of analysts' sector research.

(April Email at 1). Zang goes on to explain that he included outlines that he prepared "to improve the readability of the disclosures." *Id.* Importantly, nowhere in the April Email is there

anything to suggest that the compensation disclosures somehow deceived shareholders or violated SEC rules. In fact, there is not even a passing reference in either the March Memorandum or the April Email to any purported securities fraud or SEC rule violation. To the contrary, Zang simply indicated that he felt that the disclosures regarding the compensation of fund managers were not as clear as they could be. *See id.*

Additionally, Zang's communications concerning compensation disclosures cannot be protected activity because he never alleged that Fidelity intended to deceive shareholders. "[T]o fall under Sarbanes-Oxley, there must be an 'element of intentional deceit that would impact shareholders or investors.'" *Espinoza v. Sysco Corp.*, 2005-SOX-00025, at 3 (ALJ Dec. 27, 2006) (quoting *Tuttle v. Johnson Controls*, 2004-SOX-00076, at 3 (ALJ Jan. 3, 2005)). Zang's supposed whistleblowing activity was nothing more than quibbling over a "technically correct" description of the formula used to calculate research analyst compensation. These concerns fall far short of the sort of fraud allegations that are protected by SOX. *See e.g., Richards v. Lexmark Int'l, Inc.*, 2004-SOX-00049, at 33 (ALJ June 20, 2006) (holding that plaintiff's belief that a "more accurate picture . . . could be provided" to clarify allegedly misleading data failed to allege fraud because plaintiff never alleged that the data "involved intentional misrepresentations or fraud or that false information was disseminated to shareholders or investors").

    **ii.    Zang's Cryptic Reference To Veiled Index Funds Plainly Does Not Involve A Report Of Securities Fraud**

Zang alleges that he engaged in protected activity when he "communicated to Fidelity that he was concerned that Fidelity was operating 'veiled index funds'" in the March Memorandum. (Compl. ¶ 62). The allegation is, quite simply, ridiculous. Zang's sole "communication" concerning "veiled index funds" is an ambiguous fictitious newspaper headline, in a small text box on page 10 of the March Memorandum: "AG Riley to Fidelity:

Return Fees for Veiled Index Funds – Boston Herald, xx/xx/05."[19]  Zang never mentioned any

particular mutual fund and failed to give any information sufficient to enable a reasonable person

to have the slightest idea that he was supposedly complaining about fraud of any kind.  Such a

fleeting, hopelessly vague and abbreviated comment cannot conceivably be considered to be

"providing information ... regarding ... a violation of Section 1341, 1343, 1344, or 1348, any

rule or regulation of the Securities and Exchange Commission, or any provision of Federal law

relating to fraud against shareholders."[20]  18 U.S.C. § 1514A.

### iii.    Conflict Of Interest

Zang alleges that he "informed Fidelity that its operation and management of the Funds

created numerous conflicts of interest" throughout the March Memorandum.  (Compl. ¶ 68).

This contention is nonsense and is nothing more than an attempt to transform the March

Memorandum into protected activity *ex post facto*.  Tellingly, the phrase "conflict of interest"

does not appear anywhere in the March Memorandum.  Moreover, as discussed above, a reading

of the March Memorandum reveals that it is nothing more than an expression of Zang's

dissatisfaction with having the responsibility for providing, and being evaluated on, research

advice he provided to the Portfolio Managers of Fidelity's diversified mutual funds, and with the

analyst rotation process.

In short, Zang's attempt to recast his comments as reporting securities fraud does not

withstand scrutiny.  *Richards v. Lexmark Int'l, Inc.*, 2004-SOX-00049, at 33 (ALJ June 20,

---

[19]      "AG Riley" presumably refers to Thomas Riley, the former Massachusetts Attorney General, who has no authority whatsoever to enforce federal law or SEC regulations.

[20]      Notably, the fictitious headline was contained in a section where Zang noted that "settlements routinely arise after following the law."  Thus, not only was Zang's message concerning "veiled index funds" so obscure as to have no meaning for its recipients, but it was accompanied by language suggesting that Zang believed Fidelity was following the law.  This can hardly be considered "whistleblowing."

2006) (dismissing SOX claim where the alleged protected activity "did not mention any [SEC] rules or regulations, or criminal or civil statutes relating to fraud, that were violated"). The March Memorandum reveals that Zang was capable of drafting a lengthy document containing myriad complaints and suggestions. He certainly was capable of articulating a complaint of securities fraud or a violation of an SEC rule or regulation, but never did. Accordingly, Zang's SOX claim should be dismissed because he did not engage in protected activity.

## II.  Zang Fails To State A Claim For Wrongful Discharge In Violation Of Massachusetts Public Policy

Massachusetts generally adheres firmly to the doctrine of at-will employment, under which employment is terminable "without notice, for almost any reason or for no reason at all." *Wright v. Shriners Hosp. for Crippled Children*, 589 N.E.2d 1241, 1244 (Mass. 1992) (citation omitted). Under certain narrow circumstances, however, "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (*e.g.*, filing a workers' compensation claim), for doing what the law requires (*e.g.*, serving on a jury), or for refusing to do that which the law forbids (*e.g.*, committing perjury)." *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 533 N.E.2d 1368, 1371 (Mass. 1989). In some instances, employees may also be protected from reprisals resulting from their performance of important public deeds, for example, cooperating with a government-initiated investigation. *See Flesner v. Technical Commc'ns Corp.*, 575 N.E.2d 1107, 1111 (Mass. 1991).

Zang's claim for wrongful discharge in violation of public policy fails because he never identifies the "well-defined public policies of the Commonwealth of Massachusetts" that were supposedly violated when his employment was terminated.[21] Instead, the complaint vaguely

---

[21]     A plaintiff seeking to recover on a "public policy" termination claim bears the burden of establishing the existence of a "*statute or regulation* which clearly expresses a legislative policy" of the Commonwealth of
(Continued)

refers to "the Commonwealth's public policy interests in protecting investors in mutual funds and other companies issuing public securities from fraud." (Compl. ¶ 143). To the extent Zang relies on federal law as the source of the public policy, his claim is already addressed by SOX's comprehensive statutory scheme and cannot be sustained.[22]

Further, as discussed *supra*, at 12-18, the actual communications forming the basis of the alleged protected activity reveal that Zang did not complain of securities fraud, nor would he have had a reasonable basis for such a complaint had he made one. Instead, his alleged protected activity was merely an expression of disagreement with Fidelity's business judgment, primarily involving the method of assigning, evaluating, and compensating research analysts such as himself. Indeed, the March Memorandum does nothing more than reflect Zang's personal views that Fidelity's "organization is malfunctioning," that there was "an institutional bias against analysts," and that "we and our shareholders are . . . victims of the structural inertia that is born

---

Massachusetts that is well-defined. *Tighe v. Career Sys. Dev. Corp.*, 915 F. Supp. 476, 484 (D. Mass. 1996) (emphasis added); *Mello v. Stop & Shop Cos., Inc.*, 524 N.E.2d 105, 106 (Mass. 1988) ("[A public policy termination exists] when the Legislature has expressed a policy position concerning the rights of employees and an employer discharges an at-will employee in violation of that established policy . . . ."). Massachusetts courts look exclusively to positive law—statutes and regulations—as acceptable sources of public policy. *See, e.g., Wright*, 589 N.E.2d at 1244-6 (dismissing claim where the court was "unaware of any statute that clearly expresses a legislative policy" encouraging the type of activity alleged by plaintiff).

[22]     Plainly, the "federal whistle-blower provisions" referenced in Zang's complaint is SOX. (*See* Comp. ¶ 143). As set forth above, SOX cannot provide the basis for a claim by Zang because Fidelity was not a covered employer pursuant to SOX's carefully-delineated parameters. Where a legislature identifies a public policy and crafts a statutory scheme to vindicate it through a private right of action in specifically-delineated circumstances, courts may not create additional rights and remedies that the legislature omitted. "The rationale for implying a private remedy under the 'public policy exception' to the traditional rule governing at-will employment contracts is that, unless a remedy is recognized, there is no other way to vindicate such public policy . . . . [W]here . . . there is a comprehensive remedial statute, the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme." *Melley v. Gillette Corp.*, 491 N.E.2d 252, 253 (Mass. 1986) (adopting *Melley v. Gillette Corp.*, 475 N.E.2d 1227, 1229 (Mass. App. Ct. 1985)). *See also Mello*, 524 N.E.2d at 106 ("[N]o common law rule is needed [when] the Legislature has also prescribed a statutory remedy."); *Scalli v. Citizens Fin. Group, Inc.*, 2006 WL 1581625, at *6 (D. Mass. Feb. 28, 2006) (Woodlock, J.) ("[W]here the Legislature has prescribed a statutory remedy, the Courts should not fashion an additional common law remedy for terminations covered by the statutory scheme."); *Gauthier v. Town of Dracut*, 2005 Mass. Super. LEXIS 373 (Mass. Super. Ct. June 27, 2005) (dismissing claim where the statutory source of the policy at issue established a remedial scheme that precluded the suit brought by plaintiff).

from our long-term lack of empowered leadership." Such internal policy issues cannot be the basis of a public policy exception to the doctrine of at-will employment. *Smith-Pfeffer*, 532 N.E.2d at 1371-72 (citing *Mello*, 524 N.E.2d at 108). Thus, even if Zang had been terminated in response to the issues he raised in the March Memorandum, his termination would not have violated a clearly defined public policy because he was complaining about internal Fidelity matters. *Id.* (dismissing public policy claim because an employee "who simply disagrees with [the] employer's policy decisions, may not seek redress in the courts"). Accordingly, Zang's public policy claim should be dismissed.

## CONCLUSION

For the reasons set forth above, this action should be dismissed with prejudice.

Respectfully submitted,
FIDELITY MANAGEMENT & RESEARCH
COMPANY, FMR CO. INC., and FMR LLC,

By their attorneys,

/s/ Wilfred J. Benoit
Wilfred J. Benoit, Jr. (BBO #037900)
Ethan Z. Davis (BBO #668973)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000
wbenoit@goodwinprocter.com
edavis@goodwinprocter.com

Dated: June 6, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 6, 2008.

/s/ Wilfred J. Benoit, Jr. _____