# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JONATHAN M. ZANG,              )

            Plaintiff,        )

v.                               )

FIDELITY MANAGEMENT & RESEARCH    )
COMPANY, FMR CO., INC., and       )
FMR LLC f/k/a FMR CORP.,         )

            Defendants.     )

Civil Action No.
08-CV-10758-DPW

Leave to File Granted on July 24, 2008

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR REMAND

Alan D. Rose (BBO #427280)
Nicholas J. Rosenberg (BBO #643366)
ROSE, CHINITZ & ROSE
29 Commonwealth Avenue
Boston, MA  02116
Tel: 617-536-0040
Fax: 617-536-4400
adr@rose-law.net
njr@rose-law.net

*Attorneys for plaintiff*

Dated:  July 23, 2008

Table of Contents

Page

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ...............................................................................................1

STANDARD OF REVIEW..............................................................................................3

ARGUMENT....................................................................................................................4

    I.      ZANG HAS A CLEAR STATUTORY RIGHT TO PURSUE HIS
          CLAIMS IN FEDERAL COURT. ..........................................................4

          A.     Section 806 Expressly Permits Zang To Transfer His Complaint
                To Federal Court..........................................................................4

          B.     Defendants' Collateral Estoppel Argument Is Without Merit. ....................5

          C.     Mandamus Is Neither Appropriate Nor Sanctioned. .................................7

    II.     ZANG IS A COVERED EMPLOYEE UNDER SOX SECTION 806...................7

          A.     The Statute's Plain Language And Implementing Regulations
                Afford Zang Coverage................................................................8

          B.     Zang Is Protected Under Section 806 As An Employee Of A
                Company That Acts For, And Is An Integrated Enterprise With,
                The Fidelity Funds......................................................................9

          C.     SOX's Intent, Implementation, And Interpretation Are Consistent
                With Affording Zang Coverage Under Section 806................................12

          D.     Zang's Status As A Covered Employee Is Consistent With
                Established Mutual Fund Regulation.......................................................14

    III.    ZANG HAS SUFFICIENTLY PLED THAT HE ENGAGED IN
          PROTECTED ACTIVITY. ....................................................................16

           A.     Zang Repeatedly Complained About Specific Violations Of SEC
                Rules And Regulations. ...............................................................16

           B.     Zang Participated In An Investigation Into Fidelity's Misleading
                Disclosures..............................................................................19

    IV.    ZANG HAS SUFFICIENTLY PLED A CAUSE OF ACTION FOR
          WRONGFUL DISCHARGE UNDER MASSACHUSETTS LAW....................20

CONCLUSION ...............................................................................................................21

Table of Authorities

Page

**Federal and State Cases**

Astoria Fed. Sav. & Loan Ass'n v. Solimino
   501 U.S. 104 (1991)........................................................................................6

Baez-Cruz v. Mun. of Comerio
   140 F.3d 24 (1st Cir. 1998)..........................................................................6

Barnhart v. Sigmon Coal Co.
   534 U.S. 438 (2002)........................................................................................4

Bechtel v. Competitive Technologies, Inc.
   448 F.3d 469 (2d Cir. 2006) .......................................................................13

Bell Atl. Corp. v. Twombly
   127 S. Ct. 1955 (2007).................................................................................3, 4

Brady v. Calyon
   406 F. Supp. 2d 307 (S.D.N.Y. 2005) .................................................9, 10, 11

Carnero v. Boston Scientific Corp.
   433 F.3d 1 (1st Cir. 2006)...........................................................................10

Chandler v. Roudebush
   425 U.S. 840 (1976)........................................................................................6

Collins v. Beazer Homes USA, Inc.
   334 F.Supp.2d 1365 (N.D.Ga. 2004) ........................................................16

Creative Non-Violence v. Reid
   490 U.S. 730 (1989)........................................................................................7

Digaetano v. Lawrence Firefighters Federal Credit Union
   2002 WL 31667318 (Mass. Super. 2002)..................................................20

Fraser v. Fiduciary Trust Co. Int'l
   417 F.Supp.2d 310 (S.D.N.Y. 2006) .....................................................16, 17

Global Naps, Inc. v. Mass. Dept. of Telecommunications and Energy
   427 F.3d 34 (1st Cir. 2005)...........................................................................6

Hanna v. WCI Communities, Inc.
   348 F. Supp. 2d 1322 (S.D. Fla. 2004) ......................................................5

Hutson v. Analytic Sciences Corp.
   860 F.Supp. 6 (D. Mass. 1996) ................................................................20

In re Raytheon Securities Litigation
   157 F. Supp. 2d 131 (D. Mass. 2001) .....................................................19

Mediplex of Massachusetts, Inc. v. Shalala
   39 F. Supp. 2d 88 (D. Mass. 1999) ...........................................................7

Metropolitan Property and Cas. Ins. Co. v. Boston Regional Physical Therapy, Inc.
   538 F. Supp. 2d 338 (D. Mass. 2008) ........................................................4

Rao v. Daimler Chrysler Corp.
   2007 WL 1424220 (E.D. Mich. May 14, 2007) .......................................10

Riley v. Green
   2002 WL 31680260 (Mass. Super. 2002) ...............................................20

Riley v. Green
   2002 WL 31680260 (Mass.Super. Nov. 5, 2002) ..................................20

Rodriguez-Ortiz v. Margo Caribe, Inc.
   490 F.3d 92 (1st Cir. 2007) .......................................................................3

Ruiz v. Bally Total Fitness Holding Corp.
   496 F.3d 1 (1st Cir. 2007) .........................................................................4

Securities Indus. Assoc'n v. Connolly
   703 F.Supp. 146 (D. Mass. 1988) ...........................................................14

Shea v. Emmanuel College
   425 Mass. 761 (1997) ..............................................................................20

Simas v. First Citizens Federal Credit Union
   63 F.Supp.2d 110 (1999) .........................................................................20

Smith v. Mitre Corp.
   949 F.Supp. 943 (D. Mass. 1997) ...........................................................20

Sullivan v. Massachusetts Mutual Life Ins. Co.
   802 F.Supp. 716 (D.Conn.1992) .............................................................21

Tannenbaum v. Zeller
   552 F.2d 402 (2d Cir. 1977) ....................................................................14

U.S. v. Koenig
   912 F.2d 1190 (9th Cir. 1990) ...................................................................5

United States v. National Assn. of Secs. Dealers
    422 U.S. 694 (1975)..............................................................................................14

Univ. of Tennessee v. Elliot
    478 U.S. 788 (1986).............................................................................................5, 6

Upton v. JWP Businessland
    425 Mass. 756 (1997) ............................................................................................20

Zell v. InterCapital Income Sec., Inc.
    675 F.2d 1041 (9th Cir. 1982) ..............................................................................14


**Administrative Cases**
Klopfenstein v. PCC Flow Tech. Holdings (copy attached)
    ARB 04-149, ALJ No. 2004-SOX-11 (ARB May 31, 2006)..............................12, 16
**Statutes**

15 U.S.C. § 2(a)(20) ...............................................................................................15
15 U.S.C. § 2(a)(3) .................................................................................................15
15 U.S.C. § 7242(a) ..................................................................................................8
15 U.S.C. § 78(o)(d) .................................................................................................1
15 U.S.C. § 80a et seq..............................................................................................14
15 U.S.C. § 80a-17 ..................................................................................................14
15 U.S.C. § 80a-17(g) ..............................................................................................15
15 U.S.C. §§ 77x and 80a-48....................................................................................21
18 U.S.C § 1514A(a)(1)......................................................................................16, 19
18 U.S.C. § 1414A(b)(1)(B) ......................................................................................4
18 U.S.C. § 1514(d) .................................................................................................20
18 U.S.C. § 1514A.............................................................................................8, 10
18 U.S.C. § 1514A(b)(1)(a) .......................................................................................3
18 U.S.C. § 1514A(b)(1)(B) ...............................................................................3, 4, 5
42 U.S.C. § 1983...................................................................................................5, 6

**Rules**

ICA Rule 17g-1.........................................................................................................15
ICA Rule 17j-1 .........................................................................................................15

**Regulations**

17 C.F.R. § 240.13b2-2 .............................................................................................8
17 C.F.R. § 270.17j-1(a)(7)(i) ..................................................................................15
17 C.F.R. § 274.11A .................................................................................................17
17 C.F.R. §§ 270.17g-1(a), 270.17g-1(i)..................................................................15
29 C.F.R. § 1980.101.................................................................................................8
29 C.F.R. § 1980.103.................................................................................................3
29 C.F.R. § 1980.108(b) ..........................................................................................14
29 C.F.R. § 1980.110(a) ............................................................................................3

29 C.F.R. § 1980.114(b) ..........................................................................................................3

**Other Authorities**

Senate Report No. 107-146 (2002) ...................................................................................13, 19

64 Fed. Reg. 59826, 59827 (Nov. 3, 1999) ..........................................................................14

68 Fed. Reg. 31820 (May 28, 2003) .......................................................................................9

69 Fed. Reg. 52104 (Aug. 24, 2004) ...................................................................................6, 8

## INTRODUCTION

The Defendants' attempt to shield Fidelity from the protections afforded to whistleblowing employees pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), by arguing that the Plaintiff, Jonathan M. Zang ("Zang"), was not an employee of Fidelity's publicly-held mutual funds[1], but rather was employed by other non-public Fidelity entities created to provide all of the essential functions for Fidelity's mutual funds, is contrary to the plain language of the statute and would thwart Congress' intent to give broad protection to those reporting fraud that could harm the investing public. Defendants' argument that Zang should be denied the *de novo* review provided for by SOX on the ground that the parties have previously engaged in administrative proceedings is also unavailing, where the statute contemplates potentially extensive administrative proceedings but nonetheless expressly provides for a right of *de novo* review in the District Court. Finally, Massachusetts courts have acknowledged a public policy protection for at-will employees discharged in retaliation for reporting fraud, and there is no basis for dismissing Zang's state law claim.

## STATEMENT OF FACTS

The Defendants Fidelity Management & Research Company ("FMR Co."), FMR Co., Inc. and FMR LLC f/k/a FMR Corp. (together the "Defendants" or "Fidelity") manage and operate approximately 350 mutual funds (the "Funds"). Complaint, ¶ 7. FMR LLC is the parent of FMR Co., which is in turn the parent of FMR Co., Inc. <u>Id.</u>, ¶¶ 8 and 10. Each of the Funds is a publicly-held registered investment company, but functions as a corporate shell, with all of its day-to-day management, operational, investment and employment functions and decisions made and effected by FMR Co. and/or FMR Co., Inc. pursuant to management contracts and sub-

---

[1] The terms *mutual fund* and *investment company* are used interchangeably to refer to a registered investment company which, like other public companies, is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(o)(d).

advisory agreements between and among each of the Funds and the various Fidelity entities. Id.,
¶¶ 9, 11, and 13-15. Pursuant to his employment agreement, Zang was "employed by FMR
Corp. and/or any entity which is directly or indirectly owned or controlled wholly or in part by
FMR Corp." Id., ¶ 20. Without notice to Zang, in or around 2001, FMR Co., Inc. became his
direct employer, until his termination in 2005. Id., ¶ 22.

On February 18, 2005, Fidelity internally distributed, and transmitted to the Securities
and Exchange Commission ("SEC"), a revised registration statement including a revised
Statement of Additional Information for its Fidelity Select Portfolios mutual fund (the "SAI").
Id., ¶ 42. Upon reviewing the SAI, Zang began voicing his concerns that Fidelity's disclosures
to the SEC and to the investors in its public mutual funds were inaccurate and misleading, that
Fidelity was illegally operating veiled index funds that could become the subject of an action by
the Massachusetts attorney general and that Fidelity's compensation practices created various
conflicts of interest undisclosed in the SAI. Zang raised these concerns in conversations with his
supervisors (id., ¶¶ 46 -50), in a March 13, 2005 email memorandum to his supervisors and other
Fidelity management (the "March 2005 Memo") (id., ¶¶ 51 – 70), in discussions with Fidelity's
in-house counsel (id., ¶ 71) and Fidelity's Director of Human Resources (id., ¶ 78), and in an
email to the President of FMR Co. and FMR Co., Inc. (id., ¶ 79).

Fidelity immediately began taking adverse actions against Zang, first inexplicably asking
Zang not to attend an important mutual fund meeting, then denying him a performance-based
bonus award despite his superior performance and ultimately terminating him on July 15, 2005
under various pretexts and in contravention of Fidelity's own established personnel policies. Id.,
¶¶ 83 – 117.

On September 15, 2005, Zang filed a complaint with OSHA pursuant to 18 U.S.C. §
1514A(b)(1)(a) and 29 C.F.R. § 1980.103. Id., ¶ 118. After OSHA's Regional Administrator

2

issued a preliminary order finding that Zang was a covered employee under Section 806 but that

he had not engaged in protected conduct, and dismissing Zang's complaint, Zang and Fidelity

requested a hearing before an Administrative Law Judge ("ALJ").  On April 3, 2007, Fidelity

filed a motion for summary decision on the grounds that Zang was not a covered employee under

Section 806, and that he had not engaged in protected conduct.  After permitting limited

discovery solely on the issue of Zang's status as a covered employee, the ALJ issued a Decision

and Order Granting Summary Decision, dismissing Zang's complaint. Id., ¶ 124.  The ALJ

dismissed Zang's complaint based solely upon the parties' written submissions, and Zang was

never afforded a trial on his claims or any hearing at which he was permitted to introduce

evidence or examine witnesses.

On April 9, 2008, Zang petitioned for review of the ALJ decision and Order pursuant to

29 C.F.R. § 1980.110(a). Id., ¶ 125.  On May 5, 2008, 180 days having passed since Zang first

filed his complaint with the Secretary of Labor, and having complied with the requirements of 29

C.F.R. § 1980.114(b), Zang filed his Complaint in this Court seeking his right to *de novo* review

pursuant to 18 U.S.C. § 1514A(b)(1)(B).

## **STANDARD OF REVIEW**

FMR Co., FMR Co., Inc., and FMR, LLC f/k/a FMR Corp. (collectively, "Fidelity" or

the "Defendants") recognize that this Court should dismiss this action only if Zang has failed to

allege "a plausible entitlement to relief."  Memorandum In Support Of Defendants' Motion To

Dismiss And/Or Remand ("Def. Mem."), at 3 (citing Rodriguez-Ortiz v. Margo Caribe, Inc., 490

F.3d 92, 95 (1st Cir. 2007), quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1967 (2007)).

The Defendants consistently ignore this standard, however, and instead attempt to support their

motion by arguing their own facts.  Nothing in Twombly alters the well-established principle

that, in deciding a motion to dismiss, the court "accepts as true all well-pleaded facts and draws

3

all reasonable inferences in favor of the [] plaintiff." <u>Metropolitan Property and Cas. Ins. Co. v.</u>

<u>Boston Regional Physical Therapy, Inc.,</u> 538 F. Supp. 2d 338, 341 (D. Mass. 2008).

## ARGUMENT

## I. ZANG HAS A CLEAR STATUTORY RIGHT TO PURSUE HIS CLAIMS IN FEDERAL COURT.

The statute provides an express right to bring a SOX Section 806 complaint for *de novo*

review in this Court. Fidelity's characterization of Zang's adherence to the procedures in 18

U.S.C. § 1514A(b)(1)(B) as an "attempt to manipulate the SOX procedure" (Def. Mem. at 3), is

entirely without merit, and should be rejected.

### A. Section 806 Expressly Permits Zang To Transfer His Complaint To Federal Court.

Section 806 is unequivocal in granting Zang a right to *de novo* review in this Court:

> if the Secretary has not issued a final decision within 180 days of the filing of the
> complaint and there is no showing that such delay is due to the bad faith of the
> claimant, bringing an action at law or equity for de novo review in the appropriate
> district court of the United States, which shall have jurisdiction over such an
> action without regard to the amount in controversy.

18 U.S.C. § 1414A(b)(1)(B). "It is settled beyond hope of contradiction that 'courts must

presume that a legislature says in a statute what it means and means in a statute what it says'."

<u>Ruiz v. Bally Total Fitness Holding Corp.,</u> 496 F.3d 1, 8 (1st Cir. 2007), quoting <u>Barnhart v.</u>

<u>Sigmon Coal Co.,</u> 534 U.S. 438, 461-62 (2002). Statutory interpretation "begins with the

language of the statute," and "[w]here, as here, that language is clear and unambiguous, the

inquiry is at an end." <u>Id</u>.

Zang has adequately pled, and there is no dispute, that (1) no final decision has been

issued by the Department of Labor ("DOL"); (2) 180 days have elapsed since Zang filed his

complaint with the DOL; and (3) Zang has not engaged in any bad faith. The statutory

prerequisites for this Court's jurisdiction over Zang's complaint are clear, and there is no dispute that each of these prerequisites has been met.

### B.     Defendants' Collateral Estoppel Argument Is Without Merit.

The fact that certain issues may be re-litigated is expressly contemplated in the language of Section 806 and is part and parcel of *de novo* review. "Courts have traditionally defined 'de novo review' to mean 'that the whole process before the district court would start from scratch, as if the proceedings below had never occurred'." Hanna v. WCI Communities, Inc., 348 F. Supp. 2d 1322, 1330 (S.D. Fla. 2004), quoting U.S. v. Koenig, 912 F.2d 1190, 1192 (9th Cir. 1990). Fidelity claims that in Hanna, the Florida District Court "held that the removal to district court was proper under the plain language of the statute, but noted that, had an ALJ ruled on the case, re-litigation would be inappropriate." See Def. Mem. at 7 n. 10. This assertion is incorrect. In Hanna, the court stated that, "[u]ltimately, it is up to Congress to intervene if it believes that the 180-day provision of 18 U.S.C. § 1514A(b)(1)(B) is too unrealistic a timetable for the Department of Labor to meet in resolving claims under the Sarbanes-Oxley Act." 348 F. Supp. 2d at 1329. Thus, in denying a similar motion to dismiss, the *Hanna* court adamantly "refuse[d] to penalize [the complainant] for complying with the plain language of the statute." Id.

Other cases cited by the Defendants support Zang's right to *de novo* review. For example, the Defendants cite to Univ. of Tennessee v. Elliot, 478 U.S. 788, 797 (1986) for the proposition that issue preclusion principles may apply to the fact-finding of administrative bodies acting in judicial capacities (Def. Mem. at 5) but a plain reading of *Elliot* shows that the Defendants missed the mark.  In Elliot, the Court reviewed claims under both Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1983.  With respect to the plaintiff's § 1983 claims, the Court held that where "nothing in the language of § 1983 remotely expresses any congressional intent to contravene the common-law rules of preclusion," the fact-finding of a

5

state administrative tribunal acting in a judicial capacity should be given preclusive effect. <u>See</u>

<u>Elliot</u>, 478 U.S. at 797. However, Defendants fail to mention that, with respect to the plaintiff's

Title VII claims, the <u>Elliot</u> Court took precisely the *opposite* view, noting that, unlike § 1983,

"[t]he legislative history of [Title VII] reinforces the plain meaning of the statute and confirms

that Congress intended to accord federal employees the same right to a trial *de novo* following

administrative proceedings as is enjoyed by private-sector employees . . ." <u>Id</u>. at 795 (citing

<u>Chandler v. Roudebush</u>, 425 U.S. 840 (1976)). Thus, the Court held that "[i]t would be contrary

to the rationale of <u>Chandler</u> to apply res judicata to deny [plaintiff] a trial *de novo* on his Title

VII claim." <u>Id</u>. at 796. Defendants' reliance on <u>Baez-Cruz v. Mun. of Comerio</u>, 140 F.3d 24 (1st

Cir. 1998), is similarly misplaced. <u>Comerio</u> involved claims under 42 U.S.C. § 1983, which, in

contrast to Title VII and Section 806 of SOX, does not grant a plaintiff the right to *de novo*

review.

It is undeniable that Congress, in Section 806, intended to grant a plaintiff the right to *de
novo* review in Federal court, and, as the <u>Elliot</u> Court recognized, Congress' clear intent trumps
the common-law principle of preclusion.[2] <u>See Elliot</u>, 478 U.S. at 796; <u>see also</u> <u>Global Naps, Inc.
v. Mass. Dept. of Telecommunications and Energy</u>, 427 F.3d 34, 49 (1st Cir. 2005) (common
law principles of issue preclusion inapplicable to administrative proceeding where it would
contravene Congress' intent in Telecommunications Act). To restrict Zang's right to obtain *de
novo* review in Federal court would defy Congress' express intent and render the statute
meaningless. <u>See Astoria Fed. Sav. & Loan Ass'n v. Solimino</u>, 501 U.S. 104, 112 (1991) ("we

---

[2] Defendants recognize that SOX's "provision authorizing a Federal court complaint is unique among the
whistleblower statutes administered by the Secretary," Def. Mem. at 4 (quoting 69 Fed. Reg. 52104, 52111 (Aug.
24, 2004)), but ignore the Secretary's further advice that "[t]he Act might even be interpreted to allow a complainant
to bring an action in Federal court *after receiving a final decision from the [ARB]*, if that decision was issued more
than 180 days after the filing of the complaint." 69 Fed. Reg. 52111 (emphasis added).

construe statutes, where possible, so as to avoid rendering superfluous any parts thereof");

Mediplex of Massachusetts, Inc. v. Shalala, 39 F. Supp. 2d 88, 96 (D. Mass. 1999) (same).

### C.    Mandamus Is Neither Appropriate Nor Sanctioned.

Fidelity's request for an order of mandamus is also without merit.  The Secretary's

"suggestion" relied on by Defendants (Def. Mem. at 7) commands no deference in light of the

plain language of Section 806 which entitles Zang to *de novo* review in this Court.  Moreover,

the Defendants' cite to Allen v. Stewart Enters., Inc. is inapposite.  See Def. Mem. at 7.  Whereas

the ALJ in Allen had issued a 109-page decision after conducting a six-day trial in which all

parties were afforded a full opportunity to adduce testimony, offer evidence, submit oral

argument, and file post-hearing briefs, Allen v. Stewart Enters., Inc., No. 05-CV-04033 (E.D. La.

2006), no such adjudicatory hearing was held in this case, which was dismissed on summary

decision.  The parties in Allen, moreover, had fully briefed the ARB, whereas here, the ARB had

not even set a schedule to hear Zang's appeal.  These are hardly the same as the circumstances

which Fidelity claims are present in Allen "just as in Zang's case," Def. Mem. at 7.

## II.    ZANG IS A COVERED EMPLOYEE UNDER SOX SECTION 806.

Zang has sufficiently pled that he was a covered employee under Section 806, and the

Defendants' attempt to shield the Fidelity entities operating the Fidelity funds from coverage

under SOX strains the express language and fundamental purpose of the statute, and, moreover,

contradicts the longstanding regulatory framework of the mutual fund industry.[3]

---

[3] When the ARB issued its order holding Zang's case in abeyance in apparent contradiction of both statute and ARB authority, Zang withdrew his petition for review to the ARB.  Thus, as a practical matter, there is no objection to the ALJ's order in Zang's case pending before the ARB.  See Letter from Alan D. Rose, Esq. to Janet Dunlop, Esq., General Counsel, Administrative Review Board (June 4, 2008), attached hereto as Exhibit A.

A.    **The Statute's Plain Language And Implementing Regulations Afford Zang Coverage.**

Courts first look to the language of the statute. See Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739 (1989).  Section 806 prohibits retaliation by public companies, "or any officer, employee, contractor, subcontractor, or agent of such company . . . against an employee" who engages in protected conduct.  18 U.S.C. § 1514A.  Zang has pled that he was employed by the Defendants (Complaint, ¶¶ 19-22); the Defendants performed all or substantially all of their activities as contractors, subcontractors, and/or agents of, and on behalf of, the Fidelity mutual funds (id., ¶¶ 13-16); and the Fidelity mutual funds were companies required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (the "1934 Act") (id., ¶¶ 7 and 15). Fidelity is therefore a covered employer under Section 806.

The statute's implementing regulations are consistent with its plain language: a "company" includes "any company required to file reports under section 15(d) of the Securities Exchange Act of 1934" (29 C.F.R. § 1980.101); a "Company Representative" is "any officer, employee, contractor, subcontractor, or agent of a company" (29 C.F.R. § 1980.101); and an "employee" includes "an individual presently or formerly working for a company *or company representative*," and "an individual whose employment could be affected by a company *or company representative*" (29 C.F.R. § 1980.101) (emphasis added).[4]  Each of Fidelity's mutual funds is a "company" subject to Section 806.  Complaint, ¶ 7.  The Defendants are "Company Representatives" and are covered employers.  Id., ¶¶ 13-17.  As an employee of a contractor,

---

[4] The DOL's implementing regulations explicitly refute the Defendants' argument: "*Notwithstanding its caption,* section 806(a) expressly . . . protects the employees of publicly traded companies as well as the employees of contractors, subcontractors, and agents of those publicly traded companies." Final Rule on Procedures for the Handling of Discrimination Complaints under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act 2002, 69 Fed Reg. 52104, 52106 (emphasis added).

subcontractor, and/or agent of a company subject to SOX § 806, Zang worked for a "company representative," and therefore was a covered employee under Section 806.[5]

### B.      Zang Is Protected Under Section 806 As An Employee Of A Company That Acts For, And Is An Integrated Enterprise With, The Fidelity Funds.

Contrary to Fidelity's argument that Zang's claim hinges on affording coverage to all companies "that happen to have contracts" (Def. Mem. at 9) with any public company, Zang is in fact asserting the very narrow argument that investment advisers and sub-advisers to public investment companies are themselves covered under Section 806. Employees of such companies are not individuals who "happened to do business" (Def. Mem. at 11) with a public company. Rather, the services they provide are essential to the securities laws' central purpose of protecting investors. [6] Therefore, even if the scope of coverage under SOX were not as broad as its plain language indicates, courts have interpreted Section 806 to apply to employees of non-public entities that act on behalf of their publicly-held affiliates or that are "almost inseparable from the publicly traded company," and Zang has sufficiently pled that Fidelity indeed had such a relationship with the funds. See Brady v. Calyon, 406 F. Supp. 2d 307, 318 (S.D.N.Y. 2005).

Although Fidelity argues that a reading of Section 806 that covers agents of a public company would "contort the statutory language" (Def. Mem. at 10), Fidelity defeats its own

---

[5] SOX Section 303, "Improper Influence on Conduct of Audits," similarly shows that Fidelity is a covered employer under Section 806. Section 303 encompasses "any officer or director of an issuer, or any other person acting under the direction thereof" (15 U.S.C. § 7242(a)). Although the statute might appear to cover only direct employees of issuers of securities and those, under certain circumstances, who act on their behalf, when the SEC implemented Section 303, it set forth rules which "cover[] not only officers and directors of the investment company itself, but also officers and directors *of the investment company's investment adviser*." See Improper Influence on Conduct of Audits, Final Rule, Investment Company Act Release No. IC-26050 (May 20, 2003), 68 Fed. Reg. 31820, 31827 (May 28, 2003) (emphasis added); see also 17 C.F.R. § 240.13b2-2. Importantly, the rules under Section 303 provide uniform coverage for investment advisory employees and employees of the investment companies they manage, without regard to whether an investment advisory employee may or may not be "acting under the direction" of the investment company.

[6] See, e.g., Complaint, ¶¶ 26-27 ("each and every one of Zang's job responsibilities related to Fidelity's contractual obligations . . . to provide all services necessary to the Funds for their operation and continued existence [and] Fidelity evaluated Zang's job performance and compensated Zang based on his work on behalf of the Funds.").

argument by conceding this very point – that there is "precedent holding that a non-public subsidiary of a public company may be covered by SOX if the subsidiary is an agent of the public parent." See Def. Mem. at 5.  Indeed, Brady, relied on by Fidelity, supports this proposition. See 406 F. Supp. 2d 307, 318 (S.D.N.Y. 2005).  In Brady, the Court held that SOX does not provide "general whistleblower protection," to employees of agents of public companies, and  the "mere fact that defendants may have acted as an agent for certain public companies in certain limited financial contexts," did not "bring the agency under the employment protection provisions of Sarbanes-Oxley."  Id. at 318.  However, the Court clarified that "the proper application of the 'agency' provision" *does* cover "companies that have acted as agents of publicly traded companies *with respect to their employment relationship*," and thus "a non-publicly traded company can be deemed to be the agent of a publicly traded company if the publicly traded company directs and controls the employment decisions."  Id., 318 n.6 (emphasis in original).  Zang has alleged that all of the employment functions and decisions of the Funds are made and effected by FMR Co. and/or FMR Co., Inc. pursuant to management contracts and sub-advisory agreements between and among each of the Funds and the various Fidelity entities (Complaint, ¶¶ 14-15) and, therefore, the Defendants must have acted as the Funds' agents with respect to employment decisions affecting Zang.

Rao v. Daimler Chrysler Corp. similarly does not aid the Defendants. See 2007 WL 1424220, *3 (E.D. Mich. May 14, 2007).  In Rao, the Court held that "employees of entities with certain relationships to publicly traded companies, including agents of such companies, receive whistleblower protection under § 1514A as well," but found that, unlike here, such a relationship was not adequately pled in that case. Id. at *5. Likewise, in Carnero v. Boston Scientific Corp., in considering whether Congress intended to extend coverage under Section 806 beyond the United States, the First Circuit has adopted a similarly broad reading of Section 806:

10

> it must be remembered [that Section 806] protects a whistleblowing employee
> from retaliation or other discrimination by a publicly traded company, or any
> officer, employee, contractor, subcontractor, or agent of such company. If the
> statute has extraterritorial effect, *this broad coverage* would create an expansive
> class of potential whistleblowers by extending its protections to *countless*
> *employees* . . .

See 433 F.3d 1, 16 (1st Cir. 2006) (citation and internal quotation marks omitted) (emphasis

added). The First Circuit's reference to broad coverage for "countless employees" demonstrates

that it has already rejected Fidelity's narrow reading of the statute.

Here, Zang does not rely on general allegations that the Defendants acted as contractors

of the Funds in "limited financial contexts" or that the Defendants are covered under Section 806

by the mere fact that they are agents of the Fidelity Funds. Rather, Zang alleges that Defendant

"FMR Co., Inc. was formed in 1999 specifically for the purpose of becoming the sub-advisor to

the Funds," that "all or substantially all of its activities are performed for and on behalf of the

Funds," that the Defendants are responsible for all of the "day-to day operational, investment

reporting and employment functions and decisions" of the Funds and that the Defendants, among

other things, perform "all of the management and administrative functions necessary for the

operation of the Funds; furnish and pay for all of the office space, facilities and personnel

necessary for managing the investments of the Funds; direct all of the investments of the Funds;

trade in securities on behalf of the Funds; hire and pay all personnel performing research related

to the Funds and their investments; and prepare and submit all public reports, prospectuses and

regulatory filings on behalf of the Funds as required for the Funds' existence, including the

Funds' filings with the SEC as required by Section 15(d) of the Securities Exchange Act of

1934." Complaint, ¶¶ 14 – 16. Because the Defendants acted at all times on behalf of the

Fidelity funds as their agents or contactors, Zang was covered by the SOX whistleblower

protections.

The court in <u>Brady</u> also recognized that non-public companies have been held liable

under the whistleblower protections of SOX where "the non-publicly traded company has been

found to be almost inseparable from the publicly traded company, or subject to the same internal

controls." <u>Brady</u>, 406 F. Supp. 2d at 318 n. 6. Likewise, the ARB has rejected an interpretation

of Section 806 that would "require a complainant to name a corporate respondent that is itself

[publicly held]," so long as the complainant names at least one respondent who is covered under

SOX as an "officer, employee, contractor or agent" of such a company. <u>Klopfenstein v. PCC</u>

<u>Flow Tech. Holdings</u>, ARB 04-149, ALJ No. 2004-SOX-11 (ARB May 31, 2006), at 13. Zang's

Complaint clearly alleges that the Defendants carry out all of the managerial, operating and

investment functions of the publicly held Funds. Zang specifically alleges that not only are the

Funds and the Defendants inextricably intertwined, but that they also collectively "hold

themselves out as Fidelity and Fidelity Investments." Complaint, ¶ 12.

### C.    SOX's Intent, Implementation, And Interpretation Are Consistent With Affording Zang Coverage Under Section 806.

Fidelity is the largest mutual fund company in the country (Complaint, at 1), but it fails to

grasp that "[t]hroughout the extensive debates surrounding SOX, Congress focused

exclusively"—not, as Fidelity believes, "on protecting the employees of public companies"—but

on protecting *investors in public companies*. <u>See</u> Def. Mot. at 11. This fundamental

misunderstanding of the intent of securities regulation causes Fidelity to misconstrue the

legislative history of SOX.

For example, Fidelity relies on a statement by Senator Sarbanes to support its argument

that SOX as a whole applies exclusively to public companies. <u>See</u> Def. Mem. at 11-12 ("'[I want

to] make it very clear that [the Act] applies exclusively to public companies . . . It is not

applicable to pr[ivat]e companies, who make up the vast majority of companies across the

12

country.'") (quoting 148 Cong. Rec. S 7350, 7351 (July 25, 2002)) (alteration supplied by

Fidelity). But in his very next sentence, Senator Sarbanes discussed certain prohibitions the Act

would place on accounting firms. 148 Cong. Rec. at S 7351 ("This legislation prohibits

accounting firms from providing certain specified consulting services if they are also the auditors

of the company. In our considered judgment, there are certain consulting services which

inherently carry with them significant conflicts of interest."). Read in context, Senator Sarbanes

clearly meant that SOX was concerned with protecting investors in public companies—as

opposed to investors in private companies—and not, as Fidelity mistakenly believes, that private

companies are immune from those provisions of SOX which are necessary to protect investors in

public companies. Similarly, the Senate report accompanying the original text of the Act

recognized the potential for retaliation against corporate whistleblowers in both public *and*

private organizations, including outside accounting firms, law firms, and investment advisors.

See, e.g., S. Rep. No. 107-146, at 3-5 (discussing role of outside auditors in deceiving investors,

and the attempted whistleblowing and retaliation against whistleblowers associated with Enron's

outside accounting firm and financial advisors); see also Bechtel v. Competitive Technologies,

Inc., 448 F.3d 469, 484 (2d Cir. 2006) (Straub, C.J., dissenting) (in enacting SOX, Congress

"recognized that for *any* of these tools to work, the law had to protect whistleblowers from

retaliation, because often, in complex fraud prosecutions, insiders are the only firsthand

witnesses to the fraud. Congress therefore made whistleblower protection central to the Act.")

(citing S. Rep. No. 107-146, at 10 (2002)). There is simply no basis for an interpretation that

would shield an entire industry from the protections Congress intended.[7]

---

[7] Because the Court's determination of the scope of protections afforded to employees reporting fraud in the mutual fund industry has profound implications on mutual fund shareholders, and because the SEC is primarily tasked with responsibility for protecting investors in public mutual funds, to the extent there is any doubt about the applicability of SOX's protections for mutual fund investors, the Court should invite the SEC to submit a brief as *amicus curiae* on this issue. See Securities Indus. Assoc'n v. Connolly, 703 F.Supp. 146, 155 n. 16 (D. Mass. 1988) (inviting SEC

### D.    Zang's Status As A Covered Employee Is Consistent With Established Mutual Fund Regulation.

Congress, the courts, and the SEC have long recognized that "[t]he mutual fund industry is in many ways unique, which in part explains the specific federal regulatory legislation concerning it." Tannenbaum v. Zeller, 552 F.2d 402, 405 (2d Cir. 1977), cert. denied 434 U.S. 934 (1977).  In contrast to other public companies, "a mutual fund is a mere shell " that largely consists of a portfolio of securities. Id.  The distinction between a mutual fund's "shell legal entity" and the external investment adviser who creates, manages, and operates the fund is familiar in the industry, and is frequently acknowledged as a matter of law. See, e.g., Tannenbaum, 552 F.2d at 405 ("Control of a mutual fund . . . lies largely in the hands of the investment adviser"); Investment Company Act Release No. 24082 (Oct. 14, 1999), 64 Fed. Reg. 59826, 59827 (Nov. 3, 1999) ("investment advisers typically dominate the funds they advise").

The unique relationship between an investment company and its investment adviser prompted Congress to enact the Investment Company Act of 1940, 15 U.S.C. § 80a et seq. (the "ICA"), to mitigate conflicts of interest between an investment company's external investment adviser and the investment company's shareholders. See, e.g., United States v. National Assn. of Secs. Dealers, 422 U.S. 694, 704 (1975).

The ICA restricts or prohibits "affiliated person[s]" of an investment company from engaging in a wide range of self-dealing transactions that could harm investment company shareholders. See 15 U.S.C. § 80a-17; see also, e.g., National Assn. of Secs. Dealers, 422 U.S. at 704.  Under the ICA, an "affiliated person" of an investment company includes a five-percent

---

to participate in case involving Massachusetts securities regulations); see also Brief of the Secs. and Exch. Comm. as amicus curae, AIG Asian Infrastructure Fund, L.P. v. Chase Manhattan Asia Ltd., et al., No. 04-CV-02403 (2d Cir., brief filed Sept. 1, 2006), at 3 (the SEC has a "general interest in ensuring that courts do not adopt overly restrictive interpretations of Sarbanes-Oxley's provisions and thereby undermine Congress' objectives in enacting this legislation."); 29 C.F.R. § 1980.108(b) ("The Securities and Exchange Commission may participate as amicus curiae at any time in the proceedings, at the Commission's discretion.").

owner of the investment company; another company under common control; an officer, director, or employee of the investment company; and "any investment adviser" of the investment company. 15 U.S.C. § 2(a)(3). An "investment adviser of an investment company" includes "any person . . . who pursuant to contract with [an investment company] regularly furnishes advice to such company . . . or is empowered to determine what securities" the investment company buys. 15 U.S.C. § 2(a)(20). Affiliated persons thus include research analysts and portfolio managers—such as Zang—who are employed by an investment company's investment adviser. Therefore, under the ICA, Zang and other investment advisory employees who provide services to an investment company are the *statutory equivalents* to the investment company's *own* directors, officers, and employees.

Regulations promulgated under the ICA similarly make no distinction between employees of an investment company and its investment adviser, and encompass investment advisory employees even when the underlying statutory language refers to investment company employees and omits mention of their investment advisers. For example, ICA § 17(g) requires bonding of any "officer or employee of a registered management investment company." 15 U.S.C. § 80a-17(g). However, ICA Rule 17g-1, "Bonding of officers and employees of registered management investment companies," requires the bonding of both an investment company's and its *investment adviser's* officers and employees. See 17 C.F.R. §§ 270.17g-1(a), 270.17g-1(i); see also, e.g., ICA Rule 17j-1 (defining a mutual fund's "investment personnel" as "[a]ny employee of the Fund *or investment adviser*" who influences a fund's investment decisions.), 17 C.F.R. § 270.17j-1(a)(7)(i) (emphasis added).

The ICA demonstrates that when the SEC implemented some of the mutual fund industry's most important statutes, it understood that it was Congress' intent to treat employees of investment companies and their investment advisers as statutory equivalents. To reject Zang's

interpretation of the plain language of SOX § 806, therefore, requires the Court to conclude that

Congress intended in SOX to undo one of the central tenets of mutual fund regulation.

## III.    ZANG HAS SUFFICIENTLY PLED THAT HE ENGAGED IN PROTECTED ACTIVITY.

Section 806 protects employees who provide information, which the employee

"reasonably believes constitutes a violation *of any rule or regulation* of the [SEC] or any

provision of Federal law relating to fraud against shareholders." Collins v. Beazer Homes USA,

Inc., 334 F.Supp.2d 1365, 1375 (N.D.Ga. 2004), citing 18 U.S.C § 1514A(a)(1) (emphasis

added); Fraser v. Fiduciary Trust Co. Int'l, 417 F.Supp.2d 310, 322 (S.D.N.Y. 2006); see also

Klopfenstein, ARB No. 04- I49 at 17 ("we do not believe that activity is protected only when

…the complainant believes he is reporting fraud. SOX protection applies to the provision of

information regarding not just fraud, but also violation of ... any rule or regulation of the

Securities and Exchange Commission"). Defendants' reliance on conclusory and hyperbolic

references to Zang's complaints as "simply, ridiculous" (Def. Mem. at 16) and "nonsense" (Def.

Mem. at 17), rather than addressing Zang's actual allegations and the applicable law, is telling.

In addition, despite Defendants' focus on Zang's March 2005 Memo, Zang alleges that he

repeatedly raised his concerns about Fidelity's securities laws violations in conversations with

his supervisors and Fidelity management. Each such conversation constituted protected activity.

### A.    Zang Repeatedly Complained About Specific Violations Of SEC Rules And Regulations.

On February 18, 2005, Fidelity distributed internally and transmitted to the SEC a revised

registration statement (containing a revised Prospectus and Statement of Additional Information

("SAI")) for Fidelity Select Portfolios. *Id.*, ¶ 42. Zang thereafter began voicing his concerns that

Fidelity's disclosures to the SEC and investors were inaccurate and misleading.

16

Zang engaged in protected conduct by, among other things, raising a specific concern about a specific inaccuracy in a specific public disclosure. On March 4, 2005, Zang told his direct supervisor, Jeffrey Feingold, that he believed certain "disclosures in the February 18, 2005 SAI regarding the Select funds' portfolio managers' compensation were inaccurate." Complaint, ¶ 47. Because an inaccurate public disclosure would have violated SEC rules and regulations, Zang's March 4, 2005 conversation with Feingold *alone* constituted protected activity under Section 806. See e.g., Fraser, 417 F.Supp.2d at 322.

When Feingold failed to address its misleading disclosures, Zang sent the March 2005 Memo to his supervisors and other Fidelity management. The March 2005 Memo details Zang's concerns about the accuracy of Fidelity's disclosures and states that Fidelity should align the interests of its shareholders with its incentive structures "without relying on disclosures our attorneys may deem 'technically correct,' but which portray inaccurately the relative importance of compensation drivers." March 2005 Memo, Complaint Ex. A (emphasis added). Immediately following this reference to inaccurate disclosures, Zang quotes a specific section of the February 18, 2005 SAI for Fidelity Select Portfolios that he believed misrepresented information that Fidelity was required to disclose to the SEC and Fidelity Select Portfolios' shareholders. Id.

Pursuant to 17 C.F.R. § 274.11A and SEC Form N-1A, Fidelity Select Portfolios was required to describe in its SAI the structure and method of compensation for its portfolio managers. Consequently, if Zang's belief about the misleading compensation disclosures in the Fidelity Select Portfolios February 18, 2005 SAI ("Compensation Disclosures") was accurate (Complaint, ¶¶ 53-55), Fidelity would have violated, among other statutes, Section 17(a) of the Securities Act of 1933 and Section 34(b) of the ICA, which make it unlawful to make untrue statements in connection with the sale of securities or in an SEC filing.

The March 2005 Memo also identifies Zang's concerns about Fidelity's operation of veiled index funds. Zang even provided a provocative mock headline foreshadowing the result of Fidelity's continued operation of veiled index funds – "AG Riley [sic] to Fidelity: Return Fees for Veiled Index Funds – Boston Herald, xx/xx/05?" Defendants' characterization of Zang's discussion in the March 2005 Memo and the mock headline as "cryptic" or "ambiguous," is entirely untenable, as is Defendants' argument that the information about veiled index funds is not protected activity because "Zang never mentioned any particular mutual fund." Def. Mem. at 16-17. Nothing in the statute or its interpretation requires that specificity.

Regardless, Zang's message was clear. Why would he be sounding the alarm with a hypothetical headline indicating that the Massachusetts Attorney General would be ordering Fidelity to return fees for its funds? The only possible answer is that Zang believed that Fidelity was operating veiled index funds in violation of Federal securities laws and state laws designed to protect investors from fraud, and was bringing this to the attention of his superiors. Indeed, the undisclosed operation of a veiled index fund that its investment advisor purports to be actively managing, is a violation of various securities laws, and Zang was raising the possibility of future enforcement by the Massachusetts Attorney General. See Complaint, ¶¶ 63 – 67.

Zang's protected conduct was not limited to the March 2005 Memo and his meeting with Feingold. Zang raised his concerns about the Compensation Disclosures in an email to the President of FMR Co. and FMR Co., Inc. (id., ¶ 79); in other conversations with his supervisors (id., ¶¶ 46-50); and in subsequent discussions with Fidelity's in-house counsel (id., ¶ 71) and FMR Co.'s Director of Human Resources (id., ¶ 78). Zang raised concerns about other Fidelity violations of SEC rules and regulations, as well. See, e.g., Complaint, ¶¶ 62-70.

18

**B.    Zang Participated In An Investigation Into Fidelity's Misleading Disclosures.**

In addition to protecting employees who provide information about violations of the securities laws and regulations, Section 806 also makes it unlawful to discriminate against an employee because the employee acts to "otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of . . . any rule or regulation of the [SEC]." 18 U.S.C. § 1514A(a)(1). In response to Zang's March 2005 Memo, on March 18, 2005, FMR Corp. Associate General Counsel Mark Jensen met with Zang for the specific purpose of assisting Jensen's investigation into Zang's concerns about the Compensation Disclosures (Complaint, ¶¶ 71, 74), and Zang provided Jensen "with information regarding what Zang reasonably believed were violations of SEC rules and regulations" (id., ¶ 75). At the end of that meeting, Jensen acknowledged that the Compensation Disclosures may need to be revised (id., ¶ 76), and, on April 28, 2005, Fidelity transmitted to the SEC a revised registration statement for Fidelity Select Portfolios containing revisions to the Compensation Disclosures which were made as a result of Zang's concerns (id., ¶¶ 80-81). The Defendants' attempt to contradict the substance of Zang's March 18, 2005 meeting with Jensen by relying on Jensen's post-hoc[8] summary of that meeting (Def. Mem. at 14) is unavailing, and inappropriate on a motion to dismiss. See In re Raytheon Securities Litigation, 157 F. Supp. 2d 131 (D. Mass. 2001). Moreover, Fidelity's response to Zang's complaints confirms that Zang was reasonable in his belief that the Compensation Disclosures were in violation of the securities laws and regulations. See S. Rep. No. 107-146, at 19 ("Certainly, although not exclusively, any type of corporate or agency action taken based on the information . . . would be strong indicia that it could support such a reasonable belief.")

---

[8] Notably, Jensen prepared his memo summarizing his meeting with Zang more than four months after the meeting, and after Fidelity had terminated Zang's employment. Complaint, ¶ 82.

## IV.   ZANG HAS SUFFICIENTLY PLED A CAUSE OF ACTION FOR WRONGFUL DISCHARGE UNDER MASSACHUSETTS LAW.

"Liability may be imposed on an employer ... if an at-will employee is terminated for a reason that violates a clearly established public policy." Upton v. JWP Businessland, 425 Mass. 756, 757 (1997); see also Shea v. Emmanuel College, 425 Mass. 761, 762 (1997). In Shea the court expressly decided that "liability may be imposed" for the discharge based on an at-will employee's "internal complaint made about the alleged violation of the criminal law." 425 Mass. at 762-63. Noting that Massachusetts public policy prohibits the discharge of an employee for reporting criminal conduct to external authorities, the Court reasoned that it would be illogical not to similarly "protect an at-will employee who in good faith reports such conduct to her superior." Id. at 763 ("In neither case should the reporting of suspected criminal activity be discouraged by the threat of discharge.").

Similarly, the Court noted that in Smith v. Mitre Corp., 949 F.Supp. 943 (D. Mass. 1997), the district court "correctly anticipated that [the Massachusetts Supreme Judicial Court] 'would not require the employee to complain outside the organization to claim the public policy exception for whistleblowers' [where] the employee had reported fraud and false statements in claims made by the employer as a federal contractor."[9] See also Riley v. Green, 2002 WL 31680260, *3 (Mass.Super. Nov. 5, 2002) (protecting whistleblowing activity where employee complained that employer falsified and concealed reports in violation of federal criminal law); Hutson v. Analytic Sciences Corp., 860 F.Supp. 6, 11-13 (D. Mass. 1996) (employee complained

---

[9] To the extent Fidelity argues that the invocation of Massachusetts public policy prohibiting the termination of an at-will employee requires a statutory predicate, SOX's articulation of a federal claim for retaliation for such whistleblowing provides one. See Simas v. First Citizens Federal Credit Union, 63 F.Supp.2d 110, 115 (1999) (whistleblower provision of Federal Credit Union Act would provide adequate basis upon which to premise a public policy of the Commonwealth); see also Digaetano v. Lawrence Firefighters Federal Credit Union, 2002 WL 31667318 (Mass. Super.) (same). Contrary to Fidelity's assertions, enforcement of Massachusetts public policy protections for termination of whistleblowers like Zang could not interfere with the SOX statutory scheme because SOX expressly states that nothing in the whistleblower provisions "shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law . . ." 18 U.S.C. § 1514(d).

20

about fraud in defense contract); <u>Sullivan v. Massachusetts Mutual Life Ins. Co.</u>, 802 F.Supp.

716, 720 (D.Conn.1992) (applying Massachusetts law; employee complained of defendants'

violations of state and federal law and governing ethical codes with respect to the insider trading

of securities).

  Zang has alleged that he provided information to Fidelity managers and to its in-house

counsel regarding what he reasonably believed to be violations of federal securities laws and

SEC regulations, including the Investment Company Act of 1940 and the Securities Act of 1933,

both of which contain significant criminal and other penalties.  <u>See</u>, <u>e.g.</u>, 15 U.S.C. §§ 77x and

80a-48.  Zang alleges that he was discharged in retaliation for his whistleblowing.  Where Zang

has clearly and specifically alleged that he was terminated for his reporting of various violations

of the securities laws and regulations, Massachusetts has clearly adopted a public policy of

protecting such whistleblowing activity from retaliation.

<b><u>CONCLUSION</u></b>

  For all of the foregoing reasons, the Defendants' motion should be denied.

<b><u>REQUEST FOR ORAL ARGUMENT</u></b>

  Pursuant to Local Rule 7.1(D), Plaintiff respectfully requests oral argument on this
Motion.

Respectfully submitted,

JONATHAN M. ZANG
By his attorneys,

/s/ Nicholas J. Rosenberg
Alan D. Rose (BBO #427280)
Nicholas J. Rosenberg (BBO #643366)
ROSE, CHINITZ & ROSE
29 Commonwealth Avenue
Boston, MA 02116

Dated: July 23, 2008    Tel: 617-536-0040

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) July 23, 2008.

/s/ Nicholas J. Rosenberg
Nicholas J. Rosenberg

**U.S. Department of Labor**    Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

KEITH KLOPFENSTEIN,                    ARB CASE NO. 04-149

    COMPLAINANT,       ALJ CASE NO. 04-SOX-11

   v.                                  DATE: May 31, 2006

PCC FLOW TECHNOLOGIES HOLDINGS,
INC. and ALLEN PARROTT,

    RESPONDENTS.


BEFORE:  THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant*:
 Marc E. Grossberg, Esq., Stephen F. Fink, Esq., *Thompson & Knight L.L.P.,*
 *Houston, Texas*

*For the Respondents*:
 Samuel E. Hooper, Esq., *Neel & Hooper, P.C., Houston, Texas*


### FINAL DECISION AND ORDER

   This case arises under the employee protection provisions of the Sarbanes-Oxley Act (the Act or the SOX).[1]  Keith Klopfenstein filed a complaint on July 3, 2003, alleging

---

[1]  18 U.S.C.A. § 1514A (West Supp. 2005). Title VIII of the SOX is designated the Corporate and Criminal Fraud Accountability Act of 2002.  Section 806, the employee protection provision, protects employees who provide information to a covered employer or a Federal agency or Congress relating to alleged violations of 18 U.S.C.A. §§ 1341 (mail fraud), 1343 (wire, radio, TV fraud), 1344 (bank fraud) or 1348 (securities fraud), or any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud against shareholders.  68 Fed. Reg. 31864 (May 28, 2003). Department of Labor implementing regulations are found at 29 C.F.R. Part 1980 (2005).

that "his former employer ... and its representative, Allen Parrott" retaliated against him in violation of the SOX.  On July 6, 2004, a Department of Labor Administrative Law Judge (ALJ) issued a Recommended Decision and Order recommending that the complaint be dismissed.

As explained below, the ALJ erred in his legal analysis of two of the four contested elements (coverage and causation).  He did not make findings on the other two elements (protected activity and knowledge).  We therefore remand for further proceedings.

BACKGROUND

We briefly summarize the factual background here, and provide additional details in the discussion section.[2]

## A. The Parties

Klopfenstein began employment as Vice President of Operations for Flow Products, Inc. (Flow Products or Flow) in Brookshire, Texas, near Houston, on May 14, 2001.  On November 21, 2002 he became Vice President of Strategic Operations. Klopfenstein oversaw three business units:  PACO Pumps (PACO), General Valve, and Johnston Pumps.  R. D. & O. at 4; T. 292; R. Motion for Summary Decision, Mar. 10, 2004, at 3 n.2.[3]  His primary responsibilities included global operations process optimization, global supply chain development and optimization, and global inventory management.  CX 1 at 25, R. D. & O. at 4.  After November 21, 2002 Klopfenstein was no longer directly responsible for the shipping operations at Brookshire, but he did become responsible for inventory planning.  R. D. & O. at 4.

Flow Products is a division of PCC Flow Technologies, LP, a limited partnership wholly owned by PCC FT I LLC and PCC FT II LLC, which in turn are wholly-owned subsidiaries of PCC Flow Technologies Holdings, Inc. (Holdings).  Holdings is a wholly-owned subsidiary of Precision Castparts Corp. (PCC).  PCC is a company with a class of securities registered under Section 12 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78*l*.

---

[2]    Because this summary reflects our review of the entire record, it includes certain apparently undisputed facts that were not mentioned in the ALJ's opinion.  Our reference to this evidence does not indicate that we have found any particular facts beyond those found by the ALJ. *See Melendez v. Exxon Chem. Americas*, ARB No. 96-051, ALJ No. 1993-ERA-0006, slip op. at 7 n.8 (ARB July 14, 2000).

[3]    We use the following abbreviations:  R. D. & O - Recommended Decision & Order; CX – Complainant's Exhibit; RX – Respondents' Exhibit; ALJX – Administrative Exhibit; T – Hearing Transcript; C. – Complainant; R. – Respondents.

Allen Parrott, at the time Klopfenstein's employment was terminated, was Flow's Vice President of Finance.[4]

## B. In-Transit Inventory

In connection with his new duties after November 21, 2002, Klopfenstein became aware of a discrepancy in the in-transit inventory balances at PACO: the balance sheet accounts showed more prepaid inventory in transit from overseas than the shipping documents did. T. 314; R. D. & O. at 5. Although Klopfenstein did not believe the discrepancy amounted to "fraud," he believed that, if uncorrected, it would cause a material overstatement of Flow's assets and that correcting the overstatement would materially affect Flow's income for the period that the correction would take place. T. 314-319, 325; Complaint at 2.

Klopfenstein instructed his subordinate, Jessica George, a scheduling manager, to investigate the discrepancy. T. 315. George reported it to Mike Kerr, a sourcing agent for Flow Products, and to several people in Flow's finance department, including Parrott and Don Harris. Id. Harris was Flow's CFO. He reported to Parrott, and was also a personal friend of Parrott's. T. 240; C. Opp. To R. Motion for Summary Judgment, App. at 219. Parrott in turn reported to Holdings CFO Michael Jasperson, a personal friend who had recruited him into Flow Products. The finance department, which was responsible for keeping these accounts in order, twice informed Klopfenstein through George that it would address the problem.

The discrepancy continued, however. When the problem remained unresolved in early February 2003, Klopfenstein began placing footnotes regarding the discrepancy on PACO inventory reports he prepared for Holdings' weekly managers' meetings. T. 319; RX 3-5, 8-11. These meetings were attended by Holdings' President Wayne Robbins, who also was Executive Vice President of PCC. T. 318. Each footnote indicated that an in-transit inventory discrepancy needed to be reconciled. Id.[5] Klopfenstein had attended the weekly meetings previously, but did not attend the meetings at which these footnotes might have been discussed.

---

[4]     Holdings is representing Parrott in these proceedings. For convenience, we refer to both together as the Respondents.

[5]     The first footnote, on the report prepared February 10, 2003, and distributed February 11, 2003, stated: "*Note: Results of Physical Inventory are not comprehended. Will resolve $363k difference in In-transit inventory value by 2/14/03." RX 3. The second and third footnotes were virtually identical except that the date of projected resolution was changed to 2/21/03 on the two reports dated 2/17/03 and 2/24/03. RX 4, 5. Klopfenstein had apparently been given these dates of projected resolution from Parrott and the finance department. RX 12. A PACO inventory report dated 2/24/03, but distributed March 3, has only the first sentence and not the sentence about the in-transit inventory. RX 8. Finally, the reports prepared 3/10/03, 3/17/03, and 3/24/03 have footnotes stating "*Note: $342k difference in in transit must be reconciled." RX 9, 10, 11.

Later in February, Debbie Kramer, an employee of PCC's finance department, was assigned to Houston to reconcile the in-transit inventory discrepancy. Reconciling meant matching each piece of inventory received to its purchase order. T. 553. The process was difficult because the receiving department at times did not attribute materials received to the correct purchase order, and sometimes altered earlier purchase orders to show more requested items, causing later purchase orders to appear unfilled even though the items in fact already had been received. T. 544.

Don Harris wrote Parrott on February 14, 2003 stating that inventory imbalances were a "large exposure" and therefore should be considered one of three remaining "snakes" to be resolved along with two other "large balance sheet clean-up items." CX 5. Leah Sanchez-Arnold, an accounts payable supervisor in Flow's finance department, performed a "true-up" in February in order to avoid a "material misstatement" of the accounts. T. 556, 560. Arnold testified that she believed that failing to address the in-transit inventory misstatements in some fashion would have created "a massive material misstatement" of Flow's balance sheet. T. 560. As Arnold explained it, in a true-up "We'll writeoff [sic] any differences and so forth, we'll come to the correct balance but [unlike with a reconciliation] we won't know as to exactly how that came about." T. 554. Thus, in contrast to the detailed reconciliation process that Kramer was performing, Arnold's true-up simply matched the total quantity of inventory received with total quantities of inventory ordered. In February Arnold calculated a discrepancy of approximately $362,000, and her true-up resulted in a loss of $204,000 worth of inventory that been incorrectly logged as inventory in transit. RX 73; T. 547-50, 561, 718; R. D. & O. at 6. $9,715.66 could not be explained at all. *Id.*

At around the same time, outside auditors had concluded that the inventory imbalances were one of several significant problems that needed to be corrected. Parrott received a copy of the final auditors' report. RX 28.

The testimony did not make clear which department was actually responsible for the discrepancy. Klopfenstein apparently believed that the finance department was responsible. Arnold testified that the discrepancy was due to problems entering data through the new computer system. T. 541-542. Parrott testified that the discrepancy arose from problems with the operations department (run by Klopfenstein), most notably certain receiving practices, and Arnold agreed that some receiving practices made it more difficult to keep track of the inventory. T. 668, 544.

## C. Revenue Recognition

PCC's revenue recognition policy recognized revenue only after product title

(and, thereby, risk of loss) had transferred to customers.  CX 8 at 450.[6]  The policy applied to all subsidiaries of PCC, and Klopfenstein was aware of it.  CX 1 at 130-137.

During her investigation of the in-transit inventory issue, Kramer learned from Kerr that some Flow Products inventory was being sent to or held at an off-site crating company, Coastal Crating, apparently in order to remove items from Flow's premises so that revenue could be recognized.  For example "if they didn't have a shipping address for a customer but they wanted to be able to count the sale they were shipping it over to Coast[al] Crating [as if it were] a warehouse." T. 607.  Kramer reported this information to her boss Shawn Hagel, PCC Vice President and Corporate Controller, and said she wanted to visit the crating company to verify Kerr's information.  T. 607-08.  Kramer subsequently informed Parrott of her plans for this visit.  T. 527 (Kerr), 606-07; R. D. & O. at 6-7.

Kramer's visit uncovered a number of shipments that appeared designed to allow recognition of transactions in violation of the revenue recognition policy.  Pursuant to instructions from Hagel, Kramer informed Parrott and then renewed her focus on the reconciliation work.  RX 48.  Parrott then visited Coastal himself, where he was told it was common knowledge that Flow Products sent items at the end of the month in order to recognize revenue.  T. 672.[7]  He also visited a second crating company, which provided him with documents relating to Flow's past shipments.  T. 673-74.  Based upon Kramer's and Parrott's initial reports, Parrott was instructed by Jasperson to lead a team in investigating the circumstances when shipments were held at off site locations.  R. D. & O. at 6.[8]

The two other team members were Kramer, and Eva Flores from Flow's Human Resources department.  R. D. & O. at 17.  Kramer went back through Flow's records and identified shipments made through Coastal Crating and Cargo Crating during the past year.  She produced a spreadsheet showing shipments for which revenue appeared to

---

[6]   "Revenue is recognized when the product or service is complete, shipment is made to the customer and for sales of product to outside customers, title (and therefore risk of loss) has transferred to the customer."

[7]   The ALJ noted that Kramer, rather than Parrott, had been told this.  R. D. & O. at 17. Kramer's testimony does not contain any evidence to support such a conclusion.  T. 600-626.

[8]   Jasperson had been aware since the previous year that there was a potential issue regarding revenue recognition at Flow Products, because both a Price Waterhouse partner and Kathleen Matthews, an employee in PCC's finance department, previously had raised the issue to him.  R. D. & O. at 16; T. 246-47.  According to Jasperson, this and other information had caused him to identify Flow Products as a high-risk facility warranting closer controls.  T. 248.  Still, Jasperson talked to John Lilla, Holdings' Vice President for Human Resources and Risk Management, before deciding to instruct Parrott to investigate. T. 257-60.

have been recognized prematurely. RX 43; T. 614. Parrott wrote a report describing "an unauthorized change in established procedure" that was "directed by Keith Klopfenstein" and "not disclosed to senior management." RX 45; T. 672-74, 676-77. Kramer and Flores reviewed the report before it was sent.

Parrott's report began with a four-page section called "Flow Products Revenue Recognition Review." This section provided details showing that Klopfenstein had changed one of PACO's international shipping procedures and that revenue had been prematurely recognized on certain shipments. *Id.*; RX 45. The report described multiple shipments that appeared to violate the revenue recognition policy, such as shipments just before midnight of the end of the fiscal period that returned a few days later, including a shipment to and from a trucker's home; shipments sent to couriers on the last night of the fiscal period when those couriers would not be able to process the shipments until the next period; and shipments on which revenue was recognized upon their leaving the plant, even though additional final packing still was needed. RX 45, 47-49; T. 197-204. The report indicated that revenue from such shipments had been improperly recorded as recognized even though risk of loss had not yet passed. *Id.*

The report also contained a one-page section called "Flow Products Inventory Issues Review." RX 45. This section accused Klopfenstein of responsibility for the inventory imbalances, and of various instances of improper conduct. The accusations in this section included the following:

> Keith Klopfenstein created a $250K phantom material location; moved system records of material to this location ... . Conspired and attempted to conceal his responsibility and association with this risk.... Directed subordinates to assist in this concealing effort .... Provided misleading answers to Finance when asked .... Directed subordinates to also mislead Finance regarding the transactions being played ... instructed his subordinate Jessica George to utilize her own Oracle logon to allow another employee (Cherry Patterson) to receive instruction on posting cycle adjustments ... instructed Doug Myers in March 2003 to create bogus work orders .... Misled CEO in quarterly reviews, falsely indicating that FP [Flow Products] has a cycle count program.

Klopfenstein provided evidence to counter these accusations, including both evidence explaining the reasons for these actions and evidence that Parrott was aware of and had approved some of these actions. No findings were made about the accuracy of these accusations.

Klopfenstein testified that he was aware that Parrott was involved in the investigation. T. 328. Klopfenstein also testified that at least one of the employees

Parrott had interviewed had told Klopfenstein that Parrott was "out to fire [Klopfenstein]." *Id.*

## D. Termination of Klopfenstein's Employment

On March 20, 2003 Parrott presented his report to Jasperson, Robbins, and John Lilla, Holdings' Vice President for Human Resources and Risk Management. RX 34; R. D. & O. at 8. Later that day, Robbins, Jasperson, Lilla, Parrott, Flores and Kramer met with Jeff Conley, General Valve's Manager of Marketing and Services, to discuss his involvement in the revenue recognition issues. T. 733-34; RX 18-22, 60. The next day the same group (except Conley) met with General Valve's President John Hotz and then with Klopfenstein. T. 260-61; RX 18-22, 60.

Lilla's handwritten notes of these four meetings indicate that both Conley and Hotz expressed confusion about revenue recognition issues. RX 60. In contrast, Lilla's notes indicate that Klopfenstein said he understood the issue, and further indicate – as confirmed by Klopfenstein – that Klopfenstein said that in October 2002 he had instructed his staff to change a PACO practice regarding international shipping by recognizing revenue immediately after items left the plant in final form, rather than waiting for evidence of shipment in the form of shipping documents. T. 264-66; 287; 361-62; 683, 734. Klopfenstein testified that he told the senior managers that waiting for shipment documents was not a required part of the PCC policy and therefore his change was not intended to, and did not, change PCC's policy on revenue recognition. Klopfenstein further testified that he told the senior managers that he had instructed his staff to recognize revenue only if an item that left the plant was "done-done," and that by making the change to PACO's practice, he had intended to better effectuate PCC's policy by bringing PACO's practice into line with the practices at General Valve and Johnston Pumps. T. 331-332.

Klopfenstein testified that he also denied many of the other allegations in the report. In particular, he said he denied being aware of or approving a shipment to a trucker's home, or encouraging any other improper revenue recognition to occur, although he admitted some may have happened. Klopfenstein testified that when he "asked for specifics" regarding the various charges, "none were given" and he was therefore largely unable to defend himself against the specific allegations made. T. 374. Klopfenstein's testimony did not indicate that he took the opportunity during the meeting to alert senior management to the retaliatory bias he now alleges Parrott had.[9]

---

[9] Parrott's employment was terminated not long after Klopfenstein's was. The reason for the termination of Parrott's employment was disputed, and no finding was made. Although Klopfenstein speculates that Parrott's employment was terminated because Parrott had duped the company into firing Klopfenstein, Klopfenstein did not provide any testimony to this effect. Lilla denied the duping charge. C. Opp. To R. Motion for Summary Judgment, App. at 209. Jasperson testified that Parrott's employment was terminated because Parrott was unable to provide the leadership needed to maintain the internal controls without a "tremendous amount of effort." T. 275-76.

After the meeting with Klopfenstein and Parrott's team was over, Jasperson, Lilla and Robbins met to discuss the situation. Jasperson recommended that Robbins terminate Klopfenstein based on Klopfenstein's admission of having changed PACO's international shipping practice. T. 268. Robbins testified he had agreed with this recommendation "when we walked out of the meeting after K[lopfenstein] was there." T. 287. Lilla was not sure, however, and after discussion Robbins instructed Lilla to conduct his own investigation on the subjects covered in the team's report. T. 264 285. Robbins, Jasperson and Lilla also had at least one discussion with Mark Donegan (PCC CEO) and Bill Larsson (PCC CFO) about the proper course of action. T. 267-68.

Over the next few days, Lilla interviewed multiple people, including Parrott and some of the employees Parrott had interviewed, as well as some additional employees. (The record does not make clear who was interviewed only by Lilla.) Lilla did not interview Klopfenstein, however. After his investigation, Lilla concluded that the revenue recognition policy violations had occurred because of Klopfenstein's management style and practices, and so informed Robbins. T. 287, 736-38; RX 60; R. D. & O. at 8.

"On the recommendation of Jasperson ... based on information contained in the investigation report prepared by Parrott," Robbins then decided to terminate Klopfenstein's employment. R. D. & O. at 8; T. 265-68, 285-87.[10] Donegan and Larsson concurred. R. D. & O. at 8; C. Opposition to R. Motion for Summary Judgment, App. at 227. Robbins and Lilla informed Klopfenstein of his discharge by telephone on April 7, 2003. Later that day, Lilla sent Klopfenstein a letter that confirmed the termination and stated that it was "for cause." RX 61.[11]

---

[10]    Robbins testified that after Lilla indicated his uncertainty, Robbins "wanted to be fair" and therefore instructed Lilla to conduct an independent investigation. T. 287. In his deposition, Robbins said that after talking with Lilla he "felt that I wanted to have another follow-up, some interviews with John Lilla just to make sure that...I was comfortable with the action that I might have to take." C. Opposition to R. Motion for Summary Decision, App. at 169. Robbins further said that he had instructed Lilla to "reconfirm" Parrott's report. *Id.* at 170. After Lilla concurred with Parrott's report, Robbins had "two inputs that he trusted." T. 288. Based on these, Robbins made his final decision to terminate Klopfenstein's employment.

[11]    The Respondents contend Klopfenstein's employment was terminated because he not only violated the revenue recognition policy but also intimidated his subordinates. R. Brief at 2. Klopfenstein presented evidence that other senior managers had engaged in similar behavior without being disciplined. Because the ALJ did not discuss the alleged intimidation, we also do not consider any role that intimidation may have played. Decision and Order Denying Summary Judgment (D. & O.) filed March 24, 2004, at 2.

### E. Case History

Klopfenstein filed a complaint with the Occupational Safety & Health Administration (OSHA) on July 3, 2003. The complaint contended that "[t]he reasons for [his] firing given by Lilla were a pretext for the real motivation of the company and its representative, Parrott: Klopfenstein's persistent reporting of the in-transit inventory discrepancy." ALJX 1. After an investigation, OSHA concluded that the complaint lacked merit.

Klopfenstein objected to OSHA's findings and requested a hearing. The Respondents moved for summary decision, arguing that neither Holdings nor Parrott were proper parties; that there were valid reasons to terminate Klopfenstein's employment; and that Klopfenstein's employment would have been terminated regardless whether he had engaged in any protected activity. *See* R. Motion for Summary Decision, filed Mar. 10, 2004, at 14, 16-22, 26.

The Respondents also argued that protected activity could not have contributed to the termination of Klopfenstein's employment, for three reasons: "primarily…as no protected activity occurred"; second, because "[t]here is simply no evidence that the person who made the decision to discharge Klopfenstein had any knowledge" of any protected activity by Klopfenstein; and third, because "Respondent…had no animus regarding the reporting of such matters." *Id.* at 24-25. As evidence for this third contention, the Respondents argued that Kerr already had reported the inventory imbalance to the "finance department" in mid- to late 2002, "well prior to any report of this issue by Klopfenstein"; that "Respondent's finance department" began reconciling the discrepancy "well before any communication from Klopfenstein"; and that Kerr remained employed by Flow Products.[12]

Klopfenstein opposed summary decision, contending that Holdings and Parrott were proper parties and that the termination of Klopfenstein's employment was in retaliation for engaging in activity protected by the SOX. *See* C. Opposition to R. Motion for Summary Decision, filed Mar. 17, 2004, at 2-3. Klopfenstein contended that protected activity was a contributing factor because Parrott, who had influenced the investigation and decision process, had discriminatory animus against Klopfenstein based on Klopfenstein's "reporting, outside [Flow Products] finance department, the serious in-transit inventory discrepancies that the finance department had allowed to exist, failed to resolve, and tried to cover up." *Id.* at 3.

---

[12]    Although the motion referred to "Respondent's" finance department, and the named corporate respondent was Holdings, Kerr's affidavit actually stated that he had communicated with "finance" about items in transit with "the company," and that "the company finance department" began reconciling the discrepancy. *Id.*, Exhibit E at 2. Therefore, it appears Kerr likely reported the issue to Flow's finance department rather than PCC's.

The ALJ denied summary decision, concluding that "[t]here are sufficient facts to suggest that as either a wholly owned subsidiary or as an agent of the Precision Castparts Corp., both PCC Flow Technology Holding [sic] Inc., and by the same token, Allen Parrott, are proper parties to the complaint under the Act." D. & O. at 4. The ALJ also concluded that Klopfenstein "provided sufficient evidence to demonstrate that the determination of the merits of his claim rest [sic] on facts in issue and not solely on the law." *Id.* at 6.

The ALJ conducted a hearing on April 5 and 6, 2004, and issued his R. D. & O. on July 6, 2004. As detailed below, the ALJ concluded that neither of the Respondents was subject to the whistleblower provisions of the SOX. R. D. & O. at 12-13, 19. The ALJ made no findings regarding protected activity and knowledge. (The ALJ apparently believed such findings were not necessary after a hearing had been held. R. D. & O. at 13-14.[13]) Finally, the ALJ held that Klopfenstein "failed to establish a case for retaliation under the Act." R. D. & O. at 19. Klopfenstein timely appealed to this Board.

## ISSUES

The issues before the Board in this case are:

(1) Whether the ALJ erred in concluding that Holdings and/or Parrott were not covered parties under Act;

(2) Whether the ALJ erred in failing to determine whether Klopfenstein engaged in activity protected by the Act;

(3) Whether the ALJ erred in failing to determine whether the decision-makers or those who influenced them had knowledge of any protected activity of Klopfenstein's; and

(4) Whether the ALJ erred in analyzing whether any such protected activity was a contributing factor in the termination of Klopfenstein's employment.

## JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated to the Administrative Review Board (ARB or the Board) her authority to issue final agency decisions under the SOX. *See* Secretary's Order 1-2002 (Delegation of Authority and Responsibility to the Administrative Review Board), 67 Fed. Reg. 64272 (Oct. 17, 2002); *see also* 29 C.F.R. § 1980.110.

---

13    See note 19, *infra.*

Pursuant to the SOX and its implementing regulations, the Board reviews the ALJ's factual determinations using the substantial evidence standard. *See* 29 C.F.R. § 1980.110(b). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Lyninger v. Casazza Trucking Co.*, ARB No. 02-113, No. 2001-STA-38 (ARB Feb. 19, 2004). In assessing the substantiality of evidence, we "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). We must uphold an ALJ's factual determination that is supported by substantial evidence even if there is also substantial evidence for the other party, and even if we "would justifiably have made a different choice had the matter been before us de novo." *Id.*

In reviewing the ALJ's conclusions of law the Board, as the designee of the Secretary, acts with "all the powers [the Secretary] would have in making the initial decision . . . . " 5 U.S.C.A. § 557(b) (West 1996). Therefore, the Board reviews the ALJ's conclusions of law de novo. *Cf. Yellow Freight Sys., Inc. v. Reich*, 8 F.3d 980, 986 (4th Cir. 1993) (analogous provision of Surface Transportation Assistance Act); *Roadway Express, Inc. v. Dole*, 929 F.2d 1060, 1066 (5th Cir. 1991) (same).

DISCUSSION

A.    **Governing Law**

The employee protection provision of the SOX generally prohibits covered employers and individuals from retaliating against employees for providing information or assisting in investigations related to violations of listed laws and SEC rules. Specifically, that provision provides as follows:

> (a) Whistleblower Protection For Employees Of Publicly Traded Companies.— No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—
>
> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes

constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

> (A) a Federal regulatory or law enforcement agency;
> (B) any Member of Congress or any committee of Congress; or
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C.A. § 1514A.

Actions brought pursuant to the SOX are governed by the legal burdens of proof set forth in the employee protection provision of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, (AIR 21), 49 U.S.C.A. § 42121 (West Supp. 2005).   18 U.S.C.A. § 1514A(b)(2)(C).   Accordingly, to prevail, a SOX complainant must prove by a preponderance of the evidence that: (1) he engaged in a protected activity or conduct; (2) the respondent knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *See Getman v. Southwest Sec., Inc.*, ARB No. 04-059, ALJ No. 2003-SOX-8, slip op. at 8 (ARB July 29, 2005); AIR 21, § 42121(a)-(b)(2)(B)(iii)-(iv); *see also Peck v. Safe Air Int'l, Inc. d/b/a Island Express,* ARB No. 02-028, ALJ No. 2001-AIR-3, slip op. at 6-10 (ARB Jan. 30, 2004). *Cf.* 29 C.F.R. § 1980.104(b) (investigation).   If the complainant succeeds in establishing that protected activity was a contributing factor, then the respondent still can avoid liability by demonstrating by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected activity. *See Getman*, slip op. at 8; § 42121(a)-(b)(2)(B)(iv); *Peck*, slip op. at 10. *Cf.* § 1980.104(c).

**B. Coverage**

Klopfenstein argues that Holdings and Parrott were agents of PCC, that agents can be named respondents in a SOX case, and therefore that the ALJ erred in finding that they were not proper parties. C. Brief at 11-14; *see also* 18 U.S.C.A. § 1514A (a) ((SOX applies to any public "company …or any…agent of such company). The Respondents argue that we should affirm the ALJ's decisions about Holdings and Parrott because they were conclusions of fact supported by substantial evidence. R. Brief at 11-13.

The ALJ held that neither Holdings nor Parrott were "subject to the provisions of" the SOX. R. D. & O. at 19. With regard to Holdings, he concluded both that "it does not seem the Act provides a cause of action against [a non-public] subsidiary," and that Holdings was not an agent of PCC and thus could not be subject to liability as a company representative. R. D. & O. at 12. With regard to Parrott, the ALJ explained that "Parrott was no agent of PCC. He was an employee of Flow Products [supervised] by Holdings management." *Id.* at 13.

The ALJ relied upon our decision in *Flake v. New World Pasta Co.*, ARB No. 03-126, ALJ No. 2003-SOX-18 (ARB Feb. 25, 2004) to conclude that the Act does not provide a cause of action against a non-public subsidiary. *See* R. D. & O. at 12. But *Flake* does not support this conclusion. The complainant in *Flake* named one respondent: a company that was neither registered under § 12 of the Securities Exchange Act nor, as we determined, required to file reports under § 15(d). That respondent company did not have a public parent. Because we concluded that the company was not required to file under either provision, we held that it was not subject to the Act, noting that "the whistleblower provisions of [the Act] cover only companies with securities registered under § 12 or companies required to file reports under § 15(d) of the Exchange Act." *Flake,* slip op. at 4. Because there was no public parent involved, we did not have occasion to discuss whether a non-public *subsidiary of a public parent* could be covered under the Act. Nor need we do so here, in light of our other conclusions.

With regard to the suggestion that PCC was the only possible corporate party because employers cannot be "subject to the employee protection provision" unless they themselves "meet [the] statutory criteria," R. D. & O. at 12, we note that an agent is not generally relieved of liability for an unlawful act merely by virtue of such agent status. *See* Rest. 2d Agen. § 343. The Act prohibits an agent from discriminating against an employee who engages in protected activity, and Holdings offers no persuasive reason why we should not allow a cause of action against an agent who does so. Therefore, we do not interpret the Act to require a complainant to name a corporate respondent that is itself "registered under § 12 or … required to file reports under § 15(d)," so long as the complainant names at least one respondent who is covered under the Act as an "officer, employee, contractor, subcontractor, or agent" of such a company.

Finally, *Flake* also does not stand for the proposition that a subsidiary cannot by definition be an agent. Nothing in *Flake*, the Act, the interim and final regulations, and

the common meaning of the term "agent" gives us reason to conclude that a subsidiary, or an employee of a subsidiary, cannot *ever* be a parent's agent for purposes of the employee protection provision.[14]

Whether a particular subsidiary or its employee is an agent of a public parent for purposes of the SOX employee protection provision should be determined according to principles of the general common law of agency.[15] General common law principles of agency are set forth in the Restatement of Agency, a "useful beginning point for a discussion of general agency principles."[16] Although it is a *legal concept,* "agency depends upon the existence of required *factual elements*: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control." Rest. 2d Agen. §

---

[14]    *See* 18 U.S.C.A. § 1514A (a); 29 C.F.R. Part 1980; 69 Fed. Reg. 52104 (Final Rule); 68 Fed. Reg. 31860 (Interim Rule); Mirriam Webster Online (definition 3 ("a means or instrument by which a guiding intelligence achieves a result") and definition 4 ("one who is authorized to act for or in the place of another")); Black's Law Dictionary, 8th ed. (Agent means "2: One who is authorized to act for or in place of another; a representative").

[15]    "The starting point for our interpretation of a statute is always its language." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)). The SOX does not define the term "agent," and it is "well established that '[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Id.* (citing *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981)). We conclude that Congress intended us to incorporate the common-law meaning of the term "agent" in our interpretation of the SOX. *Cf. id.* at 741 (the term 'employee' in Title VII should be understood in light of the common law of agency"), 740 ("when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine"); *see also Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 72 (1986) (in Title VII context, "Congress' decision to define 'employer' to include any agent of an employer" means that "Congress wanted courts to look to agency principles for guidance in this area," though "such common-law principles may not be transferable in all their particulars to Title VII"). We further conclude that Congress intended us to rely upon principles of the "general common law of agency" to give meaning to this term, because "federal statutes are generally intended to have uniform nationwide application." *Reid* at 740.

[16]    *Burlington v. Ellerth*, 524 U.S. 742, 755 (citing *Meritor*, 477 U.S. at 72). The Restatement (Second) of Agency defines agency as "the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Rest. 2d. Agen. § 1; *see also* Rest. 3d. Agen. § 1.01 (draft approved, publication expected 2006). The person "for whom action is to be taken is the principal" and "the one who is to act is the agent." Rest. 2d. Agen. § 1.

1(1), comment *b*. The function of the ALJ is to ascertain whether these factual elements are present. The ALJ did not do so in this case, however, possibly because he did not begin by examining the legal standard for identifying the existence and scope of an agency relationship. *See* R. D. & O. at 11-13.

The ALJ reasoned that Holdings was not an agent of PCC because it had "overlapping officers" with PCC and because "it was as much, if not more, the actions of PCC's management that led to the decision to terminate Complainant than it was Holdings.... In other words, neither the facts here nor the commonality of management support an agent relationship within the meaning of the Act." *Id.* But neither of these facts precludes the existence of an agency relationship. Indeed, because one characteristic of an agent is that it acts on behalf of the principal, both the overlapping officers between PCC and Holdings, and the involvement of PCC officers and employees in overseeing and approving Holdings' investigation, make more probable that Holdings was PCC's agent.

We note that Robbins, who made the decision to terminate Klopfenstein's employment, was both President of Holdings and Executive Vice President of PCC. As an officer of PCC, Robbins was its general agent, and thus almost certainly was an agent of PCC with regard to the termination of Klopfenstein's employment.[17] As President of Holdings, Robbins was "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy."[18] Putting these two concepts together, it is hard to imagine that Holdings was not PCC's agent for purposes of the termination of Klopfenstein's employment. Indeed, in the face of Klopfenstein's arguments on appeal that the ALJ erred in so concluding, Holdings does not appear to have provided any counter-argument relating to Holdings' possible status as an agent. *See* R. Brief at 11-12.

Turning to Parrott, the ALJ found it important that "[Parrott] did not work for either Holdings or PCC." R. D. & O. at 13. But the ALJ also noted that Parrott was "asked by Holdings management to investigate revenue recognition violations," and that

---

[17]    A corporation's officer is generally considered a general agent of that corporation. *See* Rest. 2d § 14C; *see also* Rest. 3d § 1.01, comment *c* (draft approved, publication expected 2006). We further note that, although Klopfenstein did not name him as an individual respondent, Robbins was himself a covered individual, by definition. *See* 18 U.S.C.A. § 1514A(a) (Act covers any "company with a class of securities registered under section 12" and "any *officer*, employee, contractor, subcontractor, or agent of such company") (emphasis added).

[18]    *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (citing *Torres v. Pisano*, 116 F.3d 625, 634-35 and n.11 (2d Cir. 1997), for proposition that "a supervisor may hold a sufficiently high position 'in the management hierarchy of the company for his actions to be imputed automatically to the employer'"); *see also Ellerth*, 524 U.S. at 758 ("the agent's high rank in the company makes him or her the employer's alter ego").

Parrott was directed by Jasperson (Holdings' CFO), who acted in consultation with Larrson (PCC's CFO). In addition, there is evidence in the record that Hagel (PCC's Vice President and Corporate Controller) was directly managing Parrott with regard to the revenue recognition investigation. *See, e.g.*, RX 50. Thus, it appears quite possible that Parrott was acting as PCC's agent in *investigating* Klopfenstein, whether or not he was PCC's agent in other duties. To be covered under the Act, of course, an individual must not only be an agent of a public company, but also must "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment." 18 U.S.C.A. § 1514A(a). Although the ALJ noted that Parrott did not have "the privilege of discharging, [etc.]" Klopfenstein, this statement was not in the findings of fact section and the ALJ did not indicate that we should take it as a factual finding. It is possible that Parrott's influence on the investigation is evidence that Parrott did have the ability to affect the terms of Klopfenstein's employment. (Whether any such effect may have constituted discrimination is addressed below in the section discussing causation.) This possibility may bear further examination.

On remand, the ALJ should make whatever factual findings are necessary to properly apply agency principles in determining whether either or both of Holdings and Parrott were PCC's agents with regard to the termination of Klopfenstein's employment. We also leave it to the ALJ to determine whether to grant Klopfenstein's motion to add PCC as a party.

## C. Merits

To prevail, Klopfenstein must prove all elements of his claim, including unfavorable personnel action, protected activity, knowledge and causation.

### 1. *Unfavorable personnel action*

The parties do not dispute that Klopfenstein suffered an unfavorable personnel action when his employment was terminated on April 7, 2003.

### 2. *Protected activity*

Klopfenstein contends that he engaged in protected activity when he "discovered and persisted in reporting a material irregularity in the accounting for in-transit inventory." C. Brief at 1. The Respondents argue that these communications were not protected because Klopfenstein admitted he did not believe that the inventory imbalance amounted to fraud, and in any case the footnotes were not specific enough to be protected. R. Brief at 15. The ALJ did not reach a conclusion as to whether Klopfenstein had engaged in protected activity. Nor did he make any preliminary findings: for example, whether Klopfenstein had a reasonable belief that the in-transit inventory imbalance reflected a covered violation, and whether his activities in raising the issue

were sufficient to "express" his concern.[19]   *Cf. Knox v. United States Dep't of the Interior*, ARB No. 06-089, ALJ No. 2001-CAA-3, slip op. at 5 (ARB Apr. 28, 2006), (The ARB finds protected activity when a complainant both has a reasonable belief in his concern, and "expresses" that concern).

Because of our decision to remand, we need not determine now whether Klopfenstein engaged in protected activity. We note, however, that contrary to the Respondents' arguments, we do not believe that activity is protected only when the complainant is the first to raise the issue, or when the communications relate to published information, or when the complainant believes he is reporting "fraud." SOX protection applies to the provision of information regarding not just fraud, but also "violation of ... any rule or regulation of the Securities and Exchange Commission." 18 U.S.C.A. § 1514A(a)(1). In addition, we do not believe Klopfenstein's failure to express his concern either in his Ethics report, or in the March 21 meeting that preceded the termination of his employment, requires the conclusion that no protected activity took place. A complainant need not express a concern in every possible way or at every possible time in order to receive protection, so long as the complainant's actual communications "provide information, cause information to be provided, or otherwise assist in an investigation" regarding a covered violation. 18 U.S.C.A. § 1514A(a)(1).

It certainly is possible that Klopfenstein engaged in protected activity. The problems with PACO's in-transit inventory suggested, at a minimum, incompetence in Flow's internal controls that could affect the accuracy of its financial statements. *See* T. 716-717; RX 28. Klopfenstein's communications thus related to a general subject that was not clearly outside the realm covered by the SOX, and it certainly is possible that Klopfenstein could have believed that the problems were a deficiency amounting to a "violation." *See, e.g., Collins v. Beazer Homes USA Inc.*, 334 F. Supp.2d 1365, 1378 (N.D. Ga. 2004) (holding that "allegations ... of violations of the company's internal accounting controls ... were within the zone of protection afforded by" the SOX). On the other hand, it is possible that Klopfenstein did not engage in protected activity. For example, was Klopfenstein reasonable in believing that his concern about the inventory accounting related to a violation of a SOX-listed law or rule?[20]   In light of his position,

---

[19]     The ALJ reasoned that "[o]nce Respondent has produced sufficient evidence in an attempt to show that Complainant was subjected to adverse action for a legitimate, nondiscriminatory reason, it no longer serves an analytical purpose to answer the question whether Complainant presented a prima facie case. Instead, the relevant inquiry is whether the Complainant prevailed by a preponderance of the evidence on the ultimate question of liability." R. D. & O. at 13-14. While we agree that the prima facie case generally becomes irrelevant after a full hearing has been held, we emphasize that a complainant still must prove all elements of the case to prevail. Our review is facilitated if the ALJ makes findings on all contested elements.

[20]     Klopfenstein argues that the applicable rule is 13a-15a, which requires issuers – i.e., public companies such as PCC – to maintain "disclosure controls and procedures" and "internal control over financial reports." C. Brief at 3. The ALJ should examine this rule,

did his activity suffice to "express" his concern and count as the "provision" of "information"?

Because of our decision to remand, we need not decide these questions here. On remand the ALJ should address those questions that are necessary to reach a decision on whether Klopfenstein engaged in protected activity.

### 3. Knowledge

In denying summary judgment, the ALJ had concluded that Klopfenstein had presented sufficient evidence to raise an issue of material fact as to whether any decision-maker – most obviously, Robbins – knew of any protected activity of Klopfenstein's. D. & O. at 6. As noted above, however, the ALJ failed to reach a conclusion as to whether any decision-maker had knowledge of any such protected activity. It is not clear from the briefs whether the issue of knowledge remains disputed. *See* R. Brief at 9 (arguing only that Klopfenstein did not bring up the in-transit inventory issue during the March 21, 2003 meeting or the April 7, 2003 telephone call during which Klopfenstein was informed of his discharge). On remand, if a dispute remains, then the ALJ should resolve this factual issue. In so doing, the ALJ may need to make findings on whether knowledge should be imputed to a decision-maker based on knowledge held by other relevant persons.

### 4. Causation

Klopfenstein argues that the ALJ erred by applying the wrong legal standard, and that application of the correct standard would lead to a judgment in his favor. *See* C. Rebuttal at 8-9; C. Brief at 4, 7. We agree with the first half of Klopfenstein's argument, and leave it for the ALJ to make a judgment about the remainder.

Under the SOX, the correct standard is whether protected activity was *a contributing* factor in Klopfenstein's termination. *See Getman*, slip op. at 8; AIR 21, § 42121(a)-(b)(2)(B)(iii)-(iv); *Halloum v. Intel*, ARB No. 04-068, ALJ No. 2003-SOX-7 (Jan. 31, 2006), slip op. at 8 (SOX complainant need not show protected activity was *primary* motivating factor in order to establish causation). A contributing factor is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Marano v. Department of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (interpreting the Whistleblower Protection Act, 5 U.S.C.A. § 1221(e)(1)). As *Marano* explains, the contributing factor standard was "intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant,' 'motivating, 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *Id.*

---

and any others Klopfenstein may have raised, in determining whether the problems Klopfenstein identified with Flow's inventory accounting could support a reasonable belief by Klopfenstein that the SEC rule Klopfenstein cites could have been violated.

Because, in examining causation, the "ultimate question" is whether the complainant has proven that protected activity was a contributing factor in his termination, a complainant need not necessarily prove that the respondent's articulated reason was a pretext in order to prevail. Of course, most complainants will likely attempt to prove pretext, because successfully doing so provides a highly useful piece of circumstantial evidence.[21] But a complainant is not *required* to prove pretext, because a complainant alternatively can prevail by showing "that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).[22]

The ALJ did not apply the SOX's contributing factor standard. Instead, he applied some higher standard – it is not clear which one. First, the ALJ stated that Klopfenstein had to prove that Holdings' actions were "*based on* discriminatory motive." R. D. & O. at 14 (emphasis added). Then, the ALJ concluded that protected activity did not "play[] a role in management's decision to terminate [Klopfenstein's employment]. In other words ... Complainant has not demonstrated ... that he was fired *because of*" his activity." R. D. & O. at 15 (emphasis added). Finally, the ALJ stated that "there has been insufficient evidence offered to prove that *the motivation* to terminate was discriminatory." R. D. & O. at 18 (emphasis added). Although the phrase "play a role" is ambiguous and could potentially be read as shorthand for the contributing factor standard, we do not believe it should be so understood in this case, because to do so would be inconsistent with the other formulations used, each of which had the effect of

---

[21]     A complainant who does not prove pretext loses the opportunity to use the falsity of the respondent's explanation as evidence of discrimination, although the complainant still can use as evidence the totality of the circumstances – including temporal proximity between a protected act and an unfavorable action, and "all evidence pertinent to the mindset of the employer and its agents." *Timmons v. Mattingly Testing Servs.*, 95-ERA-40, slip op. at 5 (ARB June 21, 1996). *See Desert Palace v. Costa*, 539 U.S. 90, 100-102 (2003) (for mixed-motive jury instruction, plaintiff need not present "direct" evidence so long as plaintiff presents "sufficient" evidence for jury to conclude that protected status was a motivating factor in unfavorable employment action).

[22]     *See also Getman*, slip op. at 8 (SOX complainant must prove that protected activity was "a" contributing factor); *Peck*, slip op. at 6-10 (same, AIR 21); *Kester v. Carolina Power & Light Co.*, ARB No. 02-007, ALJ No. 2000-ERA-31, slip op. at 8 (ARB Sept. 30, 2003) (ERA complainant must prove that Respondent "fired him *in part* because of his protected activity") (emphasis added); *Shirani v. ComEd/Exelon Corp.*, ARB No. 03-100, ALJ No. 02-ERA-28, slip op. at 11 n.3 (ARB Sept. 30, 2005)(ERA "complainant must only show that the protected activity 'was *a* contributing factor in the unfavorable personnel action alleged in the complaint'" and need not show that such activity was "the likely reason" for the adverse action) (emphasis added); *cf. Richardson v. Monitronics, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) (same, FMLA retaliatory discharge).

requiring Klopfenstein to prove more than he needed to under the "contributing factor" standard.[23] Indeed, the use of the phrase "*the* motivation" suggests that Klopfenstein was required to prove that protected activity was "the" reason for the termination.  This is clearly erroneous when, as we have stated, under the correct standard a complainant need prove that protected activity contributed only *in part* to the unfavorable personnel action.[24]

The ALJ also erroneously stated that Klopfenstein's ultimate burden – to prove retaliation by a preponderance of the evidence – included the "burden ... to demonstrate that Respondent's proffered motivation was not its true reason but is pretextual."  R. D. & O. at 14.  For reasons explained above, the ALJ should not have *required* Klopfenstein to prove pretext.  On remand, if the ALJ determines that Klopfenstein has failed to prove pretext, then the ALJ may rely on such failure in drawing the conclusion that Klopfenstein has failed to provide sufficient evidence to prove his case by a preponderance of the evidence.

The ultimate question whether an action was taken due to "retaliatory motive is a legal conclusion." *Timmons*, slip op. at 5.  Thus although in reviews under the SOX we give substantial deference to factual findings, we cannot necessarily rely upon factual findings made under the wrong legal standard.  *See, e.g., Mackowiak v. Univ. Nuclear Sys, Inc.*, 735 F.2d 1159, 1164 (9th Cir. 1984).  It is not clear which, if any, of the factual

---

[23]   Our conclusion that "play a role" cannot here be interpreted as such shorthand is also based upon the ALJ's erroneous statement of the standard when describing to the parties, at the close of the hearing, the analysis he was about to undertake:

> [T]he burden does shift back and forth. He makes out a prima facie case, then they show there's another contributing factor to his termination, and then it falls back upon the Respondent [sic] to demonstrate by clear and convincing evidence that that's a pretext, that he was terminated solely for having engaged in a protected activity.

T. 757.

[24]   These two errors also give rise to concern about the ALJ's final conclusion that "the same unfavorable personnel action would have been taken in the absence of any protected behavior on Complainant's part." R. D. & O. at 18.  The ALJ did not indicate whether this final conclusion was supported by clear and convincing evidence, and did not indicate that the Respondents had the burden in this regard.  Perhaps more significantly, this final conclusion was premised on the ALJ's earlier conclusion that protected activity did not "play a role" – but, as we have explained, the ALJ apparently believed that in order for protected activity to "play a role" it had to be *the motivation* for the action.  It is possible that if the ALJ had applied the correct standard, he would have determined that protected activity, while not "the" motivation, nonetheless was *a contributing* factor.  If so, then it is possible that, recognizing that protected activity was a contributing factor, he might not have found that the same action would have been taken.

statements made in the "Discussion and Conclusions of Law" section may have been premised on the wrong contributing factor standard.   Therefore, we believe that remanding is a better course of action than attempting to parse through the various statements in the opinion to determine which, if any, might support a determination on the ultimate question.

To facilitate resolution of the case on remand, it would be helpful for the ALJ to make additional credibility determinations and findings of facts and to address any inconsistencies in the testimony where those are necessary in order to make such findings.   For example, the ALJ should make clear whether he found credible Lilla's testimony regarding the reason Klopfenstein's proffered comparators were not fired.   *See* R. D. & O. at 17-18.   The ALJ also should explain the inconsistency between his conclusion that Parrott "did not provide *any input* into the ultimate decision to discharge Complainant," and his statements that Robbins relied upon Parrott's report in making the decision, and that Parrott was asked whether Klopfenstein should be discharged.   *See* R. D. & O. at 8, 19 (emphasis added).   In addition, if the ALJ analyzes temporal proximity, he should consider the time gap between Klopfenstein's termination and any protected activity in which Klopfenstein may have engaged, keeping in mind that protected activity must include expression of a concern and not just its existence.

### CONCLUSION

The ALJ did not use the correct analysis when determining whether Holdings and Parrott were covered under the SOX. The ALJ did not make any findings as to whether Klopfenstein engaged in protected activity and whether any decision-maker had knowledge of any such activity.   And the ALJ applied too high a standard on the "ultimate question" of retaliation – making us unwilling to rely upon the conclusions he reached regarding that element.   In sum, the ALJ did not provide determinations based on relevant facts and applicable law on any of the four contested elements.   Because of the number of factual findings that may be needed, and the possibility that at least some of these would be better made by someone who has had the opportunity to assess the credibility of the witnesses, we conclude that the best course of action is to return this matter to the ALJ for appropriate findings and recommendations based upon the correct legal standards.    We therefore **REMAND** Klopfenstein's complaint for further proceedings consistent with this opinion.

**SO ORDERED.**

> **A. LOUISE OLIVER**
> **Administrative Appeals Judge**
>
> **WAYNE C. BEYER**
> **Administrative Appeals Judge**
>
> **M. CYNTHIA DOUGLASS**
> **Chief Administrative Appeals Judge**