# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JONATHAN M. ZANG,

                    Plaintiff,

          v.                         No. 08-CV-10758 DPW

FIDELITY MANAGEMENT & RESEARCH
COMPANY, FMR CO. INC., and FMR LLC f/k/a/ FMR
CORP.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND/OR REMAND

Wilfred J. Benoit, Jr. (BBO #037900)
Ethan Z. Davis (BBO #668973)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000
wbenoit@goodwinprocter.com
edavis@goodwinprocter.com

*Attorneys for defendants*

Dated:  August 11, 2008

**Table of Contents**

**Page**

I.  Zang's Coverage Arguments Are Flawed.................................................................1

    A.  Overview............................................................................................... 1

    B.  Zang's Opposition Ignores the Statute's Plain Language.......................... 2

    C.  Zang's Coverage Argument Is Contrary To Decades Of Established Mutual Fund Regulation............................................................ 3

        i.  For Nearly 70 Years, Congress Has Kept Investment Companies And Their Investment Advisers Distinct ................... 5

        ii.  Congress Did Not Intend SOX To Change The Existing Landscape of Mutual Fund Regulations by Merging Investment Companies And Privately-Held Investment Advisers ................................................................................ 6

        iii.  Congress Declined To Amend Section 806 To Include Coverage For Employees Of Privately-Held Investment Advisers ................................................................................ 7

    D.  Zang Erroneously Claims That He Is Covered By SOX Simply Because Of The Services That Fidelity Provides To The Funds .............. 9

    E.  Zang's Public Policy Argument Is Inconsistent With The Terms Of The Statute ............................................................................... 11

II.  Zang's Efforts To Distinguish Decisions Applying Principles Of Collateral Estoppel Are Unpersuasive.................................................................................13

III.  Zang Never Engaged In Protected Activity ........................................................15

IV.  Zang's Common Law Public Policy Arguments Are Meritless ...........................17

CONCLUSION.................................................................................................................19

# TABLE OF AUTHORITIES

**FEDERAL AND STATE CASES**

*Allen v. Stewart Enters., Inc.*, No. 05-CV-04033 (E.D. La. Apr. 6, 2006)………………...…14, 15

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998)…………..………………......4

*Brady v. Calyon Sec. (USA) Inc.*, 406 F. Supp.2d 307 (S.D.N.Y. 2005)………………………...10

*Carnero v. Boston Scientific Corp.*, 433 F.3d 1 (1st Cir. 2006), *cert. denied*, 126 S. Ct. 2973 (2006)………………………………………………………………………………...…10

*Gauthier v. Town of Dracut*, No. 03-2826, 2005 Mass Super. LEXIS 373 (Mass. Sup. Ct. June 27, 2005)………………………………………………………………………………..…18

*Hanna v. WCI Communities, Inc.*, 348 F. Supp. 2d 1322 (S.D. Fla. 2004)…………………..13-14

*Hutson v. Analytic Sciences Corp.*, 860 F. Supp. 6 (D. Mass. 1996)…………………………....18

*Livingston v. Wyeth, Inc.*, 520 F.3d 344 (4th Cir. 2008)…………..………………………15-16

*Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511 (1985)…………………………………………17

*Miss. Pub. Employees. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75 (1st Cir. 2008)………………4

*Navarro v. Pfizer Corp.*, 261 F.3d 90 (1st Cir. 2001) …………………………………...............2

*Riley v. Green*, No. 02-0765, 2002 Mass. Super. LEXIS 448 (Mass. Sup. Ct. November 5, 2002) ………………………………………………………………………………….……………18

*Shea v. Emmanuel College*, 425 Mass. 761 (1997)…………………………………………...18

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)…………………………………………….…2-3

*Smith v. Mitre Corp.*, 949 F. Supp. 943 (D. Mass. 1997)…………………………………………18

*Sullivan v. Massachusetts Mutual Life Ins. Co.*, 802 F. Supp. 716 (D. Conn. 1992)…………....18

*United States v. Mead Corp.*, 533 U.S. 218 (2001) …………………………………...............2

*United States  v. Utah Constr. & Mining Co.*, 384 U.S. 394 (1966)……………………………15

*Univ. of Tennessee v. Elliott*, 478 U.S. 788 (1986)……………………………………………14

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993)……………………………………………….…4

*Welch v. Chao*, No. 07-1684, 2008 U.S. App. LEXIS 16574 (4th Cir. August 5, 2008) ………………………………………………………………………..………………....16

*Wickham Contracting Co., Inc. v. Bd. of Educ. of the City of New York*, 715 F.2d 21 (2d Cir. 1983)………………………………………………………………………………………15


**REGULATORY CASES**

*Deremer v. Gulfmark Offshore, Inc.*, 2006-SOX-00002 (ALJ June 29, 2007)…………………..15

*Kalkunte v. DVI Fin. Servs., Inc.*, 2004-SOX-00056 (ALJ July 18, 2005)…………………..10-11

*Klopfenstein v. PCC Flow Tech. Holdings, Inc.*,
    2004-SOX-00011 (ARB May 31, 2006)...........................................................................10

*Morefield v. Exelon Servs., Inc.*, 2004-SOX-00002 (ALJ Jan. 28, 2004)………..…………….10

*Platone v. Atlantic Coast Airlines*, 2003-SOX-00027 (ALJ April 30, 2004)…………….....…….10

*Powers v. Pinnacle Airlines, Inc.*, 2003-AIR-12 (ALJ Jan. 28, 2004)………………....……..10


**STATUTES**

15 U.S.C. § 80(a)-10(a)…………………………………………………………………………4

15 U.S.C. § 80a-1(b)(2) ...................................................................................................6

15 U.S.C. § 80a-2(a)(3).....................................................................................................6

15 U.S.C. § 80(a)-2(a)(19)……………………………………………………………………...4

15 U.S.C. § 80a-2(a)(20)...................................................................................................6

15 U.S.C. § 80a-3(a)(1).....................................................................................................5

15 U.S.C. §80b-1 *et seq*..……………………………………………………………….............5

15 U.S.C. § 80b-2(a)(11) ...................................................................................................5

18 U.S.C. § 1513...............................................................................................................12

Section 201(a) of the Sarbanes-Oxley Act of 2002 ……………………………….................6

Section 303 of the Sarbanes-Oxley Act of 2002…………………………………………….12

Section 307 of the Sarbanes-Oxley Act of 2002…………………………………………….12

Section 405 of the Sarbanes-Oxley Act of 2002 …………………………………………….6

Section 406 of the Sarbanes-Oxley Act of 2002……………………………………………………12

Section 604(b) of the Sarbanes-Oxley Act of 2002 …………………………………………………6-7

Section 703(a)(1) of the Sarbanes-Oxley Act of 2002 …………………………………………………7

Section 806 of the Sarbanes-Oxley Act of 2002...................................................................*Passim*

Section 1107 of the Sarbanes-Oxley Act of 2002……………………………………………...…11

**OTHER AUTHORITIES**

17 C.F.R. § 270.12b-1………………………………………………………………………………..4

17 C.F.R. § 270.38a-1 ...............................................................................................................9

148 Cong. Rec. S7350 (daily ed. July 25, 2002)……………………………………………………...12

150 Cong. Rec. S794 (daily ed. Feb 10, 2004) ……………………………………………..………9

68 Fed. Reg. 31860…………………………………………………………………………...............13

69 Fed. Reg. 52104 (Aug. 24, 2004)...................................................................................... 2-3

H.R. 2420, 108th Cong. (2003)...............................................................................................8

S. 1971, 108th Cong. (2003)...................................................................................................8

S. 2059, 108th Cong. (2004).................................................................................................. 7-8

Pursuant to the Assented-To Motion to Enlarge Time in Briefing Schedule (Docket No. 14), allowed by the Court on July 22, 2008, Fidelity Management & Research Company, FMR Co., Inc., and FMR LLC (collectively "Fidelity"), respectfully submit this reply memorandum in further support of their motion to dismiss or, in the alternative, remand the complaint of Jonathan Zang ("Zang").

## I.     Zang's Coverage Arguments Are Flawed

### A.     Overview

The most striking aspect of Zang's opposition is that, while he disputes Fidelity's position that Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX" or "Section 806") should be interpreted to provide "Whistleblower Protection for Employees of Publicly-Traded Companies", as its title declares, he offers no coherent alternative interpretation of the statute for this Court to adopt.  At one point, he argues that SOX whistleblower protection should be extended to employees of contractors and subcontractors of publicly-traded companies—but not all such contractors and subcontractors, merely a "very narrow" subset of them that Congress did not define.  (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss and/or Remand at 9 (hereinafter "Opp.")).  Later he suggests that Congress intended Section 806 to cover any whistleblower situation that might be deemed (by whom, it is unclear) to relate to protection of investors in public companies.  (Opp. at 10-12).  Still later he suggests that, for purposes of SOX coverage only, investment advisers of mutual funds should be considered one with SOX-covered funds to which they provide services because they are governed by a complex regulatory scheme.  (Opp. at 14-16).  Why this makes sense only for investment advisers who, perhaps uniquely, are subject to a regulatory scheme designed to ensure that they remain *strictly separate* from the entities with which they contract, Zang does not explain.

1

None of Zang's varying interpretations is supported by the language of the statute and none of them offers a rational framework for applying the statutory language of SOX across a range of different factual situations.  Exactly what Zang thinks the statute should be deemed to say and how any employer who also happens to be a contractor or subcontractor of a public company would be able to figure out whether it is covered by any of his various interpretations are mysteries that his opposition brief conspicuously fails to address.  Contrasted against Fidelity's assertion that the words "employees of publicly-traded companies" mean "employees of publicly traded companies", Zang's various alternatives are wholly unpersuasive.

### B.    Zang's Opposition Ignores the Statute's Plain Language

As Zang acknowledges, interpretation of a statute begins with its plain language.  Section 806 begins by identifying the public companies covered by the section, then refers to those companies' officers, employees, contractors, subcontractors, and agents, and then prohibits both classes of entities—public companies and their representatives—from discriminating against "an employee."  18 U.S.C. § 1514A.  The definition of public company in the first part of Section 806 modifies both the company representatives and the employees identified in the second part: Neither public companies, nor public company representatives, may discriminate against public company employees.[1]

---

[1]    Zang's reliance on SOX's implementing regulations is misplaced because even the DOL has indicated that the "rules are procedural in nature and **_not intended to provide interpretations of the Act_**."  Procedures for the Handling of Discrimination Complaints Under Section 806, 69 Fed. Reg. 52104, 52105 (Aug. 24, 2004) (emphasis added).  When an agency promulgates regulations without invoking its statutory authority to render interpretations that bear the force of law, the regulations are not entitled to _Chevron_ deference.  _Navarro v. Pfizer Corp._, 261 F.3d 90, 98-99 (1st Cir. 2001) (citing and applying _United States v. Mead Corp._, 533 U.S. 218 (2001)).  Any weight to be given to OSHA's definitions depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  _Skidmore v. Swift & Co._, 323 U.S. 134, 140 (1944).  Here, even though commentators argued that the regulatory definitions of "employee" and "company representative" broadened the statutory definition of protected employees, OSHA rejected the position without any significant analysis, baldly asserting that it believed its definitions "accurately reflect the statutory language."  Procedures for the Handling of Discrimination Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, (Continued)

Under Zang's interpretation, the phrase "officers, employees, contractors, subcontractors, and agents" would not only identify public company "representatives" who may not discriminate against public company employees, but those terms (or some of them) would also identify additional entities whose employees are covered. Fidelity's opening brief demonstrated that this interpretation is grammatically impossible and Zang does not—because he cannot—counter Fidelity's argument. (*See* Memorandum in Support of Defendants' Motion to Dismiss and/or Remand at 8-9 (hereinafter "Mem.")).

**C.    Zang's Coverage Argument Is Contrary To Decades Of Established Mutual Fund Regulation**

Zang asserts that "investment advisers and sub-advisers to public investment companies are themselves covered under Section 806" because they are "integrated" with the public investment companies by virtue of the regulatory scheme that governs them. (Opp. at 9). Both the plain language of Section 806 and its legislative history, however, demonstrate that Congress did <u>not</u> intend to eradicate years of legislative structure and industry practice by lumping investment companies and privately-owned investment advisers together to create "integrated" employers from otherwise distinct entities.

Zang's description of the Funds as "corporate shell[s]" (opp. at 1) is a gross mischaracterization. It is common knowledge in the mutual fund industry and a matter of public record that the Funds are owned by investor shareholders (not Fidelity) and are governed by a board of trustees (the "Board") that is independent of Fidelity. In fact, Zang's complaint

---

Title VIII of the Sarbanes-Oxley Act of 2002; Final Rule, 69 Fed. Reg. 52104, 52105 (Aug. 24, 2004). Accordingly, OSHA's unsupported definitions are not entitled to deference under either *Chevron* or *Skidmore*.

references the revised registration statement filed for Fidelity Select Portfolios, [2] (compl. ¶ 80) which shows that the Board is made up of "experienced executives who meet periodically throughout the year to oversee each fund's activities, review contractual arrangements with companies that provide services to each fund, and review each fund's performance."[3]  *See* Fidelity Select Portfolios, Post-Effective Amendment (SEC Form 485BPOS), at 2, (April 28, 2005) (hereinafter, "Fidelity Select Portfolios SEC Filing" and pertinent portion attached hereto as Exhibit 1).[4]  As the Fidelity Select Portfolios SEC Filing shows, at the time of the filing, ten of the fourteen trustees were non-interested, which means that they were neither employed by, nor had any ownership interest in, Fidelity.  (Exh. 1, at 3-6).  It is the responsibility of the Board to protect the interests of the investor shareholders and each of the services provided by Fidelity under their management contracts with the Funds is "subject to the supervision of the Board of Trustees."  (Exh. 1, at 7).  Fidelity and the Funds are distinct entities, owned by different owners and supervised by different executive boards, consistent with the mutual fund industry's longstanding regulatory regime.

---

[2]     Because the registration statement allegedly contains revisions resulting from Zang's comments and suggestions and is specifically referenced in the complaint, (compl.  ¶¶ 80-81) it may be considered on a motion to dismiss.  *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) (court can consider undisputed documents alleged or referenced in the complaint).  *See also Miss. Pub. Employees. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 86 (1st Cir. 2008) ("In reviewing a motion to dismiss under Rule 12(b)(6) courts ordinarily will consider only documents attached to the complaint, but have made exceptions 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; [and] for documents sufficiently referred to in the complaint.'") (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

[3]     To ensure the independence of the Board from the influence of Fidelity, the number of interested trustees is limited by rule.  *See* 15 U.S.C. § 80(a)-10(a); 17 C.F.R. § 270.12b-1 (requiring a majority of independent trustees for a number of exemptive rules).  Pursuant to the Investment Company Act of 1940, 15 U.S.C. § 80(a)-2(a)(19), trustees are deemed "interested" by virtue of, among other things, their affiliation with the trust or various entities under common control with the investment adviser.

[4]     The Fidelity Select Portfolios SEC Filing is also available at:
http://www.sec.gov/Archives/edgar/data/320351/000032035105000010/0000320351-05-000010-index.htm.

### i.   For Nearly 70 Years, Congress Has Kept Investment Companies And Their Investment Advisers Distinct

Under the legal framework that has governed the mutual fund industry for nearly 70 years, an investment company and an investment adviser are separate and distinct entities. Indeed, the division between investment advisers and investment companies is the fundamental basis for mutual fund regulation upon which the industry is built. This split flows from the two pieces of legislation which serve as the legal architecture for the mutual fund industry in America: the Investment Company Act of 1940, 15 U.S.C. §80a-1 *et seq.* (the "Investment Company Act") and the Investment Advisers Act of 1940, 15 U.S.C. §80b-1 *et seq.* (the "Investment Advisers Act").

"Investment companies" are defined in the Investment Company Act as funds that raise capital through the issuance of securities and, in turn, invest that capital in securities. 15 U.S.C. § 80a-3(a)(1). "Investment advisers," by contrast, are defined in the Investment Advisers Act as entities which provide advice about securities to, or manage portfolios of, investment companies in exchange for compensation. 15 U.S.C. § 80b-2(a)(11). Like investment companies, investment advisers are subject to extensive controls and regulation to protect investors from conflicts of interest arising from the relationship between the two.

Congress used this legislation to define the contours of the mutual fund industry, creating a distinction between investment companies and investment advisers that has been unfailingly acknowledged since 1940. The Securities and Exchange Commission ("SEC" or the "Commission") likewise has consistently maintained this distinction in the rules it has promulgated under the Investment Company Act and the Investment Advisers Act. In these statutes and rules, "investment advisers" and "investment companies" are never used interchangeably, confused or "integrated".

A stated aim of the Investment Company Act is to keep separate—not to integrate—investment companies and advisers. *See* 15 U.S.C. § 80a-1(b)(2) (declaring as a policy rationale the prevention of conflicts of interest between investment companies and advisers). Not surprisingly, therefore, numerous provisions in the Investment Company Act illustrate the distinction Congress created between investment companies and their investment advisers. For example, in defining persons affiliated with an investment company, the Investment Company Act clearly separates an investment company from its investment adviser; hence, while an adviser is an "affiliated person" of an investment company it advises, an investment company is not, by that same definition, an "affiliated person" with its adviser. *See* 15 U.S.C. § 80a-2(a)(3). The Investment Company Act further demonstrates the separation between the two by excluding any "bona fide officer, director, trustee, member of an advisory board, or employee of such [investment] company" from the definition of an "investment adviser" of an investment company. 15 U.S.C. § 80a-2(a)(20). These provisions demonstrate that when Congress enacted the Investment Company Act and the Investment Advisers Act, it did not intend to "integrate" an investment company with its investment adviser.

>     ii.    **Congress Did Not Intend SOX To Change The Existing Landscape of Mutual Fund Regulations by Merging Investment Companies And Privately-Held Investment Advisers**

Had Congress—which was fully aware of the distinction between investment advisers and investment companies—intended to extend Section 806 whistleblower protections to employees of privately-held investment advisers, it would no doubt have drafted Section 806 differently. Indeed, elsewhere in SOX, Congress made specific references to investment companies and investment advisers. *See, e.g.* SOX § 405 (exempting "investment companies registered under Section 8 of the Investment Company Act of 1940" from certain SOX provisions); § 201(a) (including "investment advisers" in amendments to the 1934 Act); § 604(b)

(titled "Investment Advisers" and amending the Investment Advisers Act); and § 703(a)(1) (ordering the SEC to conduct a study of, *inter alia*, "investment advisers"). No such references appear in Section 806.

Undaunted by the absence of any reference to investment advisers in Section 806, Zang argues that Congress did not actually mean what it said, asserting that because investment advisers are private companies, giving Section 806 its plain meaning "would shield an entire industry from the protections Congress intended." (Opp. at 13). While it is true that in practice most investment companies generally contract with private investment advisers, this need not be the case. Indeed, many investment advisers to investment companies are public, and their employees therefore would be covered by Section 806.[5] Hence, public investment advisers are neither a logical impossibility nor a null set.

### iii. Congress Declined To Amend Section 806 To Include Coverage For Employees Of Privately-Held Investment Advisers

Perhaps most devastating to Zang's position that investment advisers must be covered by the language of Section 806, Congress recently considered *but did not pass* various whistleblower provisions to cover them. In 2003, revelations of market timing and late trading[6] within the mutual fund industry prompted Congress to reevaluate the scope of its corporate responsibility regime. This resulted in a wave of proposed legislation, including the Mutual

---

[5]     Item 2(b) of Schedule A of SEC Form ADV (annual report required to be filed by investment advisers) requires an adviser to "List below the names of: . . . (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, UNLESS YOU ARE A PUBLIC REPORTING COMPANY (a company subject to Section 12 or 15(d) of the Exchange Act);" (all caps added for emphasis). SEC Form ADV may be found on the Sec's website, at http://www.sec.gov/about/forms/formadv-partla.pdf.

*See also*, John Waggoner, "Get Return on Fees by Investing in Fund Managers," *USA Today*, at 3B, accessible at http://www.usatoday.com/money/perfi/columnist/waggon/2006-09-14-fund-investing_x.htm ("The very largest fund managers — Fidelity, Vanguard and the American Funds — are not publicly traded. But many fund managers are, and have long been, remarkably profitable.").

[6]     Market timing involves frequent trading in and out of a fund's shares. Late trading arbitrages price movements through the purchase of shares at an essentially backdated price.

Fund Reform Act, S. 2059, 108th Cong. (2004) ("MFRA"), the Mutual Funds Integrity and Fee

Transparency Act, H.R. 2420, 108th Cong. (2003), and the Mutual Fund Investor Confidence

Restoration Act, S. 1971, 108th Cong. (2003).  Among other remedial provisions, each of these

bills would have increased whistleblower protections to employees in the mutual fund industry,

either by directing the SEC to establish policies and procedures to this end or ordering

investment companies directly to do so.  *See, e.g.,*  H.R. 2420, 108th Cong. § 201 (2003); S.

1971, 108th Cong. § 301(2003).

MFRA took an additional approach to the problem, one especially revealing of Congress'

understanding of Section 806.[7]  MFRA sought specifically to extend Section 806 protections to

employees of investment advisers.  S. 2059, 108th Cong. § 116(b) (2004).  The relevant text of

MFRA is striking on this point; it would have amended Section 806 as follows (changes to

current language are highlighted):

> (a) Whistleblower Protection for Employees of Publicly Traded
> Companies *and Registered Investment Companies*- No company
> with a class of securities registered under section 12 of the
> Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is
> required to file reports under section 15(d) of the Securities and
> Exchange Act of 1934 (15 U.S.C. 78o(d)), ***or that is an investment***
> ***adviser***, *principal underwriter, or significant service provider (as*
> *such terms are defined under section 2(a) of the Investment*
> *Company Act of 1940 (15 U.S.C. 80a-2(a)) of an investment*
> *company which is registered under section 8 of the Investment*
> *Company Act of 1940*, or any officer, employee, contractor,
> subcontractor, or agent of such company, may discharge, demote,
> suspend, threaten, harass, or in any other manner discriminate
> against an employee in the terms and conditions of employment
> because of any lawful act done by the employee--'."

*Id*. (emphasis added).

---

[7]      The Senate version of MFRA attracted 13 co-sponsors; of those who had been in Congress in 2002, all
voted for SOX.

The only logical implication of this Congressional attempt to amend Section 806 is that SOX as written does <u>not</u> provide whistleblower protection to employees of privately-held investment advisers.  Otherwise, the amendment to Section 806 proposed in MFRA would be extraneous.  For this reason, the Senate Record in connection with MFRA explains that among other important changes, MFRA would be "instituting Sarbanes-Oxley-style . . . whistleblower protections." 150 Cong. Rec. S794 (daily ed. Feb 10, 2004).

Importantly, however, Congress did <u>not</u> pass MFRA or any of the other bills, nor did it amend SOX or Section 806.  Instead, the Congressional response was to rely on the SEC's 2004 adoption of Rule 38a-1 under the Investment Company Act, 17 C.F.R. § 270.38a-1, which mandates that investment companies adopt procedures and practices to ensure compliance with federal securities laws.  Significantly, nothing in Rule 38a-1 requires or even suggests that the decades-old distinction between investment companies and investment advisers should be conflated for purposes of determining coverage under Section 806 of SOX.[8]

**D.     Zang Erroneously Claims That He Is Covered By SOX Simply Because Of The Services That Fidelity Provides To The Funds**

Zang claims that "all of the employment functions and decisions of the Funds are made and effected by FMR Co. and/or FMR Co., Inc. . . . and, therefore, the Defendants must have acted as the Funds' agent with respect to employment decisions affecting Zang." (Opp. at 10).  First of all, the employment functions and decisions of the *Funds* and who may have affected them have no relevance at all to Zang because, as is undisputed, he was not employed by them.

---

[8]     Rule 38a-1 requires each investment company to appoint a Chief Compliance Officer ("CCO"), whose responsibilities include investigating and reporting on compliance matters related to federal securities law.  17 C.F.R. §270.38a-1(a)(4).  Rule 38a-1 protects the CCO from an investment adviser's potential undue influence by requiring that 1) a CCO's appointment and compensation be approved by the investment company's board of trustees, including a majority of independent trustees; 2) the CCO may be removed only by the trustees, including a majority of the independent trustees; and 3) the CCO meet separately with the independent trustees on an annual basis.  *Id.*

If he is arguing in his Opposition that SOX coverage is proper because the Funds controlled

FMR Co. or FMR Co., Inc.'s employment decisions about him, he failed to allege as much in the

Complaint.  His Complaint nowhere alleges that the Funds had any authority to make

employment decisions over Fidelity employees or that the Funds were involved in any way in the

decision to terminate him.  Thus, *Klopfenstein v. PCC Flow Technologies Holdings, Inc.*, 2004-

SOX-00011 (ARB May 31, 2006), which Zang cites in support of his agency argument (Opp. at

12), is inapposite.[9]

Zang cites *Brady v. Calyon* for the proposition that non-public companies may be

covered by SOX where the non-public company is found to be "almost inseparable" from the

publicly traded company.  (Opp at 12).  Tellingly, Zang's quote from *Brady* ignores the more

relevant portion of that decision discussing the "[n]umerous administrative decisions [that]

illustrate the proper application of the 'agency' provision [of SOX] to companies that have acted

as agents of publicly traded companies with *respect to their employment relationships*."  *Brady*,

406 F. Supp.2d 307, 318 n.6 (S.D.N.Y. 2005) (emphasis in original).  Significantly, none of

those administrative decisions would support a finding of SOX coverage on the facts alleged by

Zang.  *Kalkunte v. DVI Fin. Servs., Inc.*, 2004-SOX-00056 (ALJ July 18, 2005), is the only case

cited in *Brady* (and the only decision of which Fidelity is aware) [10] in which a private company

---

[9]        *Klopfenstein* involved a parent-subsidiary relationship in which the publicly-traded parent "made the ultimate decision to terminate complainant" (who was employed by the private subsidiary).  *See also Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 6 (1st Cir. 2006), *cert. denied*, 126 S. Ct. 2973 (2006) (suggesting in dicta that employees of non-public subsidiaries might be covered under the Act if their employers acted as the agents of public parent companies in committing a retaliatory act).

[10]       The other administrative decisions cited in *Brady* (and conveniently ignored by Zang) involved employees of private subsidiaries of publicly traded companies.  *Morefield v. Exelon Servs., Inc.*, 2004-SOX-00002 (ALJ Jan. 28, 2004) (dismissing SOX claim because employee of private subsidiary did not name public parent company as a defendant); *Powers v. Pinnacle Airlines, Inc.*, 2003-AIR-12, at 1-2 (ALJ Jan. 28, 2004) (dismissing SOX claim brought by employee of non-public subsidiary of a public company); *Platone v. Atlantic Coast Airlines*, 2003-SOX-00027, at 19-20 (ALJ April 30, 2004) (holding that an employee of a non-public subsidiary could bring a SOX claim (Continued)

was found covered by § 806 based on its contractual services to a public company.  In that case,

the publicly traded company, DVI Financial Services, Inc., hired a non-publicly traded company,

AP Services ("AP") to act as its agent and manage its day to day operation while it went through

bankruptcy.  *Id.* at 9.  AP was found liable under SOX based on the control it exercised over the

employees of the public company and because it retaliated against one of the public company's

employees.  Thus, *Kalkunte* stands for the proposition that a private company's contractual or

agency relationship with a public company may be sufficient to extend coverage under the Act

where the private company assumes control of, and takes action against, the public company's

employees.  Here, of course, Zang was employed by Fidelity—a private company—and there is

no allegation that the Funds were in any way involved in the decision to terminate him.

### E.    Zang's Public Policy Argument Is Inconsistent With The Terms Of The Statute

Zang argues that extending SOX coverage beyond its plain meaning is necessary to

achieve Congressional intent.  (Opp. at 12).  Of course, the simple answer to this argument is that

it is counter to the express language and legislative history of the statute.  *See* Mem. at 8-12.

Moreover, Congress enacted specific provisions in Sarbanes-Oxley applicable to

employees of non-public companies *where it deemed it necessary*.  For example, SOX § 1107

establishes criminal sanctions for those who knowingly retaliate against a certain class of

whistleblowers who provide information to law enforcement authorities and applies to private

companies as well as public companies.  SOX § 1107, 18 U.S.C. § 1513(e).  Congress easily

could have used the same broad language to extend the coverage of Section 806 to include

employees of contractors, subcontractors or agents of covered companies.  Instead, Congress,

---

if subsidiary is operated as a "mere instrumentality" of the public parent).  Because Fidelity and the Funds have a
contractual relationship and are not parent and subsidiary, those cases plainly are inapposite.

undoubtedly concerned about the effect of imposing a broad statutory mandate on the vast number of private companies in the U.S.,[11] chose a more narrow approach by protecting private employees from retaliation only when they provide information to law enforcement officers. Because the Sarbanes-Oxley Act specifically addresses private company whistleblowers elsewhere, the absence of language in Section 806 directed to employees of private companies compels the conclusion that Congress did not think it necessary to accomplish SOX's investor protection goals.

Zang inexplicably points to the rules under SOX § 303 to argue that they show that Fidelity is covered under Section 806.[12]  (Opp. at 9 n.5).   In fact, the SEC has reflected the will of Congress by adopting rules under SOX that maintain the distinction between investment companies and advisers.  For example, in rulemaking under SOX Sections 303, 307, and 406, the SEC has held those provisions in some instances may apply to employees of an adviser, yet it has never made such a ruling with respect to Section 806.  The rationale for the SEC rulemaking is (as it must be) grounded in the specific statutory language in SOX.

For example, in amending Rule 13b-2 under the 1934 Act under authority granted by SOX, the SEC noted that:

> [o]ne commenter suggested expanding the scope of the persons covered by the prohibition, to include accounting personnel working for an investment company's service providers. *Consistent with the language of section 303(a)* and the scope of the rule for operating companies, we have not expressly included these persons, although we note that they would be covered by the rule if

---

[11]     As Senator Sarbanes – one of the Act's sponsors – stated when introducing the Senate Conference Report: "[I want to] make clear that [the Act] applies exclusively to public companies – that is, to companies registered with the Securities and Exchange Commission.  It is not applicable to pr[ivat]e companies, who make up the vast majority of companies across the country."  148 Cong. Rec. S7350, 7351 (daily ed. July 25, 2002) (emphasis added).

[12]     Section 303 concerns improper influence on auditors and audits.  15 U.S.C. § 7242.

> they are acting under the direction of an officer or director of the
> investment company….

Final Rule: Improper Influence on Conduct of Audits, Investment Company Act Release No. IC-26050 (June 26, 2003) (emphasis added).  In other words, the SEC determined that statutory language covering directors and officers of an investment company—that is, specific positions within the investment company—was insufficiently broad to justify application to its service providers.  *Id.*

## II.     Zang's Efforts To Distinguish Decisions Applying Principles Of Collateral Estoppel Are Unpersuasive

Although SOX provides for the filing of an action for "de novo review" in the appropriate district court if the Secretary of Labor has not issued a decision within 180 days, there is nothing in SOX that precludes the Court from dismissing Zang's claim based on principles of collateral estoppel.  *See* 18 U.S.C. § 1514A(b)(1)(B).  Zang is unable to cite any judicial authority for such a proposition, and his efforts to distinguish the cases cited by Fidelity are unpersuasive.

In an effort to distinguish *Hanna v. WCI Communities, Inc.*, 348 F. Supp. 2d 1322 (S.D. Fla. 2004), Zang quotes language out of context and ignores the part of *Hanna* most relevant to his case.   In *Hanna*, the court declined to apply principles of collateral estoppel to the *preliminary investigative findings* of the DOL, *id.* at 1324, but emphasized that relitigation in district court would be "absurd" if the case had reached the ALJ stage before Hanna's removal to federal court.  "As the DOL has recognized, applying the statute according to its plain meaning might indeed lead to an absurd result in cases where 'a complainant will have litigated a claim before the agency, will receive a decision from an administrative law judge, and will then file a complaint in Federal court while the case is pending on review by the Board.'"  *Id.* at 1328 (citing 68 Fed. Reg. 31860).

The *Hanna* court concluded that issue preclusion would be appropriate when "a complainant brings a new action in federal court following extensive litigation before the Department that has resulted in a decision by an administrative law judge or the Secretary." *Id.* at 1331. This is precisely the circumstance here, and Zang's effort to circumvent the DOL appeals process is exactly the sort of maneuver that principles of collateral estoppel were designed to curtail. *Allen v. Stewart Enters., Inc.*, No. 05-CV-04033, 11 (E.D. La. Apr. 6, 2006) ("[W]hen the failure to give [preclusive] effect to a finding of an administrative agency would encourage litigants to bypass prescribed appeal procedures of an agency, that factor should weight strongly in the decision.") (citation omitted).

Next, despite the plain language of the case in which the Supreme Court recognized that "it is sound policy to apply principles of issue preclusion to the fact-finding of administrative bodies acting in a judicial capacity," Zang would have this Court reject that principle. *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 797 (1986). Zang acknowledges that *Elliott* gave preclusive effect to an administrative body's ruling on the plaintiff's Section 1983 claim, but attempts to distinguish *Elliott* because it denied preclusive effect to the plaintiff's Title VII claim. (Opp. at 6). The Court's decision not to give preclusive effect to the Title VII claim, however, was premised on the fact that a *federal* administrative agency, the Equal Employment Opportunity Commission ("EEOC"), is already charged with reviewing Title VII claims. Indeed, one of the EEOC's duties is to review state administrative agency determinations as to Title VII claims—a duty that "would be pointless if the federal courts were bound by such [state] agency decisions." *Id.* at 793. Because no federal agency was charged with reviewing Section 1983 claims, the Court did give preclusive effect to the administrative agency's factual holdings concerning the civil rights claim.

Here, there is no such tension between the role of state and federal administrative bodies because the decision dismissing Zang's SOX claim came from the DOL, which is the only federal agency charged with reviewing SOX grievances.  Accordingly, the ALJ's findings ought to estop future fact-finding on identical factual issues.  *See also Wickham Contracting Co., Inc. v. Bd. of Educ. of the City of New York*, 715 F.2d 21, 26 (2d Cir. 1983) (applying collateral estoppel to determinations by an ALJ because the subsequent lawsuit filed in federal court raised legal and factual issues that were identical to the issues before the ALJ).

Zang attempts to distinguish *Allen v. Stewart Enters., Inc.*, No. 05-CV-04033 (E.D. La. Apr. 6, 2006), by stating that the parties in *Allen* underwent a six-day hearing, while "no such adjudicatory hearing was held in this case, which was dismissed on summary decision."  (Opp. at 7).  The only reason there was no hearing on the merits in this case is because the ALJ acted precisely as a trial court would by dismissing Zang's complaint after she concluded, on a well-developed record and voluminous briefs, that it had no legal validity.  *United States  v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) ("[W]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.").

## III.    Zang Never Engaged In Protected Activity

To engage in protected activity under SOX, a plaintiff must have a reasonable belief that the employer's conduct constituted a violation of an enumerated fraud statue, or any other rule or regulation of the SEC, or any provision of federal law relating to fraud against shareholders. *Deremer v. Gulfmark Offshore, Inc.*, 2006-SOX-00002, 46 (ALJ June 29, 2007).  Although SOX does not explicitly refer to rules or regulations of the SEC involving fraud, courts have held that fraud is an essential component of any SOX whistleblower claim.  *Livingston v. Wyeth, Inc.*, 520

15

F.3d 344, 351 n.1 (4th Cir. 2008). "To conclude otherwise would absurdly allow a retaliation suit for an employee's complaints about administrative missteps or inadvertent omissions from filing statements." *Id.* Here, Zang's allegations about a draft Statement of Additional Information ("SAI") do not include any facts that would cause anyone to have a reasonable belief that Fidelity had committed fraud.[13] *See also Welch v. Chao*, No. 07-1684, 2008 U.S. App. LEXIS 16574 (4th Cir. August 5, 2008) (concern raised by company's chief financial officer that accounting practices were deficient and resulted in misstatement of income in SEC filing was not protected activity under SOX).

Fidelity distributed the draft SAI to select employees because it wanted their feedback and recommended revisions. (Compl. ¶ 42). In response, Zang then allegedly raised a concern that the SAI "contained false and misleading statements or omissions regarding Fidelity's compensation of Fidelity Select Portfolio's equity portfolio managers." (Compl. ¶ 52). Fidelity's associate general counsel Mark Jensen met with Zang shortly after Zang raised his concerns. (Compl. ¶¶ 71-75). After conducting an inquiry, Fidelity submitted a revised SAI to the SEC that "contained revisions . . . which were made as a result of Zang's concerns." (Compl. ¶ 80-81). Zang's claim, then, is that he "blew the whistle" by **doing what Fidelity had asked him to do** – provide comments on a draft document. (Compl. ¶¶ 42 - 47). Zang does not allege that Fidelity ever deliberately attempted to mislead investors or the SEC – far from it, his allegations highlight Fidelity's desire to craft the best possible registration statement.

Zang also claims that he blew the whistle about Fidelity's supposed operation of "veiled index funds" and "even provided a provocative mock headline" in his March 13, 2005 e-mail

---

[13] Zang appears to concede that he never raised any concerns of fraud by arguing that there is no such requirement to engage in protected activity under SOX. (Opp. at 16).

("March Memorandum"). (Opp. at 18). The mock headline, however, is the *only* thing that

Zang ever said about the supposed veiled index funds. Indeed, the phrase "veiled index funds"

does not appear anywhere in the text of the March Memorandum. Moreover, the phrase "veiled

index funds" is not a term of art in the mutual fund industry that has some associated meaning –

it is merely Zang's own characterization of something about which he provided no context

beyond the mock headline. While he appears now to be certain that this was an allegation of a

securities law violation, it is anyone's guess what he meant through his use of the concocted term

and the way he used it at the time. He did not expound upon the mock headline anywhere else in

the text of the March Memorandum, or in any other context until the commencement of this

litigation. Surely an employee who reasonably believed he was blowing the whistle about an

actual securities law violation would have provided a bit more context about his actual concerns.

A common sense reading of the mock headline plainly shows that it was never intended to be

SOX-type whistleblowing activity and Zang's retroactive characterization to the contrary should

be disregarded.

## IV.   Zang's Common Law Public Policy Arguments Are Meritless

Zang argues that he was wrongfully terminated in violation of a Massachusetts public

policy that is codified in SOX. (Opp. at 20 n.9).[14] This argument is nonsensical. Massachusetts

does not provide a duplicate cause of action for wrongful discharge in violation of public policy

where there is already a statutory remedy designed to vindicate, or preclude a claim based on the

alleged wrong. *See Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 514 (1985) ("[R]ecent

decisions of the Supreme Judicial Court . . . disfavor the creation of duplicative remedies"). The

---

[14]     Zang also generally references the federal securities laws, but since he does not identify any particular
provision of these laws other than the penalty provisions and does not articulate what public policy they reflect that
is relevant to his claims, he has not pled a claim with respect to these laws with sufficient particular to survive a
motion to dismiss.

fact that Zang's claim happens not to be covered under SOX does not change this analysis.  If every claim that failed to meet the requirements of a remedial statute were transformed into a public policy claim *because* it failed to meet those requirements, the effect would be a wholesale undercutting, by the judiciary, of the legislature's intent in crafting the remedial statute.  Zang cannot seek relief from this Court for a SOX remedy that Congress did not see fit to provide him.  *See Gauthier v. Town of Dracut*, No. 03-2826, 2005 Mass Super. LEXIS 373, *27-28 (Mass. Sup. Ct. June 27, 2005) (holding that plaintiff's claim for wrongful discharge against individual plaintiffs was barred because the pertinent Whistleblower Act permits actions only against the employer).

       None of the cases cited by Zang warrant limiting Massachusetts's strong presumption of at-will employment on the facts here because those cases all concern employees who made allegations of criminal or fraudulent conduct by their employers under circumstances where no remedial scheme existed through which they could address their subsequent terminations.  *Shea v. Emmanuel College*, 425 Mass. 761, 762 (1997) (employee terminated for reporting theft of funds).  *See also Riley v. Green*, No. 02-0765, 2002 Mass. Super. LEXIS 448, *12 (Mass. Sup. Ct. November 5, 2002) (employee terminated for reporting "suspected criminal activity"); *Hutson v. Analytic Sciences Corp.*, 860 F. Supp. 6, 11 (D. Mass. 1996) (employee terminated for alleging criminal defrauding of government); *Smith v. Mitre Corp.*, 949 F. Supp. 943, 949-50 (D. Mass. 1997) (employee terminated for complying with "federal law prohibiting fraud and the making of false claims in connection with the performance of federal government contracts"); *Sullivan v. Massachusetts Mutual Life Ins. Co.*, 802 F. Supp. 716, 719-20 (D. Conn. 1992) (employee terminated for complaining of insider trading violations).   As described above and in

Fidelity's opening memorandum, the concerns Zang expressed fell far short of this type of conduct, and his claim therefore fails.

## <u>CONCLUSION</u>

For the reasons set forth above, this action should be dismissed with prejudice.

Respectfully submitted,
FIDELITY MANAGEMENT & RESEARCH
COMPANY,  FMR CO. INC., and FMR LLC,

By their attorneys,

/s/ Wilfred J. Benoit
Wilfred J. Benoit, Jr.  (BBO #037900)
Ethan Z. Davis (BBO #668973)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000
wbenoit@goodwinprocter.com
edavis@goodwinprocter.com

Dated: August 11, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 11, 2008.

/s/ Wilfred J. Benoit, Jr.