```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2


 3      ----------------------------x
        LAWSON                      :   DOCKET NUMBER 08-CV-10466
 4           PLAINTIFF             :
                   versus          :   UNITED STATES COURTHOUSE
 5      FMR, LLC, ET AL             :
             DEFENDANTS             :   BOSTON, MASSACHUSETTS
 6      ----------------------------x


 7
        ----------------------------x
 8      ZANG                        :   DOCKET NUMBER 08-CV-10758
             PLAINTIFF              :
 9                 versus          :   UNITED STATES COURTHOUSE
        FIDELITY MANAGEMENT & RESEARCH:
10         COMPANY, ET AL           :
             DEFENDANTS             :   BOSTON, MASSACHUSETTS
11      ----------------------------x

12
                        NOVEMBER 5, 2008
13

14                         2:30 p.m.

15
                    TRANSCRIPT OF MOTION HEARING
16

17      BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
                    UNITED STATES DISTRICT JUDGE
18

19                       OFFICIAL COURT REPORTER

20          DIANE M. MOLAS, RPR, DE & MA CSRs, AND NJ CCR
                         OFFICIAL COURT REPORTER
21      UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS
                         ONE COURTHOUSE WAY
22          THIRD FLOOR - COURTROOM 1 - SUITE 3200
                         BOSTON, MA 02210
23                  TELEPHONE: (267) 977-2909
                    E-MAIL:  Dmolas1@aol.com
24
             PROCEEDINGS REPORTED USING MACHINE STENOGRAPHY.
25      TRANSCRIPT PRODUCED EMPLOYING COMPUTER-AIDED TECHNOLOGY.
```

1    APPEARANCES:

2         ATTORNEY FOR THE PLAINTIFF LAWSON:

3              SEGAL ROITMAN, LLP

4                   BY:  INDIRA TALWANI, ESQUIRE
                         111 DEVONSHIRE STREET
5                        FIFTH FLOOR
                         BOSTON, MA 02109
6                        TELEPHONE:  617-603-1427
                         E-MAIL:  Italwani@segalroitman.com
7                        FAX:  617-742-2187

8

9         ATTORNEYS FOR THE DEFENDANTS, FMR, LLC, ET AL:

10             GIBSON, DUNN & CRUTCHER, LLP

11                  BY:  EUGENE SCALIA, ESQUIRE
                         1050 CONNECTICUT AVENUE, N.W.
12                       WASHINGTON, DC 20036-5303
                         TELEPHONE:  202-955-8500
13                       E-MAIL:  Escalia@gibsondunn.com
                         FAX:  202-530-9606

14                            AND

15             LOCAL COUNSEL:  GOODWIN PROCTER, LLP

16                  BY:  WILFRED J. BENOIT, JR., ESQUIRE
                         53 STATE STREET
17                       BOSTON, MA 02109
                         TELEPHONE:  617-570-1155
18                       E-MAIL:  Wbenoit@goodwinprocter.com
                         FAX:  617-227-8591

19                            AND

20                  BY:  ETHAN Z. DAVIS, ESQUIRE
                         53 STATE STREET
21                       BOSTON, MA 02109
                         TELEPHONE:  617-570-1451
22                       E-MAIL:  Edavis@goodwinprocter.com
23                       FAX:  617-570-1231

24

25

1  APPEARANCES (CONTINUED):

2      ATTORNEYS FOR THE PLAINTIFF ZANG:

3          ROSE, CHINITZ & ROSE

4              BY:  ALAN D. ROSE, SR., ESQUIRE
                      and NICHOLAS J. ROSENBERG, ESQUIRE
5                  ONE BEACON STREET
                   4TH FLOOR
6                  BOSTON, MA 02108
                   TELEPHONE:  617-536-0040
7                  E-MAIL:  Adr@rose-law.net;
                             njr@rose-law.net
8                  FAX:  617-536-4400

9

10     ATTORNEYS FOR THE DEFENDANTS, FIDELITY MANAGEMENT &
          RESEARCH COMPANY, ET AL:

11         GOODWIN PROCTER, LLP

12             BY:  WILFRED J. BENOIT, JR., ESQUIRE
                   53 STATE STREET
13                 BOSTON, MA 02109
                   TELEPHONE:  617-570-1155
14                 E-MAIL:  Wbenoit@goodwinprocter.com
                   FAX:  617-227-8591
15
                            AND
16
               BY:  ETHAN Z. DAVIS, ESQUIRE
17                 53 STATE STREET
                   BOSTON, MA 02109
18                 TELEPHONE:  617-570-1451
                   E-MAIL:  Edavis@goodwinprocter.com
19                 FAX:  617-570-1231

20

   OFFICIAL COURT REPORTER:
21
           DIANE M. MOLAS, RPR, DE & MA CSRs, and NJ CCR
22         OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS
23         ONE COURTHOUSE WAY
           THIRD FLOOR - COURTROOM 1 - SUITE 3200
24         BOSTON, MA 02210
           TELEPHONE: (267) 977-2909
25         E-MAIL:  Dmolas1@aol.com

4

1                    P R O C E E D I N G S

2                       MOTION HEARING

3            THE DEPUTY CLERK:  All rise.

4            This Honorable Court is now in session.

5            You may be seated.

6            Calling the case, Civil Action, CA-0810466,

7    Jackie Lawson versus Fidelity Management and Research, et al,

8    and CA-0810758, which is Jonathan Zang versus Fidelity

9    Management and Research Company, et al.

10           THE COURT:  Well, let me start, I guess, with Zang

11   and the question of collateral estoppel.

12           I want to understand a little better than I think I

13   do now how the parties say the rule actually works.

14           Let me -- I don't know, Mr. Rose, if you're going

15   to be handling this aspect of it.

16           MR. ROSE:  Yes.

17           THE COURT:  Let me focus you with questions.

18           Assume that someone stays in the administrative,

19   and we'll call it, the administrative route all the way

20   through, and there is a final decision by the board.

21           Am I correct that it then is subject to judicial

22   review in traditional APA fashion?

23           MR. ROSE:  Yes.

24           THE COURT:  Now, if you choose to step off that

25   process, at any point, and 180 days have passed, your view is

1    you get de novo review in the District Court.

2                    MR. ROSE:  That's correct, Your Honor.

3                    THE COURT:  That's your structure for this.

4                    MR. ROSE:  That's my -- that's my position.

5                    THE COURT:  Okay.

6                    Now, what does finality mean in this context; that

7    is to say, what's the implication of finality?

8                    I understand it's a label, but what does it really

9    mean?

10                   For example, it can be final if there is no further

11   determination by the ALJ and final if there's no further

12   determination by the Board.

13                   Is it your view that, if you didn't appeal the OSHA

14   determination, that this would be final and would prevent you

15   from seeking de novo review in This Court?

16                   MR. ROSE:  Well, Your Honor, my position is that,

17   once 180 days --

18                   THE COURT:  Just assume that 180 days have not

19   passed, just for these present purposes.

20                   MR. ROSE:  If 180 days have not yet passed and

21   there is a final decision.

22                   THE COURT:  That's the label.

23                   MR. ROSE:  I'm not clear on The Court's --

24                   THE COURT:  Let me start with OSHA, the first stage

25   of this.

```
1            Let's assume that you get an adverse determination
2   or you, your client does, an adverse determination from OSHA,
3   and you don't take it any farther.
4            MR. ROSE:  And that happens within 180 days?
5            THE COURT:  Right.  Right.
6            MR. ROSE:  And there's an adverse decision?
7            THE COURT:  Mm-hmm.
8            MR. ROSE:  Well, the way the statute works, as I
9   see it, is that, if I do not do something, then, the initial
10  decision becomes, under OSHA's rules, a final decision.
11           THE COURT:  Of the secretary.
12           MR. ROSE:  Yes, and, if that happens within 180
13  days, then, I am -- I cannot come to the U. S. District Court.
14           THE COURT:  And you can't go anywhere else under
15  the circumstances that I described; that is, you just let it
16  ride; you didn't go to the ALJ?
17           MR. ROSE:  I don't know whether, under those
18  circumstances, I would be allowed to avail myself of appellate
19  rights under the APA.
20           THE COURT:  Alright; so, Mr. Benoit, let me
21  understand something from you.
22           MR. BENOIT:  I guess, as to the latter point, if
23  the administrative agency doing the preliminary investigation,
24  sort of a cause or no cause investigation, if you will, made
25  its finding within 180 days that there was no cause and
```

```
 1   dismissed the Complaint, I don't think the statute provides

 2   for any review, other than the possibility of filing an appeal

 3   with the administrative law judge's office, that's what

 4   happened in this case, although it was after 180 days.

 5             There was a quote de novo process before the --

 6             THE COURT:  There is a time period, though, in

 7   which you --

 8             MR. BENOIT:  Right.

 9             THE COURT:  -- can go to the ALJ.

10             MR. BENOIT:  That's correct.

11             THE COURT:  My question to you is, is the flip of

12   this, which is -- and let me see if we're on common ground;

13   There is APA review of the Board's determination.

14             MR. BENOIT:  Correct.

15             THE COURT:  Now, it's a different standard.  It's

16   some sort of universal camera standard, I suppose.

17             MR. BENOIT:  Substantial evidence, records.

18             THE COURT:  So why is it that someone can't make

19   the choice all the way through where they want to be, after

20   180 days?

21             (No response.)

22             THE COURT:  Well, where in the statute does it tell

23   me that they can't do that?

24             MR. BENOIT:  There's nowhere in the statute that

25   specifically addresses your question, Your Honor, but, in this
```

8

 1    case, it's our position that Mr. Zang, after 180 days had

 2    elapsed, before the administrative agency had even made a

 3    finding, once the 180 days had elapsed, Mr. Zang could have

 4    chosen to come into this Court to file a suit to start the

 5    process.

 6            Instead, Mr. Zang waited for the administrative

 7    investigation to conclude, I suspect, hoping that the OSHA

 8    regional administrator would find in his favor and, then,

 9    issue a preliminary order requiring his reinstatement as a

10    unique feature of the Sarbanes-Oxley Act, so he waited

11    approximately a year after the 180 days had elapsed for the

12    administrative agency to conclude its findings.

13            At that point, he had a choice.  He could have come

14    into this Court and had a de novo process and litigated his

15    case, despite the lack of probable cause finding on the part

16    of the regional administrator at OSHA, or he could appeal to

17    an administrative law judge.

18            He appealed to the administrative law judge for

19    de novo review, which initiated a from-scratch litigation of

20    the Sarbanes-Oxley claim, and, of course --

21            THE COURT:  I understand that.  I think I

22    understand that part of it.

23            MR. BENOIT:  Yes.

24            THE COURT:  The question is:  So where does it say

25    he can't do this?

9

1          Where does it say he can't go into federal court

2    after 180 days, if the determination is not final?

3          MR. BENOIT:  If I could, as I start to answer your

4    question, Your Honor, jump ahead, literally read, even if the

5    ARB issues its final decision, which everybody would agree

6    with the final, the statute doesn't seem to preclude a

7    complainant from nonetheless going into court and starting the

8    process all over again, if you read the statute literally,

9    which many courts and the Secretary of Labor have said would

10   be absurd.

11         THE COURT:  Many courts, one court, and the

12   Secretary of Labor.

13         MR. BENOIT:  Right.

14         THE COURT:  And I understand the Secretary of Labor

15   would like to unburden himself about burdens, but that's not,

16   in any way binding on a court.

17         They don't like the idea that they will do some

18   work and, then, somebody else might be able to reverse them on

19   that.

20         MR. BENOIT:  Sure.

21         THE COURT:  On the other hand, they take awhile to

22   get to these decisions, there's a consequence of which they

23   open themselves up to precisely that outcome, so it's, to some

24   degree, within their control.

25         MR. BENOIT:  Your Honor, I think, as a practical

```
1   matter, it's almost impossible to complete the OSHA

2   administrative investigation, plus the ALJ litigation, do all

3   that in 180 days.

4               THE COURT:  Well, that's their problem with

5   Congress.

6               MR. BENOIT:  Correct.

7               THE COURT:  What they want to do.

8               MR. BENOIT:  I would concede, as I did last time,

9   that the Secretary of Labor's views that were expressed in

10  that opinion weren't entitled to deference by This Court,

11  unless you find it's persuasive or somewhat helpful.

12              There are three decisions that I'm aware of that

13  grapple with this issue.

14              One of them, the Hanna (phonetic) case, did it on a

15  hypothetical basis, because there had only been an

16  administrative finding.

17              The other two cases, Stone, which I believe I gave

18  you last time, what we cited in our brief.

19              THE COURT:  I'm sorry?

20              MR. BENOIT:  Stone.

21              THE COURT:  Right.

22              MR. BENOIT:  And the other case was the Allan case,

23  find very specifically that that result, you know, after full

24  litigation before the ALJ to start the process all over again

25  from scratch, would be absurd.
```

```
1              THE COURT:  Well, you use the word absurd.  What's

2   absurd about it?

3              I mean, Congress provides various routes for

4   various kinds of review under various circumstances.

5              I suppose that the Social Security Administration

6   feels a burden by the idea that there is going to be a review

7   in This Court of whatever the ALJ does.

8              You know, there are just a variety of different

9   rights that you can get into the federal court and have

10  review, and the statute contemplates it.  It contemplates, I

11  think you'll agree, APA review we have under the

12  administrative review and, then, it contemplates something

13  called de novo.

14             What does de novo mean, new from what?

15             New from what happened in the administrative

16  process?

17             MR. BENOIT:  I believe, Your Honor, that that's

18  ultimately a question if, perhaps, for a later stage of these

19  proceedings --

20             THE COURT:  Well, no, I want to --

21             MR. BENOIT:  -- if the motion's denied, but I'd be

22  happy to try to answer.

23             THE COURT:  I think you should, because it's going

24  to have some bearing on the way in which I view the likelihood

25  that I'm going to attach collateral estoppel, in fact, to some
```

1     order or some subordinate administrative body.

2               MR. BENOIT:  I think there are a couple of ways in

3     which The Court could approach a de novo review, if you

4     conclude that de novo review is called for.

5               THE COURT:  But it's de novo of what?

6               MR. BENOIT:  De novo review, which, if you adopt

7     the appellate standard of de novo review, it would be de novo

8     review of the record below, but there wouldn't be any

9     independent fact-finding.

10              If you look at de novo review from a context of,

11    for example, District Court judge reviewing the

12    recommendations of a magistrate or reviewing the findings of a

13    magistrate in a criminal detention hearing, I think there's a

14    case in the Ninth Circuit -- as a matter of fact, it's cited

15    in Mr. Zang's brief, the Caponi (phonetic) case -- that stands

16    for the proposition that de novo review entails a review by

17    the judge of the submissions to the magistrate and the

18    magistrate's finding.

19              THE COURT:  Has there been any case law of what

20    de novo review is in this context?

21              MR. BENOIT:  I'm not aware of that, Your Honor.

22              THE COURT:  Alright.

23              MR. BENOIT:  The only places that I'm aware of that

24    address this issue and these circumstances are the three cases

25    that we've cited.

```
 1              THE COURT:  The absurdity trilogy, I'd guess you'd
 2    call it.
 3              (Laughter.)
 4              MR. BENOIT:  Right.
 5              Yes.
 6              THE COURT:  At some point, the federal court is
 7    either obligated to observe the limitations of substantial
 8    evidence review or it does something, called, de novo review,
 9    which may be on the papers, it may be a new lawsuit;
10    effectively, a new lawsuit altogether, or it may be some
11    mixture of all of those, right?
12              MR. BENOIT:  Our view of it would be, Your Honor,
13    that, at most, it would be a review of the papers and
14    submissions.
15              THE COURT:  Okay, but without the deference and
16    constraints that substantial evidence would be.
17              MR. BENOIT:  Without deference.
18              THE COURT:  Okay.
19              Now, let's go back to this:  At what point does it
20    become absurd, from your point of view?
21              Does it become absurd if they haven't done it at
22    the OSHA level?
23              MR. BENOIT:  No.
24              THE COURT:  In 180 days?
25              Does it become absurd if they haven't done it
```

```
1    within 180 days at the ALJ?

2              MR. BENOIT:  I think -- it's hard to draw a fine

3    line, Your Honor.

4              I guess I'd use Potter Stewart's analogy in the

5    pornography cases, that you know it when you see it.

6              THE COURT:  It's not the analogy I would take in

7    this.

8              MR. BENOIT:  In this case, I think it becomes

9    absurd and egregious when you have someone who willingly

10   participates in the process below and fully and aggressively

11   litigates and asks for 250 days of extension and could have

12   been in This Court two-and-a-half-years earlier.

13             THE COURT:  Asked for 250 days of extension?

14             MR. BENOIT:  Yes.

15             THE COURT:  How?

16             MR. BENOIT:  Before the ALJ.

17             THE COURT:  You mean, they litigated before the

18   ALJ?

19             MR. BENOIT:  Yes.

20             THE COURT:  That wasn't a kind of trick.

21             It was they were engaged in litigation --

22             MR. BENOIT:  Correct.

23             THE COURT:   -- before the ALJ.

24             Now, let's assume at Day 248 they decide to --

25   enough is enough.  We'd like to go into the federal court.
```

```
 1              Is that absurd?

 2              MR. BENOIT:  Not having completed the process

 3  before the ALJ, I would say not.

 4              THE COURT:  So the completion of the process before

 5  the ALJ is the critical factor here?

 6              MR. BENOIT:  In my opinion for what it's worth,

 7  yes.

 8              THE COURT:  Okay.

 9              Well, hope springs eternal, it might be worth

10  something, and, so, the question is what the distinction is.

11              What you're essentially saying, I think, is when

12  you finish with the ALJ, you no longer have a right to go to

13  federal court for de novo review.

14              MR. BENOIT:  Well, I say, under those circumstances

15  it would be absurd and egregious to allow the complainant to

16  go into court and start and initiate the process all over.

17              THE COURT:  Why?

18              I mean, why is that any different?

19              Why is it any different from any other

20  administrative agency schemes, EEOC schemes, MCAD schemes,

21  that involve a substantial amount of litigation towards some

22  provisional determination which ultimately can be, not

23  reviewed, but ultimately leads to de novo litigation in

24  federal or state courts?

25              MR. BENOIT:  Well, there are significant
```

1  differences between the EEOC scheme and the Sarbanes-Oxley

2  scheme.

3         With the EEOC, the EEOC doesn't conduct any kind of

4  judicial hearing or quasi-judicial hearing.  There is no

5  litigation process before the EEOC.  The.

6         EEOC, upon the receipt of the charge, investigates

7  the matter and makes a cause or no-cause determination, and,

8  typically, if it's a no-cause determination, or, even, a cause

9  determination, the plaintiff is issued a Right to Sue letter,

10  and the plaintiff can go -- can bring suit in state or federal

11  court.

12         THE COURT:  That's a form of adjudicative act,

13  that's a form of adjudicative determination, isn't it, that is

14  probable cause?

15         MR. BENOIT:  Well, it's an investigative

16  determination rather than an adjudicative determination.

17         There is no testimony of witnesses, no

18  cross-examination, or anything like that.

19         On the MCAD side, the MCAD does the same kind of

20  investigation and, then, if there is a probable cause finding,

21  the MCAD will schedule a public hearing, which is an

22  administrative trial.

23         Now, under that state statute, the plaintiff has

24  the right to opt out of that hearing process and go directly

25  to court and get a jury trial or the plaintiff can stay with

17

1  the MCAD, have the administrative trial, but has to,

2  expressly, as a condition of the MCAD conducting that

3  administrative trial, give up his or her right to a trial in

4  court later on.

5          THE COURT:  And that's because the statute provides

6  that.

7          MR. BENOIT:  Statute and regulations.

8          THE COURT:  Right.

9          MR. BENOIT:  Well, I don't think the statute

10  provides it, but the regulations.

11          THE COURT:  Okay; so let's assume that we can do

12  this by regulation.

13          Why didn't the Secretary -- who seemed so huffy

14  about the idea that people might be able to go into federal

15  court after spending time in the department -- why didn't she

16  write regulations that foreclose this?

17          MR. BENOIT:  I'd be speculating, but there was a

18  reference in the section regarding the -- or, in one of the

19  cases, I think, regarding the Secretary's comments in the

20  preamble, which indicate that the Secretary felt that she

21  didn't have any kind of authority to direct the federal courts

22  to do, or not do anything.

23          THE COURT:  Well, does the MCAD believe it does?

24          MR. BENOIT:  I think that the MCAD believes that it

25  has the authority to tell the plaintiff that, if you want to

DIANE M. MOLAS, RPR, DE & MA CSRs, and NJ CCR
USDC - MAD
OFFICIAL COURT REPORTER

1    have your proceeding here, you have to give up your right

2    there.

3              THE COURT:  So the Secretary could have done it

4    here.

5              MR. BENOIT:  I really can't speculate.

6              THE COURT:  The bottom line is, the Secretary

7    didn't.

8              MR. BENOIT:  Correct.

9              THE COURT:  And the statute didn't, and, so, what

10   we have is a less than final determination in the

11   administrative process, right?

12             MR. BENOIT:  Correct.

13             THE COURT:  And finality is the touchstone of any

14   kind of issue preclusion.

15             MR. BENOIT:  I believe, Your Honor, that the --

16   that -- that the mere fact that a decision by an

17   administrative law judge could be appealed for collateral

18   estoppel purposes doesn't render it not final, and I believe

19   you cited some cases to that effect.

20             THE COURT:  Well, I'm not sure that that's

21   altogether true; I mean, what happens when you invoke your

22   right to go to the ARB?

23             That foreclosures the finality of the ALJ

24   determination; doesn't it?

25             MR. BENOIT:  Yes.

1            THE COURT:  Okay; so the short of it is, once

2    you've done that, you have foreclosed the finality of the ALJ

3    determination and, now, you have no finality to whatever the

4    ALJ did, and, consequently, it can be reviewed in the federal

5    court.

6            MR. BENOIT:  Your Honor, in the view of --

7            THE COURT:  Let me use -- this is all done by

8    analogy, because what we have is a statute that was hastily

9    created, and it is pock marked by less than full consideration

10   or full development of a number of the issues, but the way in

11   which I have to, for instance, looking at a state finality

12   determination, I look to see what the State law is on that.

13           If the State, as Massachusetts does, says that a

14   determination of a trial court, even if it's on appeal, is

15   final, then, I must accord it finality.

16           If a state, like some states, says, until the

17   appeal is completed, it's not final, then, I don't accord

18   finality to it.

19           Now, what I'm faced with here is a scheme in which

20   the secretary has not been prepared to file -- to create

21   regulations that accord finality to the determination of an

22   ALJ if it's been appealed to the board, whether with a

23   deference to the federal court, or not, she hasn't done that,

24   so I don't mind treating it the same way she would, which is

25   to say, it's not final yet, and if it's not final, you don't

1    get collateral estoppel.

2            MR. BENOIT:  I would agree if it's not final you

3    don't get collateral estoppel, and I would think that the

4    Allan case and the Stone case seem to be of the view of the

5    ALJ's finding, even though there was a subsequent appeal, was

6    sufficiently final for collateral estoppel purposes, so, for

7    that situation, they -- it seemed to view that document

8    appropriately as resolving what they considered to be an

9    absurd situation.

10           THE COURT:  But that's taking a position that's

11   inconsistent with the Secretary's position, right?

12           I mean, it's final, kind of final, final-like, I

13   guess you'd call it, but it is not finality as recognized by

14   the adjudicative body that is supposed to -- adjudicative

15   figure that's supposed to make that determination.

16           Is there any dispute about that?

17           I mean, that she would not view, if we take a

18   snapshot of that determination and, at the time of the appeal

19   to the ARB, that she would view that as not a final

20   determination?

21           MR. BENOIT:  The Department -- well, it could be a

22   final determination if it were not appealed to the

23   Administrative Review Board.

24           THE COURT:  That's what I said.

25           That was the hypothetical I raised, is if it was

```
 1   appealed.

 2           MR. BENOIT:  Right.

 3           THE COURT:  So it's not final.

 4           Now, I'm not sure I fully understand, and I'm not

 5   sure I have to, what the implications would be of lack of

 6   finality, if, for instance, the plaintiff were to die; then,

 7   presumably, the plaintiff wouldn't be able to get any of the

 8   benefits, and I'm not sure what benefits there are other than

 9   reinstatement.

10           I guess there's back pay; isn't there?

11           MR. BENOIT:  Well, there would be back pay.

12           THE COURT:  Let's assume termination, and let's

13   assume that, under the hypothetical I've just raised, one

14   doesn't get reinstated.

15           One could get back pay, I suppose, but, if the

16   decision was not final, then, that plaintiff would not have

17   any basis to or her estate would not have any basis to obtain

18   moneys from the defendant.

19           MR. BENOIT:  I honestly don't know whether, under

20   this statutory scheme, it's possible for the plaintiff's

21   executrix to bring to bring the Administrative Review process.

22   I just don't know.

23           THE COURT:  Okay.

24           MR. BENOIT:  I will also say, Your Honor, that, if

25   in the event you conclude that collateral estoppel isn't
```

```
 1   appropriate in this particular situation, that wouldn't

 2   preclude you from addressing and granting our 12(b)(6)

 3   Motion to Dismiss on the grounds that there is no coverage

 4   here.

 5           THE COURT:  No, I'll get to that.

 6           I simply wanted to deal with this threshold

 7   question, which is, you know, of a piece with kind of the

 8   problematic character of the statute itself.  It doesn't seem

 9   to have covered all of the potential circumstances.

10           MR. BENOIT:  No question that it was hastily put

11   together with this particular provision and that the courts

12   that we referred to, the trilogy, were struggling with ways to

13   deal with it appropriately.

14           THE COURT:  Okay; so let's turn to the question of

15   coverage, and I guess I want to understand, because it seems

16   to me that Lawson takes the broadest view of this.

17           I want to understand what limits, if any, there are

18   here on Lawson's position.

19           I'm looking at the language in Brady (phonetic),

20   and the corrival that Judge Lynch identifies is a local

21   realtor or law firm that has had occasion in the normal course

22   of its business to act as an agent for a publicly-traded

23   company being within the coverage here, even, as to employees

24   who had no relation whatsoever to the publicly-traded company.

25           MS. TALWANI:  It seems to me it is a very broad
```

1    statute, and the limits are only, I believe, the limit that

2    you find within the statute itself.

3         The acts that are prohibited tend to be the ones

4    that one does to one's own employees, although the defendants

5    have pointed out, in arguing, that the agent can't take

6    actions against the public employer's employees, that

7    harassment could happen to a non-employee, but I think, for

8    the most part, the language appears to be looking at any

9    employee can't be discriminated against in their terms and

10   conditions of employment.

11        THE COURT:  Any employee of the real estate company

12   who does business with a publicly employed --

13        MS. TALWANI:  Cannot be retaliated for reporting,

14   in summation, fraud against shareholders of the public

15   company.

16        THE COURT:  Oh, no.

17        It's more than that.

18        It's mail fraud, wire fraud, bank fraud, and it's

19   not just to a member of Congress or to the SEC.  It's to law

20   enforcement agencies.

21        MS. TALWANI:  Correct.

22        THE COURT:  And, so, for example, if someone

23   identified mail fraud in an employee of the real estate

24   company, identified mail fraud by the real estate company, and

25   that real estate company did business with a -- or was

1    contracted with a publicly-employed -- a publicly -- let's

2    say -- what's the precise language -- a public company, they

3    use the exchange in that language, then, they're within it,

4    right?

5              MR. ROSE:  Arguably.

6              THE COURT:  Well, that's where we are, and I want

7    to understand what the implications are of the position you're

8    taking, and what the implications of this position would be is

9    that all you need as a hook is doing business with a public

10   company, which, I suspect, covers a pretty broad swath of our

11   economy and private entities in our economy.

12             MS. TALWANI:  The reason I say, "arguably," is that

13   there are different parts of this statute that you're

14   interpreting altogether there, and there have been cases

15   suggesting that mail fraud, wire fraud, other fraud related to

16   securities and violations of the rules and regulations of the

17   SEC, are all pointed at wrongdoing toward shareholders, and

18   even though the literal language of mail fraud and wire fraud

19   would be -- could arguably include any mail fraud or wire

20   fraud, there have been cases suggesting that those terms would

21   be more narrowly limited.

22             Our case doesn't get to that point, although I

23   understand you're looking at the broadest possible --

24             THE COURT:  It does in this sense.

25             You're asking me for a rule of decision, and to

1    interpret a particular statute in a particular way.

2              Now, I don't see anything in the statute that says

3    by terms that it is only directed at fraud against

4    shareholders.

5              It says it constitutes a violation of Section 1341,

6    1343, 1344, and 1348, which are the most capricious of federal

7    criminal statutes.

8              They cover virtually any kind of fraud, not

9    shareholder fraud, any kind of fraud, and, so, I want to

10   understand where the line is that I would be able to draw,

11   apart from saying you don't have to get there because we don't

12   fall in that category.

13             We're saying fraud against the -- fraud against the

14   shareholders, but that's not enough.

15             MS. TALWANI:  Right.

16             Okay.  If -- if -- if the question is:  Are there

17   any conceivable lines that could be drawn or are we on the

18   slippery slope to, you know, hotdog vendors sending bad checks

19   in the mail --

20             THE COURT:  Mm-hmm.

21             MS. TALWANI:   -- the -- I guess I have two

22   answers, which are somewhat contradictory, but the one is that

23   where Congress has written a broad statute, the fact that

24   something might be broader doesn't necessarily mean it would

25   be excluded, but I would just say that the flip side of that

1    is that subcontractor -- subcontractor and contractor could be

2    easily understood to be the subcontractor contractor and agent

3    doing business related to the matters that bring the first two

4    in, so, if you look at what was in front of Congress at the

5    time, they were looking at Enron, and Enron had not only all

6    of these different variations of corporations and how they had

7    set the whole thing up, but they had accountants, outside

8    accountants who were involved in the whole process, and, when

9    you look at the fact that subcontractors and contractors were

10   included in the language, Congress had to have meant somebody.

11          THE COURT:  Well, they might have meant something

12   along the lines of contractors who harass employees in public

13   companies.

14          MS. TALWANI:  Which makes no sense, because you

15   could have gotten that just by having an agent.

16          If you would have had just the agent language,

17   maybe you could arguably make the language.

18          THE COURT:  Well, I want to understand, and I also

19   want to ask the defendants about this, but is it possible to

20   conceive of a contractor of a public company who harasses the

21   employee of the public company?

22          MS. TALWANI:  I don't know why it would be relevant

23   to Congress.

24          THE COURT:  Well, what I'm trying to do is take

25   language in which some qualifications are just -- have been

```
 1   left out.  They didn't bother to get around to them, and, so,

 2   I take one theory, which is the theory that, even arguably,

 3   you haven't backed away from yet, which is that, if you're an

 4   employee of a contractor and you report mail fraud by your

 5   contractor, and your contractor does business with a public

 6   company, then, you're within the scope of this provision.

 7            MS. TALWANI:  I think, if you look at the other

 8   whistle-blower statutes, which is what Congress started as

 9   their template for that, and you look, for example, you have a

10   mine and mine-safety issues, and maybe it's run by the owner

11   of the mine or maybe the owner has a contractor who runs --

12   runs the mine, Congress really doesn't care.

13            THE COURT:  Well, Congress has to care somewhat.

14   They have to give us language that any of us can read or, you

15   know, an essential being can read without reference to the

16   zeitgeist, and, so, I want to understand how I properly read

17   this language, and, so, you say:  Well, you know, we knew what

18   they were after, and it was fraud and securities and

19   shareholders; you know, if you find all of that, then, you

20   found it here, and I want to parse the language that they

21   actually used, and I'm not sure that it's in Congress' best

22   interest over the long run, certainly not for clarity in law,

23   to let them write a statute that's a little bit like a

24   zen koan.

25            MS. TALWANI:  But the used contractor and
```

1    subcontractor was not on a blank template.

2           I think that's an important thing to understand;

3    and, then, I suggest that what Congress understood from all

4    the other whistle-blowers statutes is that they had some

5    purpose in mind, and it didn't matter if it was the owner of

6    the mine that was worrying about safety or the contractor who

7    was cleaning the mine.

8           THE COURT:  Well, you know, but, then, you ask me

9    to construe other statutes; I mean, this is the statute that I

10   have.

11          I understand.  There's a class of statutes, called,

12   whistle-blower statutes, and, then, there are subspecies, and

13   the question is:  What does this species reach, or what can a

14   language fairly be read to say it reaches?

15          MS. TALWANI:  Fair enough, breaking it down piece

16   by piece, the five parts, the five other entities besides the

17   publicly traded and the registered company, the agent employee

18   contractor, subcontractor and agent necessarily includes the

19   contractor, subcontractor, and agent, with respect to the

20   responsibilities of those first two classifications.

21          If it doesn't mean that, it -- it makes little

22   sense, and, so --

23          THE COURT:  Why is that true?

24          I mean, this is the peculiar, not peculiar, but the

25   special circumstance of an investment company which really

1    doesn't have employees, or, at least, I'm not aware of what

2    employees it would have and its directors, maybe it's got a

3    secretary or something.

4                I don't know.  I'll ask the defendants about that,

5    but, assuming it doesn't have those employees, this is a very

6    special kind of situation.

7                Now, I don't know why, putting that to one side,

8    the particular character of mutual funds, why this doesn't

9    make sense in another setting; that is, we're concerned about

10   employees of the public company.

11               That's who we're concerned about, those with

12   reporting responsibilities, those with direct reporting

13   responsibilities, and, so, if an officer, the vice-president

14   of the public company, harasses or demotes or suspends, that's

15   easy, that comes within it.

16               If another employee does it, that comes within it.

17               If a contractor in some fashion does it to them,

18   that comes within it.

19               MS. TALWANI:  Why do we care about an employee of a

20   public company?

21               THE COURT:  Because that's the hook that Congress

22   chose literally to apply here.

23               MS. TALWANI:  That's the hook and the title.

24               THE COURT:  Well, not just the hook and the title,

25   although, that's something, not much, but that's something,

 1   but, if we say, if we have an alternative which says we're

 2   talking about an employee of a public company here, then,

 3   that, at least, cabined it to some degree, because the other

 4   alternative, which we started exploring and we'll go back to,

 5   is the real estate agent who's engaged in wire fraud who also

 6   happens to rent space to a mutual fund and harasses its own

 7   employees.

 8         MS. TALWANI:  You've comfortably cabined it, but

 9   you haven't cabined it with anything that Congress was putting

10   in its statute.

11         THE COURT:  Well --

12         MS. TALWANI:  With all due respect, every time the

13   employer, every time the defendants talk about it, they say

14   that this is a statute that refers to employers of

15   publicly-traded companies.

16         That is not the text of the statute, so the text of

17   the statute simply says that it's protecting employees, so the

18   question, then, is:  Why do you think that the -- why give the

19   employees of the publicly-traded company this great

20   protection; and, when people are concerned with protecting

21   employees; for example, in Title 7, they knew how to protect

22   against those people out there doing bad things to them.

23         THE COURT:  Mm-hmm.

24         MS. TALWANI:  They said that any person who aids or

25   abets the employer in discriminating.

1          They prevented unions from taking actions

2    against --

3          THE COURT:  They didn't do it here.

4          MS. TALWANI:  They didn't do it here, because their

5    concern was not that these -- there is nothing to show --

6    there is absolutely nothing to show, that what Congress was

7    concerned about here was some magic employment rights for

8    public employees.

9          THE COURT:  Okay; so let's take it in two parts.

10          The first part is:  Here's their language, the

11    language is not very good; in fact, the reason we're having a

12    discussion about it is because they didn't nail it down, if

13    that's what they want, so I look at one of the two

14    alternatives.

15          The one that you suggest seems to me to be

16    uncabined, that effectively takes someone into Sarbanes-Oxley

17    for any form of mail fraud when you are a contractor to a

18    public company.

19          Is there some, in the statute itself, apart from,

20    you know, devining what individuals, rushing to get a statute

21    out, had on their minds?

22          MS. TALWANI:  In the statute itself, you have three

23    separate parts, and, if the concern is that reading each of

24    these three things to their broadest effect leads you somehow

25    that that makes the statute ambiguous.

32

```
 1              THE COURT:  No, it is not.

 2              It is:  What is a coherent way of reading the

 3    statute?

 4              MS. TALWANI:  Well, it seems to me that a coherent

 5    way of reading the statute is that a subcontractor,

 6    contractor, or agent, with respect to that part of the

 7    business, that the first two issues, the publicly-traded and

 8    the filing; in other words, they were concerned -- I mean, I

 9    can't say -- I wish I could -- I wish I could give you the

10    mutual-fund history, but I think, more accurately, they were

11    concerned about accountants and lawyers and those outside

12    companies.

13              They were concerned that those are contractors or

14    subcontractors or agents.  That's who they were worried about,

15    and, once you get over there and you're worried about there

16    and you're trying to protect shareholders, you don't care that

17    the attorney who works for the outside law firm works as the

18    attorney who works in-house.

19              If either of those attorneys is saying that there

20    is fraud against shareholders, or wire fraud, or whatever,

21    that is where the concern is, and, so, I think you have a

22    limit, by saying you're not talking about reporting things

23    unrelated to these statutes, you're talking about related to

24    these statutes, and you're talking about the contractors,

25    subcontractors, agents, employees, with respect to the
```

33

1    business that's regulated by our securities laws.

2                THE COURT:  Now, in your, you know, brief

3    recitation of the concerns of Congress, of course, you're

4    talking about things that are unexpressed here; that is, they

5    don't say lawyers, contractors who are lawyers or accountants.

6                They don't say concerned with the question of --

7    solely concerned with the question of securities fraud, and

8    what they've done is they've added on these statutes which are

9    themselves a mere illusion of elasticity.

10               MS. TALWANI:  I believe the Supreme Court's -- and

11   I don't have those cites in my briefs, but I'm happy to give

12   them -- but I think, if the question is that the concern is

13   that you would have a greater breadth because Congress didn't

14   specify here, for example, accountants, lawyers and investment

15   advisors, but just said subcontractors or contractors, if the

16   concern is that the specific was neither mentioned nor can you

17   say it was actually specifically contemplated by Congress, the

18   rule, I believe, would still that be that it falls within the

19   language of the statute.

20               THE COURT:  Well, you've recast it in a different

21   way.

22               What you're asking me to do is construe a piece of

23   legislation which is problematic, and I want to understand

24   what the implications are of this construction.

25               Now, what you've done is supplied a whole series of

1    terms, unexpressed in the statute, for me to redline in, blue

2    pencil into the statute, and I'm not sure that I have that

3    authority, and, so, I look at what does it mean in its own

4    terms, and, if it's read in its own terms, perhaps you'll tell

5    me otherwise, but, if it's read in its own terms by your

6    analysis, then, the real estate agent who's engaged in wire

7    fraud and fires one of her employees, is covered by

8    Sarbanes-Oxley if she also does business with a publicly-held

9    company, and, if not, tell me why your analysis doesn't reach

10   that.

11               MS. TALWANI:  The contractor -- I think the

12   contractor agent, subcontractor language on its face gets read

13   more narrowly than to suggest somebody who simply has some

14   relationship and, therefore, you know, has a relationship over

15   here and, then, has an employee over there.  I think it gets

16   read more narrowly.

17               THE COURT:  How -- how --

18               MS. TALWANI:  But, if it doesn't on its face --

19               THE COURT:  Right.

20               MS. TALWANI:  -- then, I would suggest that there's

21   the flip-side problem, which is that there is nothing in the

22   statute to say that employee is only the employee of the

23   publicly-traded company.

24               That's not in the statute, and, so, what you're

25   suggesting is that, because you can't -- you're concerned with

35

 1    the outer limits of this.

 2              You're not suggesting that her reporting isn't

 3    relating to fraud or that she isn't involved in matters that

 4    are the subcontract at the heart of the things; in fact, a

 5    contract that would be regulated by Congress.

 6              You're saying, because of the outer limits here,

 7    we're going to draw a narrower limit -- that's what the

 8    employer's saying -- a narrower limit that has no basis in the

 9    statute.  It's in it's title, and that's it.

10              THE COURT:  Well --

11              MS. TALWANI:  It's in its title, and that's it.

12              THE COURT:  It suggests that you have to read this

13    statute and any statute with some circumspection, and, if the

14    effect is that it's going to gobble up and create a

15    whistle-blower -- basically a federal whistle-blower statute

16    for anybody who does business with a publicly held company,

17    maybe it gives me pause.

18              Now, you say:  Well, the contractor means lawyer or

19    accountant.  I don't know how I get to that.

20              MS. TALWANI:  I'm not saying that it means only

21    lawyer and accountant.  We're not the lawyer or the

22    accountant.

23              I'm suggesting it's this contractor of the

24    subcontractor of the business that relates to the securities

25    laws, that portion of the business.

1              The -- the -- if you get to the point where you say

2     the text on its face needs to be looked at in the context of

3     the purpose of the statute in order to understand the text on

4     its face, which is fair assertion, then, you get to the

5     question of what the purpose of the statute is, and the

6     purpose of the statute, I think, there can be no question that

7     the purpose of the statute is to protect shareholders.

8              THE COURT:  I understand that.

9              The question is:  Where does your analysis take me;

10    that is to say, yes, Congress, you know, this was something

11    that agitated the public mind, and they got very excited about

12    it, and they raced to enact a statute that is -- has

13    problematic dimensions in its drafting.

14             All of that I agree with and I think I understand I

15    understand, so, now, you press on me an analysis that means

16    that I gobble up not merely those who, as I read it, those who

17    are doing business on the core issue of shareholder

18    relationships, but anyone.

19             MS. TALWANI:  I guess I would suggest that the term

20    you need to interpret, in the connection with the purpose of

21    the statute, would be the unlawful conduct, so, if --

22             THE COURT:  I have to interpret all of them, and

23    what I'm looking for is where I draw -- you know, where I say

24    that employee of a public company is different from the

25    employee in the -- to be found later in the -- later in that

37

1  provision.

2          MS. TALWANI:  And I would suggest that vis-a-vis,

3  the purpose of the statute, there is no difference between the

4  employee of a publicly-traded company versus the employee of

5  the CPA or the employee of the law firm.

6          THE COURT:  How about the real estate agent?

7          MS. TALWANI:  Or the employee of anybody else.

8          The question is the violation, does the violation

9  have to do with shareholders?

10          That's the issue.

11          THE COURT:  No, it's not the issue, with all

12  respect.

13          It's where I find -- where I'm able to import this

14  language, and where, fairly, I can reach this language, and

15  what you say is:  Well, what they really meant, you can help

16  them out here, is to include language that they didn't include

17  there.

18          MS. TALWANI:  I'm saying that no more than my

19  brother is suggesting that --

20          THE COURT:  Don't worry, I'll be asking them

21  questions.  This is not the Parable of the Prodigal Son.

22          I'll preach -- approach both sides on the same

23  issue, but I want to understand what the implications are of

24  what you say, and if you're saying that it is to limit it to

25  those employers who are -- or those contractors, to use that

1  rough term, those contractors who are doing business in the

2  same area, shareholder area, then, I want to understand where

3  I get that, and you say from the zeitgeist of the statute.

4        MS. TALWANI:  I'm saying that, rather than

5  suggesting that you have to interpret employee by looking to

6  the zeitgeist of the statute, I'm suggesting that you have to

7  understand the five categories of unlawful activity in the

8  context of the zeitgeist of the statute, and that what

9  Congress was concerned about, the whole point of the

10  whistle-blower statute, was that Congress was concerned about

11  protecting shareholders, that was the only concern here, and,

12  so, in order to protect shareholders, what you're basically

13  saying is that, if somebody's coming forward with allegations

14  of potential violations of laws that impact shareholders,

15  we're concerned about that.

16        That's the only meaningful distinction, and, to

17  suggest that, no, it's the employee of the public company

18  versus the employee of the accounting company, is not a

19  distinction that Congress was making.

20        THE COURT:  Well, I don't know.  We've got this

21  language here, but let me take it a little bit further.

22        Let's assume that someone who wants to do business

23  with Fidelity, and they've got an employee who, for some

24  reason, has identified violations by Fidelity, and they fire

25  him.

```
 1                Now, is that person within the scope of this
 2    statute?
 3                MS. TALWANI:  I'm sorry.
 4                I didn't hear exactly, I guess.
 5                THE COURT:  I'm giving an example of someone who's
 6    not contracted with the company -- not contracted with a --
 7    with Fidelity at the time, who fires one of their employees
 8    because the employee has raised concerns about Fidelity, and
 9    that contractor some day would like to do business with
10    Fidelity.
11                Are they covered?
12                MS. TALWANI:  Somebody who is not presently a
13    contractor?
14                I don't think so.
15                THE COURT:  So you have to be a contractor, right?
16                MS. TALWANI:  Contractor or agent, yep.
17                THE COURT:  So here is this big concern on the part
18    of Congress, about the reporting or whistle-blowing, and
19    there's, at least, some limitation on the basis of
20    contracting.
21                You have to be a present contractor, right?
22                You have to use those, that particular set of
23    words, that particular relationship, right?
24                MS. TALWANI:  I'm nodding my head a little bit
25    sideways on that, because, if you simply go to -- forget about
```

1    the contractor or subcontractor or agent, if you simply go to

2    the public company and its employee, and that narrow

3    relationship, DOL interprets that for this and every other

4    whistle-blower as potential applicant and future applicant,

5    and, you know, so forth, so I don't know.

6            I mean, yes, there's Congress -- Congress put a

7    list, but that list was intended to be as broad and not as

8    narrow as possible.

9            THE COURT:  But let me be sure I understand what

10   you're contending for.

11           I gather you're contending for one of the -- or two

12   alternatives:  One, that it really doesn't make any difference

13   if it's a contractor with a public company and they fire their

14   employee, as a result of any action that constitutes a

15   violation of 1341, or 1343, or 1344, or 1348, then,

16   Sarbanes-Oxley applies.  That's one.

17           The other is only if it is a violation of 1341,

18   1343, 1344, 1348 that constitutes a prohibition on fraud

19   against shareholders.

20           MS. TALWANI:  Or related to shareholders.

21           THE COURT:  Or related to shareholders.

22           Those are the two that you want me to --

23           MS. TALWANI:  Or you could read it more -- you

24   could read it narrowly and say you're talking about the

25   contractor, or subcontractor, or agent doing that part of the

41

```
1   business that is related to securities law.

2           Just like -- I mean, I know you don't want to go

3   look at the other statutes, but I think it is to the extent

4   that we get beyond Congress --

5           THE COURT:  Well, I do want to understand what they

6   mean, but, ordinarily, one reads a statute on its own terms,

7   rather than saying there's a family resemblance to another

8   statute.

9           MS. TALWANI:  Correct.  I simply make the point

10  that in these other statutes, what Congress did is they took

11  the person who was responsible for whatever the safety or

12  other issues there were and whoever was the contractors and

13  made them all responsible, and, here, they took that list and,

14  then, they just kept adding names.  They kept adding agent,

15  and officer, and employee.

16          They were looking to expand it, not to narrow it,

17  and, then, to come back and say:  Oh, no.  They get this whole

18  long list of people.  To suggest that those people can't

19  discriminate, in terms and conditions of employment against

20  the publicly-traded company's employees, there's a disconnect.

21          THE COURT:  Are there lawyer and accountant cases

22  under this provision?

23          MS. TALWANI:  The only cases that I am aware of

24  that are wrestling with the coverage issues are the subsidiary

25  cases.
```

```
 1              THE COURT:  But there are no lawyer and accountant
 2     cases that have bubbled up yet?
 3              MS. TALWANI:  No.
 4              If they have, I don't know of them.
 5              THE COURT:  And those, of course, were the core
 6     concern that you described of these contracts.
 7              MS. TALWANI:  Right.
 8              THE COURT:  Does that mean they were less wistfully
 9     free of harassment by lawyers and accountants for their
10     employees who are engaged in calling attention to problems
11     with public entities?
12              MS. TALWANI:  We have no idea.
13              What we know is that the statute has been around
14     for six years, and I don't believe there have been any
15     successful prosecutions under it.  That's what we found.
16              THE COURT:  They are not prosecutions.
17              They are civil claims.
18              MS. TALWANI:  Sorry.
19              There have been no successful civil claims under
20     it, at this point, but, essentially, people have been
21     litigating these cases at the DOL, and the DOL, they
22     disappear.
23              Either they get settled; so, perhaps, the positive
24     ones are disappearing in that way, or they are coming out with
25     a line of decisions.
```

43

```
 1            We saw in the subsidiary cases where the first few
 2   cases started coming out and saying:  Oh, no.  The subsidiary
 3   couldn't be covered -- the employees of the subsidiary
 4   couldn't be covered under any circumstances.
 5            The current state of the law, over at the DOL, as
 6   of that Copperfield (phonetic) decision, which is the ARB
 7   decision there, is that the employees of the subsidiary are
 8   covered if the subsidiary is covered, and the question, then,
 9   is:  Is the subsidiary the agent or the contractor?
10            THE COURT:  For the purpose of employment, right?
11            That they're dealing with the question of:  Does
12   this subsidiary have an influence over the employment of
13   persons in the public company?
14            MS. TALWANI:  No.
15            That's the First Circuit case, but the DOL cases,
16   what they have started, there is a whole line of the
17   subsidiary cases, all cited by the -- by Fidelity.
18            THE COURT:  No, I understand --
19            MS. TALWANI:  And they go to
20   Copperfield (phonetic) -- no, the question is --
21            THE COURT:  -- but, in any event --
22            MS. TALWANI:  The question there is:  Are the
23   employees of the subsidiary covered?
24            And the current state of the law is that the
25   employees of the subsidiary are covered if the subsidiary is
```

44

```
 1   covered.

 2            THE COURT:  Well, is that, in fact, what it is?

 3            When you say, the current state of the law, you

 4   mean within the administrative agency?

 5            MS. TALWANI:  Yes.

 6            THE COURT:  Now, as I understand it, what the ARB

 7   was doing with Klopfenstein is sending it back to the ALJ to

 8   make findings, with respect to the influence that they had to

 9   effect the terms of Klopfenstein's employment.  That's the

10   narrow issue that they're sending it back on.

11            Now, what they -- and just to use the language,

12   they -- are talking about acting against an employee in the

13   terms or conditions of employment.

14            MS. TALWANI:  I believe the issue where the DOL has

15   gone, and I would frankly disagree at some point with them,

16   but where they're going, there is an order to find the

17   employees -- that their company covered is to suggest that

18   they're acting as the agent of the publicly-trade company.

19            THE COURT:  Right.

20            MS. TALWANI:  But there's two different choices,

21   agent and subcontractor -- or, contractor, so, if we just

22   focus, for a minute on agent, the defendant here's position is

23   that the agent's own employees couldn't be covered.

24            THE COURT:  I understand.

25            Just as a preview, they now know that I'm going to
```

1   be asking them about that.

2           MS. TALWANI:  And I think the question, I think the

3   way this has been litigated in the cases that are developing

4   around the country, has been a focus on saying:  Well, if the

5   agent acted at the direction of these publicly-traded company

6   against its own employees, then, they would be covered, and

7   we're fine until we get so far.

8           My problem is the next question, which is

9   contractor, because Congress didn't say just agent.  They said

10  contractor, and, just as the agent's employees are covered --

11          THE COURT:  Okay; but, that requires, doesn't it,

12  that the public company direct the agent to take the adverse

13  action?

14          MS. TALWANI:  Because it's an agency.

15          That's an agent, and, so, it needs an agency

16  requirement.

17          THE COURT:  Yes, but that doesn't say that the

18  independent actions of an agent to fire one of its employees,

19  without direction from the public company or the ceding of

20  responsibility for the public company would be actionable.

21          MS. TALWANI:  That's correct, and I haven't really

22  made an agency claim, so, that nuance, I'm not sure I need to

23  worry about.

24          THE COURT:  Well, you do, because it's going to

25  come back for purposes of contractor, as well.

```
 1              The point is that I don't read Klopfenstein, unless

 2     you can persuade me otherwise, to be anything other than a

 3     traditional agency case, in which the ARB wants further

 4     fact-finding?

 5              MS. TALWANI:  That's correct, but to render the,

 6     sort of the, starting point of what we're arguing about, but

 7     the question here is:  Assuming the facts that makes someone

 8     either an agent or a contractor, are they a covered employer

 9     under the statute, and is their employee a covered employee?

10              And I believe that case gets me a piece of the way.

11     It doesn't get me all of the way, I grant you that, but, in

12     that case, the primary argument, we started here in saying:

13     What are the limits of all of this; and you started and said:

14     Well, the limits are -- this is a statute about public company

15     employees.

16              THE COURT:  I mean, I understand the desire to make

17     my comments a position.  Consider them provocations.

18              MS. TALWANI:  I apologize.

19              THE COURT:  But, in any event, as provocations,

20     understand that I'm concerned about finding limits here,

21     because I can conceive of a set of circumstances that were

22     identified by Judge Lynch.

23              MS. TALWANI:  And I guess what I'm suggesting here

24     is that the first issue, which is:  Are we only dealing with

25     the employees of the public company; the answer has to be No
```

47

1    to that question, and the reason the answer has to be No to

2    that question is that the text of the statute doesn't limit it

3    to it.

4              The purpose of the statute doesn't limit it to it.

5              If you look at where the case law is going, it is

6    not limited to just the employees.

7              You're sort of out on your own with the notion, the

8    notion that only the public, only the employees of the public

9    company, the only place that rests is in the title of the --

10   in the heading, and that's certainly not the starting point

11   for the analysis.

12             THE COURT:  Probably not.

13             I mean, I view that as not particularly helpful as

14   authoritative construction of the statute, but let me just

15   take Judge Lynch's language.

16             Nothing in the Act suggested that it is intended to

17   provide general whistle-blower protection to the employees of

18   any employer whose business involves acting in the interest of

19   public companies.

20             Do you agree or disagree?

21             MS. TALWANI:  I agree.

22             THE COURT:  So why isn't the construction that you

23   pressed on me precisely that?

24             MS. TALWANI:  Because Congress did intend, not any

25   employee, but an employee who reports, engages in protected

48

```
1   activity of the specific kind enumerated under the statute who

2   is also --

3            THE COURT:  Let's just go back to what it is.

4            That protected activity is providing information or

5   causing information to be provided regarding any conduct to

6   which the employee reasonably believes -- which the employee

7   reasonably believes constitutes a violation; and they start

8   with the fraud sections, 1341, 1343, 1344, 1348, before they

9   even get to regulations of the Securities Exchange Commission

10  or, you know, the statutory provisions that deal with the

11  fraud against shareholders.

12           MS. TALWANI:  I think Congress provided for an

13  extremely broad statute.  It doesn't cover anybody, but it

14  certainly covers --

15           THE COURT:  So you say, and I want to understand

16  how I get to what you say, and the way in which I do that is

17  by saying that dealing with any employee of these several

18  entities, any employee who is -- provides information relating

19  to fraud, securities fraud.

20           MS. TALWANI:  Right, violations, rules and

21  regulations, right, things involving the shareholders,

22  exactly, violations of laws relating to the shareholders.

23           THE COURT:  And what do I do with 1341?

24           (No response.)

25           THE COURT:  I just say:  This is a narrow portion
```

49

1    of 1341?

2            MS. TALWANI:  The fact that it is possible that the

3    statute is even broader than I need it to be isn't the reason

4    to say that, therefore -- I don't know; I mean, from my --

5    from -- from where I sit, it seems to me that my client is

6    exactly in the position that Congress was trying to protect

7    here.

8            THE COURT:  Okay; but you understand that I'm not

9    necessarily assimilated to your client the way you are.  I

10   have to construe a statute in a meaningful way that doesn't

11   lead to what sometimes are referred to as absurd results.

12           MS. TALWANI:  And I would suggest that there are

13   limits to the statute, because you have to be one of these

14   entities, and you have to be an employee, and you have to have

15   been engaged in these fraud types of things, and, if that

16   means that there are things on the far outside that shouldn't

17   be included, then, maybe someone would construe it to not

18   include all of that, but I don't see that you can draw the

19   line to exclude all of this stuff because of the danger of the

20   slippery slope at the end.

21           THE COURT:  Well, perhaps, it is to say if Congress

22   makes a statute that has in it -- I mean, after all, it's in

23   Title 18, the Criminal Code, and Congress makes a statute like

24   that, it ought to be read with some, as I've said earlier,

25   circumspection, rather than making it possible to have a

```
 1   reading that just goes beyond any -- beyond what even you say

 2   is the purpose of the statute.

 3         But what it should come down to, I think -- tell me

 4   if I'm wrong -- is that I have to interpolate language that

 5   requires that this be as a result of information regarding

 6   fraud against shareholders.

 7         MS. TALWANI:  I would make it slightly broader, in

 8   that I would say:  In the context of a statute designed to

 9   protect shareholders, that the issue has to be protecting the

10   shareholders.

11         THE COURT:  Okay; and so what I should do is read

12   the provisions that have to do with 1341, et cetera, so long

13   as they're dealing with shareholders and not with some other

14   form of fraud?

15         MS. TALWANI:  Right; and where that has come up, to

16   sort of bring the conversation around, is that, in the cases

17   where you have a very straightforward coverage, you don't have

18   a coverage question, you have a public company, and you have

19   one of their employees, the courts and DOL have been very

20   concerned about employees not using this for reporting just

21   general wrongdoing, and there have been cases where, you know,

22   there are issues where there's fraud; such as, overcharging

23   customers or undercharging, things of that sort, and the

24   courts have been and DOL has been pretty regular, and they

25   come up with lots of different -- they approach it from a lot
```

1    of different places, but they always come back down to they're

2    not interested in general corporate malfeasance.

3           What they're interested in is protecting the

4    shareholders.

5           THE COURT:  Now, let me get to that, because I

6    haven't explored those cases, I'm not familiar with them, but

7    are you saying that, if an employee from a public company is

8    discharged, as a result of providing information that he

9    reasonably believes to constitute a violation of mail fraud,

10   he still has to prove that it is mail fraud involving

11   shareholders, and is there administrative law that says that?

12          MS. TALWANI:  There's case law that goes in that

13   direction, that may be countervailing that I don't know about,

14   but, yes, that seems to be the trend, that, if it's something

15   that's unrelated to the shareholders, that, at the end of the

16   day, you're not seeing any injury of shareholders, I don't

17   think there is a case out there that supports it.

18          THE COURT:  But are there cases, not to, you know,

19   put too fine a point on it, but, cases that say:  We can see

20   that this constitutes a violation of the mail fraud statute or

21   wire fraud statute, but, nevertheless, they do involve

22   shareholders and consequently it doesn't get coverage under

23   the whistle-blower statute.

24          MS. TALWANI:  I believe that's where they're going.

25   I believe that's what they said, but I wasn't completely

1    focused on it from that angle, but cases that have come up

2    where employees have come forward with something that, and I

3    assume they are mail fraud and wire fraud cases, although I

4    can't absolutely put my mind on it, but where they come

5    forward and they say:  This is an illegal act that happened,

6    and The Court looks back and says:  Yeah, but why would the

7    shareholders care?

8              I mean, this is to protect shareholders.

9              THE COURT:  Okay; so your construction is both

10   broadening and narrowing on this; that is, it doesn't provide

11   protection for the non-shareholder matter report of wire fraud

12   or mail fraud.

13             Right?

14             MS. TALWANI:  Yes.

15             THE COURT:  Mr. Rose, do you have anything else

16   that you'd like to add to this analysis?

17             MR. ROSE:  No, I don't think so, Your Honor, other

18   than just to say that the language, in the seventh -- I think

19   it's the seventh and eighth line of (a)(1), where it says:

20   Or any provision of federal law; and, then, the next few

21   words:  Relating to fraud against shareholders; I have read

22   that as limiting the scope of the previous references; in

23   other words, the term relating to fraud against shareholders

24   limits the scope of a Section.

25             THE COURT:  Why would it?

1           I mean --

2           MR. ROSE:  Just looking at the grammar or the

3    structure of the thing.

4           THE COURT:  But they're talking about rules and

5    regulations of the SEC.

6           They haven't touched on statutes of the SEC, and

7    most of the statutes are proliferated by rules, so that's

8    another category of concern.

9           MR. ROSE:  My point is simply that, if The Court

10   was concerned that any violation of 1341 might be encompassed

11   within Sarbanes-Oxley, my point is I don't think that's the

12   case, because, by adding the term relating to fraud against

13   shareholders, I think that Congress intended to limit the

14   scope of a 1341, 43, 44, 48, et cetera, claim or conduct to a

15   matter involving relating to fraud against shareholders.

16   That's how I have read this section, Your Honor, frankly,

17   until, and I hadn't really thought of an alternative until

18   this -- until this session here today.  I just thought that

19   that was limiting language.

20           THE COURT:  Alright.

21           MR. ROSE:  I would also point out that there are

22   references to shareholders throughout this -- you know,

23   throughout 1514(a) -- (a)(1), and, certainly, in Section 2,

24   which also seems to me to indicate Congress' intent to limit

25   the scope of Sarbanes-Oxley whistleblower claims to cases

```
 1   involving reports by an employee or assistant in an

 2   investigation.

 3              THE COURT:  Where does 2 come in?

 4              I didn't see that.

 5              Oh, I see.

 6              (a)(2).

 7              I see.

 8              I'm sorry.

 9              MR. ROSE:  Isn't there some -- I'm out on a limb

10   here, Your Honor -- but isn't there some principal of

11   statutory construction which says that words shall be

12   interpreted, construed, in accordance with the company they

13   keep?

14              In other words, throughout these sentences, you see

15   references to shareholders and securities laws, and, so, I

16   think that is what Congress was trying to get at.

17              THE COURT:  Well, I think it's nascitur a sociis.

18              MR. ROSE:  Well, I confess, Your Honor, I did not

19   take Latin.

20              THE COURT:  But the point is that, you know, you

21   aggregate all of these things in the statute and say:  Well,

22   you know, he's really related to that guy; he's really related

23   to this person; and the problem is the statute doesn't connect

24   the dots.

25              MR. ROSE:  If we all agree on anything, it was that
```

1  the statute was hastily drafted and leaves a lot to be

2  desired.

3         One other point beyond what Ms. Talwani was saying,

4  Mr. Zang does have in his Complaint an integrated enterprise

5  theory, and that theory essentially says that the Fidelity

6  empire, if you will, the Fidelity integrated enterprise,

7  includes the mutual funds or investment companies, and it also

8  includes FMR Co., Inc., which is the investment advisor.

9         THE COURT:  How do I deal with that?

10         I mean, your integrated entity theory is basically

11  piercing the corporate veil, right?

12         MR. ROSE:  That's essentially correct.

13         THE COURT:  Now, if I don't pierce the corporate

14  veil or if I don't permit the corporate veil to be pierced,

15  what I'm confronted with is the public company being a fund

16  and without any employees; effectively, no employees in the

17  funds themselves.

18         MR. ROSE:  That's correct.

19         THE COURT:  And you're saying that a contractor who

20  deals with the kinds of things that are critical to

21  shareholder relationships or shareholder disclosure is

22  necessarily assimilated to it, right?

23         MR. ROSE:  Correct.

24         THE COURT:  Now, what do I do, have a factual

25  Discovery on that question?

```
 1              I mean, you look at it and, on its face, and in the

 2    SEC filings, I'm not sure, yet, that I'm entitled to look at

 3    them, but let's assume that I am, on a Motion to Dismiss, the

 4    Investment Company Act and the Advisors Act set up what you

 5    can call a reticulated scheme of regulation for investment

 6    companies that requires that they be separate and requires

 7    that they have -- and, to some degree, regulates their

 8    relationship between the advisor and the investment company.

 9              What you're talking about is something that is, if

10    it's an integrated theory, in violation of both the Advisors

11    Act and the Investment Company Act; isn't it?

12              MR. ROSE:  Well, you say in violation.

13              I would argue that, for certain purposes, including

14    purposes of Mr. Zang's employment here, what he did, what the

15    other employees and officers of the Fidelity companies do.

16    They report to each other; they deal with each other.

17              Mr. Jensen (phonetic), for example, who

18    investigated what Mr. Zang reported in his March 13 E-mail,

19    was providing services both to the investment-company mutual

20    funds and to FMR Co., Inc.

21              THE COURT:  He wasn't an employee of FMR Co., Inc.;

22    was he?

23              MR. ROSE:  Mr. Zang was an employee, first, of

24    Fidelity Management --

25              THE COURT:  Excuse me.
```

1              Of the funds.

2              Mr. Zang was never an employee of any Fund, nor was

3    Mr. Jensen (phonetic), during the relevant time period.

4              MR. ROSE:  The Funds don't have any employees, and,

5    therefore, that is correct.

6              The investment companies, the mutual funds, are

7    shells, and many of the cases talk about the fact.

8              THE COURT:  They refer to them as shells, but their

9    directors have obligations that are independent of the

10   advisors.

11             MR. ROSE:  That's true, but the directors -- but

12   the directors rely completely upon the employees of FMR Co,

13   Inc., the investment advisor, to rent space, keep records,

14   file reports, hire and fire and evaluate personnel.

15             THE COURT:  But is that the nature of your

16   integrated enterprise theory?

17             That is, let's assume somebody sues the investment

18   company for not paying its rent.

19             Can you then go against the advisor, as well?

20             MR. ROSE:  I don't know the answer to that

21   question, Your Honor.

22             I do know that the -- my understanding is that FMR

23   Co., Inc., pays the bills of the investment companies.

24             THE COURT:  Right.

25             MR. ROSE:  And, so, I suppose that, while the

58

1   investment company would be ultimately responsible for paying

2   the rent in the sense that the money comes out of the Fund's

3   pockets, it's the investment advisor that has to write the

4   check.

5           THE COURT:  Okay; but, back to my question, so you

6   can sue the investment advisor when the rent isn't paid?

7           (No response.)

8           THE COURT:  You owned 84 States -- 84 Devonshire.

9           You have a lease.

10          The lease is with one of the Funds.

11          The Fund doesn't pay.

12          Does that, under your theory, mean that you can sue

13  both the Fund and the Fidelity Management or

14  Fidelity Investment?

15          MR. ROSE:  I don't know the answer to that

16  question, Your Honor.

17          THE COURT:  But doesn't the answer to that question

18  have to be at least parallel to your integrated empire theory?

19          MR. ROSE:  I'm saying, Your Honor, that the

20  purposes of Mr. Zang's employment, he is performing services.

21          With respect to the Funds, he was, for a time, a

22  Portfolio Manager, he was an Equity Analyst, and, in that

23  respect, he's providing services both for the Funds, he's also

24  providing services for FMR Co., Inc.

25          THE COURT:  But he's not an employee of the Funds.

```
 1              This is a process of attempting to assimilate into

 2    the Fund, and, as a legal matter, he's not an employee of the

 3    Fund, unless you use some -- I've used corporate, piercing the

 4    corporate veil, as a way of dealing with that.

 5              MR. ROSE:  I think that's right.

 6              MR. ZANG:  Your Honor, I think I can answer that

 7    question.

 8              I'm the plaintiff in this case, Jonathan Zang.

 9              THE COURT:  Well, you probably can, but, for formal

10    purposes, you can't in this setting.

11              MR. ROSE:  Your Honor.

12              THE COURT:  Anything else?

13              MR. ROSE:  I don't believe so, Your Honor.

14              THE COURT:  Okay; so let me hear from the

15    defendants.

16              Mr. Scalia, maybe I'll hear from you, first.

17              You haven't had a speaking role yet.

18              MR. SCALIA:  Thank you, Your Honor.

19              THE COURT:  So let me go back to it.

20              Don't you all know what they were trying to do

21    here, what Congress was trying to do?

22              MR. SCALIA:  We do, Your Honor, by reading the

23    statute, by reading the statute.

24              THE COURT:  Well, let me just pause and step back

25    and say:  Isn't it true that what they were trying to do is to
```

1    deal with people who were giving information relating to fraud

2    against shareholders and, if it's the employee of the company,

3    the public company, that's pretty clear, you wouldn't disagree

4    with that, I think, and, so, what are they doing when they

5    say, for instance, a contractor?

6            Is this the contractor who harasses the employee of

7    the public company?

8            MR. SCALIA:  That's right, and you asked a question

9    about that, and I'll give you an example.

10           We talked about lawyers and accountants, and I'd

11   like to respond to that, regarding whether there had been

12   cases about that, and there hadn't.

13           THE COURT:  There have not?

14           MR. SCALIA:  There have not, and there is some

15   relevant statutory and regulatory language on that, but, to

16   your question that you asked earlier on, you could certainly

17   envision a scenario where an outside auditor, for example,

18   that feels beholden to the audit client, is working with one

19   of the employees in the internal audit department who raises

20   an issue, and the auditor concerned about having to raise

21   something with his client that he doesn't want to, bullies

22   that public-company employee, that's certainly a conceivable

23   scenario.

24           THE COURT:  The scenario is the auditor who finds

25   some fraud.

1          MR. SCALIA:  Somebody with internal audit says to

2     the external auditor:  I've got some concerns, and, I don't

3     know, and I think I need to elevate this.

4          The external auditor, concerned about his client

5     relationship, says:  Cut that out; and harasses the person.

6          That's certainly a conceivable scenario.

7          I wouldn't be surprised to see any of the

8     plaintiffs' counsel at this table say that's a case, you know,

9     I can see occurring in Brady (phonetic).

10         THE COURT:  Is it one you see?

11         MR. SCALIA:  There's a case, the

12    Calcouti (phonetic) case, where you've got a company coming in

13    to provide management services to a bankrupt company, and

14    there is an allegation of harassment and attempt to terminate

15    one of the internal people, so a somewhat different scenario.

16         THE COURT:  Those are people who are exercising the

17    employment function directly.  They're exercising the

18    employment function.

19         MR. SCALIA:  They did take a more direct role in

20    supervising the case.

21         THE COURT:  Okay.

22         Let's go back to your circumstances, the

23    circumstance in which the auditor is an independent entity,

24    but it has a contractual relationship with the public company,

25    and, so, you say if they're bullying somebody in the public

1    company, they're covered?

2              MR. SCALIA:  You could, for example, have an

3    injunction, prohibiting them from doing so.

4              That public-company employee is protected by the

5    statute, and, if they're harassed by an employee --

6              THE COURT:  Yes, but are they --

7              MR. SCALIA:  -- the contractor of a public company,

8    in a way that affects the terms of their employment, then,

9    they're covered.

10             THE COURT:  So that's what this means when it says,

11   "contractor"?

12             MR. SCALIA:  I think that is one situation in

13   itself.

14             THE COURT:  So why not include the employees of the

15   contractor performing that same function; that is, you know,

16   the lower-level guy and the -- Arthur Andersen says there is

17   something really funny about this, and he goes to his, you

18   know, the engagement partner, or however they refer to it, and

19   says that, and the engagement party says:  You're canned.  I

20   don't want to hear any of that language anymore.

21             Why is that any different?

22             MR. SCALIA:  Your Honor, couple of respects.

23             First of all, your first question, we know what

24   Congress is doing.

25             Well, we do.  It was trying to provide protection,

1  but it also was trying to constrain the breadth of the

2  statute; you know, Congress doesn't just enact mental

3  gestures.

4          It enacts language with not just one purpose, so,

5  when you look at what Senator Sarbanes was saying about this

6  statute, for example, he really was at pains to emphasize:

7  This covers public companies, he says, and we quote this in

8  our brief.

9          He says:  It applies exclusively to public

10 companies, not applicable to companies that make up the vast

11 majority of employers, so that --

12         THE COURT:  Well --

13         MR. SCALIA:  -- language countervailing, consistent

14 with the concern you've articulated, about not making this too

15 broad.

16         THE COURT:  But that language is equally -- not

17 equally, but it's capable of a different determination.

18         Our concern is public companies and the integrity

19 of reporting, regarding public companies, but that can be done

20 by private contractors.  That can be effected by private

21 contractors and the employees of private contractors.

22         MR. SCALIA:  My point is narrower, Your Honor.

23         It's not that his statement is some Rosetta Stone

24 that we can use to determine the precise limits of the

25 statute.

 1                It's just a reminder that Congress had, not simply

 2     one concern, protect people.

 3                It would also limit the scope of the statute so

 4     that it doesn't become overbroad.

 5                THE COURT:  I think we're agreed that this is a

 6     statute that is, what should I say, linguistically-challenged,

 7     that it's not altogether clear what the several employees are.

 8                You know, there are, at least, three employees who

 9     are mentioned in the statute.

10                There is someone, called, an employee of a public

11     company; then, there's another employee, and, then, there's,

12     yet, another employee who isn't identified as either an

13     employee of the public company or the contractor.

14                We don't know who this orphan employee is at the

15     very end of the statute.

16                Now, you're telling me that it's the employee of

17     the public company, so we're into trying to discern what the

18     intent of Congress was with language that is open-textured.

19                MR. SCALIA:  I'm sorry.

20                Language that is?

21                THE COURT:  Open-textured.

22                And how do I do that?

23                Now, you say:  Well, you've got to provide limits;

24     and the limits are created by, what?

25                They're created by, I suppose, trying to understand

1  what it is that Congress is doing here.

2          I'm supposed to be the disinterested interpreter of

3  Congress' will; and the principal place I go is to the

4  language itself, and, if it's plain, we all go home, but this

5  one isn't plain.

6          MR. SCALIA:  Your Honor, I think we can sit down

7  and make this clear.  There is no denying that.

8          However, I think when you consider the language as

9  a whole, that, even on the face of the statute, it is clear,

10  and as we point out in our brief, for example, it's really not

11  possible to read these five terms that the plaintiff has

12  described as identifying the, so-called, company

13  representative as then having half of them split off and

14  perform a separate function of identifying whose employees are

15  covered, so I think when you consider linguistic difficulties

16  like that, it becomes clear.

17          The other thing I would emphasize is the title.

18          THE COURT:  Well, excuse me.

19          The limiting theory, unexpressed in the statute

20  that plaintiff's counsel has raised is, you know, concern with

21  the question of fraud against shareholders; that is,

22  contractors, subcontractors, agents, who are concerned with

23  the question of fraud against shareholders.

24          Basically, people who are involved in disclosure

25  obligations, why aren't they included in this?

```
 1              MR. SCALIA:  Well, you know, first of all --

 2              THE COURT:  And you say I should exclude it.

 3              They say I should include it, and, at some point, I

 4   do look at the purpose of the statute, and I'm not sure that

 5   Senator Sarbanes, or the majorities who voted for this, would

 6   think that I have misconstrued the statute if I said it

 7   includes employees of contractors concerned with disclosure

 8   responsibilities of public companies.

 9              MR. SCALIA:  Understood, and, obviously, what

10   Senator Sarbanes might say today is not bearing on how to read

11   this --

12              THE COURT:  No, we're not going to have depositions

13   of Sarbanes and Oxley.

14              (Laughter.)

15              THE COURT:  The question is, you know, imagine me

16   projecting myself onto the floor of the House or the Senate

17   when this was passed.

18              Why wouldn't I?

19              So that's, you know, been inartfully drafted, but

20   that's what they mean.

21              MR. SCALIA:  Let me mention four things.

22              Again, I've talked about how linguistically it

23   makes no sense to split those words up.

24              Employees don't have employees.

25              THE COURT:  Well, hold on, a second.
```

67

```
 1              MR. SCALIA:  Officers don't have employees.

 2              THE COURT:  What does that mean, when you say

 3   employees don't have employees?

 4              The employee that we're talking about here is

 5   another employee of a public company, under your theory; isn't

 6   it?

 7              MR. SCALIA:  That's correct.

 8              THE COURT:  Okay; so what's the problem with

 9   looking deeper into the employees of the contractor?

10              MR. SCALIA:  Because you're trying to use those

11   five words to do two things, say:  Who can't do bad things;

12   and say, secondly:  Whose employees are covered?

13              You're trying to attribute a meaning to, at least,

14   the first two words of this phrase, that it can't reasonably

15   bear, because employee of contractor, that makes some sense,

16   but you've got to read those five words together.

17              An employee of an employee is nonsensical.

18              THE COURT:  No.

19              MR. SCALIA:  And, so, the term, contractor, can't

20   be serving that function.

21              THE COURT:  If I read it this way to say:  Officer

22   of a public company, employee of a public company, contractor

23   or its agents, which doesn't have to be a -- it's contractor

24   of a public company, but the employees are not employees of

25   the public company, what's the strain with that?
```

68

```
 1                MR. SCALIA:  Your Honor, there are two potential
 2     interpretations there.  One is that the employee must be the
 3     employee of either the public company or the contractor.
 4                THE COURT:  Right.
 5                MR. SCALIA:  And I've tried to explain why I think,
 6     that, you can't take the contractor and be referring to a
 7     potential bad actor and also an employing entity at the same
 8     time, because you've got other words in this phrase --
 9                THE COURT:  Well, let's go back to your scenario,
10     which is by the auditor.
11                The auditor itself, as an entity, would be liable
12     under your theory, right?
13                MR. SCALIA:  You know, I think that it would, at
14     least, be subject to an injunction and it had to cease doing
15     it.
16                It's not clear to me that it would be monetary
17     liability.
18                THE COURT:  I'm not getting into remedy at this
19     point, but I'm getting into coverage.
20                So the company itself would be liable; that is, the
21     contracting entity itself would be liable, for such an
22     imposition on an employee of the --
23                MR. SCALIA:  Of the public company.
24                THE COURT:  -- of the public company.
25                MR. SCALIA:  It would be subject to an action under
```

1   this section.

2          THE COURT:  Now, I want to understand what the leap

3   is to say that they'd be equally subject to injunction, if

4   that's what you say is the limit of the remedy available, to

5   their own employees who attempt to raise the question of fraud

6   against shareholders in a public company.

7          MR. SCALIA:  Well, to complete my earlier thought,

8   and the other way to read this is:  Why make it their

9   employees?

10         Why not just any employee on the face of the earth,

11  which, I think, is how Ms. Lawson has at different times

12  suggested that we read this language, that there's not even a

13  limitation to the employee of the contractor, which is

14  immensely broad.

15         THE COURT:  That is, and not one that commends

16  itself to me, but an alternative that limits it to the

17  employee of the contractor, in connection with the provision

18  of disclosure or fraud.

19         MR. SCALIA:  Yes.

20         Well, really, the second point I had to make on

21  that, Your Honor, there, as I say, I'm not aware, and I've

22  read a lot of these Sarbanes-Oxley cases, are one involving an

23  employee of an outside law firm or an outside auditor, and

24  what I would note is that there are other provisions of the

25  Act that, for example, provide reporting up roles for lawyers

 1   who become concerned about misconduct, and, in conjunction

 2   with that, there also is a requirement that public companies

 3   have procedures by which lawyers who think they've been

 4   retaliated against can report up to the Board of Directors, so

 5   there are other means the statute provides to address some of

 6   these retaliatory acts against potential outsiders that are

 7   identified, and, so, the fact that there may not be a claim

 8   specifically here doesn't mean those people end up wholly

 9   unprotected, but, in terms of the question:  Why stop at the

10   employee of the public company; you know, in addition to the

11   point just made, you know, what I would add is -- I think what

12   we've all been saying -- there needs to be a limiting

13   principle, and what I would suggest is that, when we're

14   looking for a limiting principle, given that Congress' intent

15   and objective here is not unitary, that it had countervailing

16   concerns, protection not overbreadth, let's look at the title,

17   and there was some confusion in the initial briefing in this

18   case, as to whether it was in the title or the caption, that

19   there was a reference to retaliation against employees of

20   publicly-traded companies who report allegations of fraud; in

21   fact, if you look at the enrolled bill, that phrase appears

22   twice in the main title to this entire whistle-blower section,

23   and, again, in this specific provision that we're looking at,

24   right here, so, when there is a lack of textual clarity, I

25   think you get to clarity just by focusing on the words, but --

```
 1              THE COURT:  You'll agree with me that relying on

 2    titles is not a particularly strong way of construing the

 3    statute.

 4              MR. SCALIA:  Your Honor, respectfully.

 5              It's a lot better than trying to teleport ourselves

 6    to the debates in 2002 and figure out what people meant.

 7              I think that the title was enacted by Congress.

 8    It's in the codified bill, it's there twice, and there is a

 9    specific reference to employees of publicly-traded companies,

10    so, I think, once a conclusion is reached, you know, it's not

11    a submission I would make, but plaintiff certainly argues this

12    language isn't clear, and we need to search for a limiting

13    principle, and, if that's your assessment, as well --

14              THE COURT:  But isn't it yours, too?

15              Is there any real question that we have these

16    several words about employee here?

17              We just don't know who it is, who it's talking

18    about.

19              MR. SCALIA:  As I say, I think I can sit down and

20    make this clear, but I, also, think that it is not possible to

21    take those five words and have half of them do two functions

22    and the first two of them perform only one; i.e., identify who

23    the potential bad actors are, so, textually, I have a real

24    problem, getting to where Ms. Lawson wants to get.

25              THE COURT:  Well, but all we would be doing is
```

```
1    saying who are employees of such entities, right?

2              MR. SCALIA:  Well, no, Your Honor, respectfully,

3    because there's been a reference to an officer and an employee

4    and those aren't entities.

5              THE COURT:  No, but such entities, and, of course,

6    their officers and directors of such entities; I mean, if we

7    were doing the drafting, we both sat down and did the

8    drafting, wouldn't we be saying officer, employee, contractor,

9    subcontractor, agent of such company or employees of such

10   entities?

11             Wouldn't that do it?

12             MR. SCALIA:  Your Honor, that would be clear, and

13   you know what?

14             Language close to that is used in some of these

15   other whistleblower statutes, where they say employees can't

16   do things.

17             THE COURT:  You want me to look at the other

18   statutes, too?

19             MR. SCALIA:  I think that the fact, as you've

20   indicated, the fact that Congress writes something one way in

21   one statute and another in another statute is not an argument,

22   that the statutes must be read identically.

23             To the contrary, it's an indication that Congress

24   set about doing things in different ways and --

25             THE COURT:  These are all anodynes to the painful
```

1  thought of trying to figure out what it is that Congress was

2  trying to get to, and, so, you know, we reach for a title.

3          So, what else?

4          What else should I be doing?

5          You said there were four.

6          MR. SCALIA:  Right.

7          THE COURT:  I'm not sure I got them all.

8          MR. SCALIA:  You may have thrown me off my step at

9  this point, Your Honor, and I might have lost count.

10          I've talked about the alternative protections that

11  exist elsewhere for people who do want to complain, and I've

12  talked about the legislative history.

13          Again, I'm not claiming it's a Rosetta Stone, but

14  it makes clear, as you would expect, that "protect our

15  employees" cannot be the interpretive mantra here because, as

16  always in legislation, there are countervailing concerns.

17          I wanted to comment briefly on the Brady (phonetic)

18  case, which you've emphasized the decision by Judge Lynch, and

19  one of the things that I think is notable about his decision

20  is that, although he did give that example of the realtor,

21  that case itself was in the securities industry.

22          It was a former employee of

23  Calyou Securities (phonetic), I think, LLC, and he claimed --

24  and it's at Page, I believe, 311, of Judge Lynch's decision --

25  that he had complained about the company's failures to comply

1   with New York Stock Exchange and NASD rules, so it was very,

2   very much --

3                  THE COURT:  That wouldn't be covered; would it?

4                  NASD rules and New York Stock Exchange rules aren't

5   within the scope of the regulations that are covered by this;

6   at least, I don't see them.

7                  MR. SCALIA:  Might not.

8                  THE COURT:  I don't consider, even, regulations of

9   the SEC.  The SEC does.

10                  MR. SCALIA:  I think that's probably right; but my

11  point is the following.  It's that:  Ms. Talwani has

12  suggested, on behalf of Ms. Lawson, that what matters is

13  whether you're kind of in that general province of shareholder

14  concerns and public reporting and that sort of thing, and I

15  think it's notable that Judge Lynch, when he gave that

16  hypothetical, was not, himself, dealing with facts that were

17  so attenuated.  He was indeed himself dealing in the industry

18  of allegations of misreporting.

19                  THE COURT:  But he didn't suggest that he

20  considered that.

21                  I mean, he never really grappled with that wrinkle

22  that Ms. Talwani had raised.

23                  He did what he says is there are neither

24  publicly-traded companies nor issuers, and that's it.

25                  MR. SCALIA:  That's correct, but he did so in a

 1   factual context that would have made him mindful that --

 2              THE COURT:  No, even Homer nods from time to time.

 3              What's clear is that there's no reference from him

 4   saying, and I've considered the fact that he's in the industry

 5   but, nevertheless, don't want to include it.

 6              Yes, it is the case that he didn't take it up, I

 7   think.

 8              MR. SCALIA:  Yes, Your Honor.

 9              The final point I wanted to make, with respect to

10   how to interpret the language; again, relating to the title,

11   is that, although concededly, text prevails over the title, we

12   cited on Page 12 of our supporting memorandum, the

13   Supreme Court's National Center for Immigration Rights case,

14   which, actually, involved a very similar situation where there

15   was a statutory title that had a limiting word that was not

16   present in one relevant part of the text, and The Court said:

17   Well, we're going to take a look at the title and use that

18   word in the title to limit the language of the text, so that

19   case, as well as the case relied upon by Ms. Lawson, the

20   Trayman (phonetic) case, which says:  In case of ambiguity, we

21   will look at the title, what I would suggest is, that, given

22   plaintiff's own acknowledgment, that you need to search for

23   some limiting principal, and, given that no court, no court,

24   has accepted the reading that she's proffering to you, and

25   looking at the title under the Trayman (phonetic) case, under

1     this --

2             THE COURT:  You go to the Trayman (phonetic)

3     language, and it is kind of dismissive.

4             It refers to titles that shorthand references to

5     general subject matter and, in fact, it says you cannot avoid

6     the plain meaning of the text by the heading.

7             Now, yes, when agreeable to The Court, it says that

8     the title can be helpful, it does, all of which it seems to me

9     to suggest that it's a make way.

10            MR. SCALIA:  Your Honor, what training refers to is

11    when the language is plain.

12            THE COURT:  Right.

13            MR. SCALIA:  And, you know, I think, there is an

14    argument to be made, certainly it's plaintiff's argument that

15    it's not plain, that we need to consider legislative context,

16    that sort of thing, so, but, secondly, I think it's misplaced

17    in this case to characterize the heading is shorthand.  It's

18    actually longer than it might otherwise have been, and it's

19    highly specific in referring to employees of publicly-traded

20    companies, so I think it becomes harder to say:  Well, that's

21    just shorthand.  We don't pay it much heed.

22            Your Honor, it may be that Mr. Benoit has another

23    point or two to make.  I don't know if you have additional

24    questions for me.

25            THE COURT:  No.

77

1            That question I was going to ask Mr. Benoit.

2            MR. BENOIT:  Just a couple of points, Your Honor, I

3    know we've been at This Court a while.

4            First of all, if I can go back and just answer one

5    of your questions that you asked of Ms. Talwani, that:  Are

6    there any cases out there that have interpreted Section 806 of

7    Sarbanes-Oxley to apply the mail-fraud provisions, or the

8    other fraud provisions, something besides fraud against

9    shareholders; and the answer to your question is:  Yes.  I'm

10   aware of one case, at least, in the

11   Southern District of New York.

12           It's Mahoney (phonetic) versus Accenture, Limited.

13           THE COURT:  Hold on, a second.

14           Do you have a cite?

15           MR. BENOIT:  Yes.

16           It's 537 F. Supp. 2d. 506, and that involved

17   Social Security fraud, so I just wanted to answer that

18   question for you.

19           THE COURT:  Did it grapple with the issue of --

20           MR. BENOIT:  Yes, it did.  I'm looking here at

21   Page 5 -- this is a U. S. Law printout -- 516.

22           Defendants allege that O'Mahoney's (phonetic)

23   claims should be dismissed on the ground that

24   O'Mahoney (phonetic) cannot show she engaged in activities

25   protected under 1514(a), specifically that 1514(a) applies

  1    only to employees' reporting of fraud against shareholders.

  2            This Court disagrees, and there is some language in

  3    the middle I skipped over.

  4            THE COURT:  Who was the judge?

  5            I'll find out, but . . .

  6            MR. BENOIT:  The judge?

  7            Bear with me.

  8            (Pause.)

  9            MR. BENOIT:  Judge Marrero (phonetic).

 10            THE COURT:  Okay.

 11            MR. BENOIT:  Just to follow up on one other point

 12    that Your Honor was addressing earlier, I think, in the

 13    discussion with Mr. Rose, regarding the independence of the

 14    Funds, throughout the plaintiff's argument with Zang, Mr. Zang

 15    attempts to equate the investment advisor in the mutual fund

 16    as, you know, inseparable entities and makes the comparison or

 17    the analogy to corporate subsidiaries and publicly-traded

 18    parents or, even, characterizes the investment advisor as a

 19    subsidiary, and, in fact, it's not, at all, a subsidiary.

 20            It's an independent entity, and one of the cases

 21    that was cited by Mr. Zang in his surreply brief was the

 22    Fidelity Micron case, First Circuit case, which allegedly,

 23    according to the briefs, stood for the proposition that these

 24    entities were inseparable, when, in fact, the holding was

 25    exactly the opposite.

1          The case involved a lawsuit, a fraud suit against

2    the Magellan Fund and the investment advisor of the -- the

3    portfolio manager would be the investment advisor; at that

4    time, Jeffrey Bennett (phonetic), and the case was dismissed

5    against -- the claim against the mutual fund, the

6    Magellan Fund was dismissed because Mr. Vinick (phonetic) and

7    the advisor were separate entities in the view of The Court

8    and, in fact, The Court held very specifically that -- this is

9    at Page 543 of the Micron case -- the principal purpose of the

10   Investment Company Act is to protect mutual-fund investors by

11   maintaining the Fund as the entity independent of its advisor.

12         THE COURT:  Well, you know, that brings it to a

13   different level, which is that mutual funds are

14   hermaphroditic, I guess, is the way I would express it.

15         They're a special kind of organization and have

16   qualities of interrelationship that are governed in a very

17   specific way by the Advisors Act and the Investment Company

18   Act, but the recognition is that they are really -- the reason

19   you have to be careful about them is that they're joined at

20   the hip, and, so, I suppose the larger argument is to say:

21   Gee, if they want to mess around with the kind of regulatory

22   machinery that we have for mutual funds, they ought to do it

23   specifically.  That's one argument.

24         The other argument is the one that Mr. Rose is

25   making, which is:  They are basically an integrated

1    enterprise, and the advisor is assimilated to the Fund itself.

2              Now, that brings me to the point that I wanted to

3    follow up on with you, which is:  If he makes an allegation

4    like that, doesn't it have to go to some sort of Discovery?

5              MR. BENOIT:  Your Honor, I think when you look at

6    the Complaint, and face the Complaint, and take into

7    consideration those documents that are referenced in the

8    Complaint, which are permitted to take into consideration,

9    they're matters of public record, which are undisputable.

10             There are a couple of key principal points to

11   emphasize.  One --

12             THE COURT:  When you say they're referenced in the

13   Complaint.  They are references to some disclosure

14   obligations, but they're not of the essence of the Complaint

15   itself.

16             MR. BENOIT:  And the Complaint refers to certain

17   filings or certain documents which, I think, for purposes of a

18   Motion to Dismiss, you can consider.

19             THE COURT:  I can consider in terms of that's the

20   language.

21             I'm not sure that I can consider it for purposes of

22   resolving factual disputes; that is, they could or could not

23   be true that they are independent entities in fact, as opposed

24   to de jure.

25             MR. BENOIT:  Your Honor, Number 1, I've looked at

81

```
 1    the Complaint carefully.

 2              I don't find a single allegation in the Complaint

 3    that challenges the independent governance structure of the

 4    Fund.

 5              Now, as the filing indicates, that ten of the

 6    fourteen trustees are independent, disinterested trustees.

 7              The fact is -- and there can't really be a

 8    dispute -- that the Funds are owned by their investor

 9    shareholders, not by Fidelity, that makes them independent.

10              Further, if you look at the Complaint, you'll

11    search in vain for any allegation that challenges the

12    independent governance structure.

13              The allegations that Mr. Rose is referring to refer

14    to the contractual services provided by the advisor, and,

15    lastly, there is no allegations in the Complaint that the

16    Funds were, at all, involved in the decision to terminate

17    Mr. Zang's employment, nor is there an allegation --

18              THE COURT:  Then, again, that comes back to --

19    well, that comes back to two things, one, limiting, obviously,

20    the employee of the public company, but the other is, what is

21    the nature of the relationship in respect to two things:  One,

22    employment, and, two, disclosure or its flip side --

23    disclosure of fraud.

24              MR. BENOIT:  And, to get back to your question

25    about Discovery, during the ALJ proceedings with the
```

1   Department of Labor, Mr. Zang had the opportunity to depose,

2   pose, conducted responses to 500 --

3           THE COURT:  So he's foreclosed in his Discovery

4   here?

5           MR. BENOIT:  On the integrated enterprise issue, he

6   was able to pose 500-plus written Discovery requests,

7   Notice 530(b)(6) depositions, and ten individual depositions,

8   and, from all of that, he cannot come up with a single

9   allegation in the Complaint to challenge the independence of

10  the governance structure or a single allegation in the

11  Complaint to allege that the Funds were, at all, involved in

12  his termination.

13          THE COURT:  Okay; so, I guess, what you're saying

14  is that it's simply a conclusory pleading as to this issue,

15  and I don't have to go any farther than to say that he doesn't

16  plausibly assert a claim for --

17          MR. BENOIT:  I think that's right, under

18  Twombley (phonetic).

19          THE COURT:  Alright.

20          Anything else?

21          MR. BENOIT:  No.

22          Thank you, Your Honor.

23          THE COURT:  I have -- I mean, we've taken a good

24  deal of time -- I have another matter on, I have the argument,

25  with respect to, even if there is coverage, as an employee or

1    employees, that this was not protected activity, and I'll do

2    that on the papers.

3            I will say one other thing, which is, just so

4    you're aware:  If I dismiss the federal claims, I'm not going

5    to exercise supplemental jurisdiction in this case.  It will

6    go to the state court.

7            The state court is, I think, perhaps, a good deal

8    more imaginative than the federal court is in the scope of its

9    provisions, and I'm not going to be adding my two cents to

10   that.

11           MR. BENOIT:  May I make one comment on that,

12   Your Honor?

13           If you were to dismiss the federal claim in Zang on

14   the theory -- there wasn't a lawsuit in that matter -- on the

15   theory that there was no protected activity, where the hook

16   for the alleged protected activity is the federal statute and

17   you've invested the time and analysis, it would seem to me it

18   would be your discretion.

19           THE COURT:  Unlike the Department of Labor, I will

20   not be unhappy if I've expended a great deal of time and some

21   other adjudicatory body has to deal with the rest.

22           My view is that the state claims are sufficiently

23   independent that it's best to have it adjudicated in the

24   state court, and in any event, not here, if I reach it that

25   way, but the order that I'm going to go through, or I've been

1    going through in my own mind, is, first, from your

2    perspective, the question of collateral estoppel, it's

3    collateral estoppel, that's it.

4           Second, the question of coverage, and, if these are

5    covered; that is, employees were covered by it, then, I will

6    get to, for federal purposes, the question of whether or not

7    it's protected activity, and, if I do that, I have to get to

8    the rest.

9           I can't give up on the state claims, if there is

10   still a federal claim here, but, if there is no federal claim

11   here, I'm not going to be dealing with the state claims.

12          Just a sneak preview of at least one branch of the

13   potential decision tree.

14          Is there anything else?

15          MR. ROSE:  Your Honor, just very briefly, The Court

16   referred to the possibility of Discovery on the coverage issue

17   and integrated enterprise.  There was, indeed, Discovery in

18   the Department of Labor.

19          I understand that Fidelity -- in the event that

20   this Motion to Dismiss is denied -- Fidelity is interested in

21   a fairly quick decision from The Court; I think by way of,

22   perhaps, as a Motion for Summary Judgment on the coverage

23   issue.

24          I'm more than happy to cooperate in that, and I

25   don't believe that further Discovery would be necessary.

1          THE COURT:  Okay.  If it comes to that, I will

2   address it in that way, okay?

3          Thank you very much.

4          We'll take a recess before we get to -- because I

5   want to give Diane some time -- before we get to my notes.

6          THE DEPUTY CLERK:  All rise.

7          (The proceedings were concluded.)

8                        -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

<u>PAGE</u>

Hearing

-   -   -

1          I N D E X
           (CONTINUED)
2

3          E X H I B I T S

4

           (NO EXHIBITS WERE MARKED.)
5

6                -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, DIANE M. MOLAS, a Registered Professional Reporter (RPR), a Certified Shorthand Reporter (CSR) in the States of Delaware and Massachusetts, a Certified Court Reporter (CCR) in the State of New Jersey, and a Notary Public in the Commonwealth of Pennsylvania, do hereby certify that the foregoing is a true and accurate transcript of the proceedings reported by me, on November 5, 2008, and that I am neither counsel, nor kin, to any party or participant in said action, nor am I interested in the outcome thereof.

/s/Diane M. Molas_____
Diane M. Molas, RPR, DE & MA CSRs, and NJ CCR
    DE Certification Number 208-RPR
    MA Certification Number 149208
   NJ Certification Number 30XI00228400
    7/23/09

- - -

*(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the DIRECT CONTROL AND/OR SUPERVISION of the Certifying Court Reporter herself.  THE COURT REPORTER'S CERTIFICATION NEVER APPEARS AS A PHOTOCOPIED SIGNATURE.)*

- - -