UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| JACKIE HOSANG LAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 08-10466-DPW |
| | ) | |
| FMR LLC, dba FIDELITY | ) | |
| INVESTMENTS; FMR CORP., dba | ) | |
| FIDELITY INVESTMENTS; and | ) | |
| FIDELITY BROKERAGE SERVICES, | ) | |
| LLC, dba FIDELITY | ) | |
| INVESTMENTS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| JONATHAN M. ZANG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 08-10758-DPW |
| | ) | |
| FIDELITY MANAGEMENT & | ) | |
| RESEARCH COMPANY, FMR CO., | ) | |
| INC., and FMR LLC f/k/a | ) | |
| FMR CORP., | ) | |
| | ) | |
| Defendants. | ) | |


MEMORANDUM AND ORDER
March 31, 2010

This Memorandum addresses motions to dismiss in two separate cases alleging unlawful retaliation against employees of non-public companies in the mutual fund industry who complained of improper business activities by their employers.  Because the cases share a common defendant, FMR LLC, and both raise the question of the reach of the Corporate and Criminal Fraud

Accountability Act of 2002, also known as the Sarbanes-Oxley Act ("SOX"), I address them jointly.  In particular, the plaintiffs in both cases seek the protection of Section 806, the SOX whistleblower provision, administered through the Occupational Safety and Health Administration ("OSHA") of the Department of Labor ("DOL").  18 U.S.C. § 1514A.

In the first case (No. 08-10466), Jackie Hosang Lawson seeks relief against her former employers, FMR LLC, FMR Corp. and Fidelity Brokerage Services, LLC (collectively "Fidelity Investments").  Lawson's employment at Fidelity Investments ended in September 2007, when she concluded she had no choice but to tender her resignation.

In the second case (No. 08-10758), Jonathan M. Zang seeks relief against his former employers, Fidelity Management & Research Company, FMR Co., Inc. and FMR LLC (collectively "Fidelity Management").  Zang worked for Fidelity Management from 1997 until July 2005, when his employment was terminated.

Both Fidelity Investments and Fidelity Management have moved to dismiss the cases pursuant to Fed. R. Civ. P. 12(b)(6).

## I.  FACTUAL BACKGROUND

In summarizing the factual background of this litigation, I take all well-pleaded facts contained in the Complaints as true, and I draw all reasonable inferences in the Plaintiffs' favor. *In re Citigroup, Inc.*, 535 F.3d 45, 52 (1st Cir. 2008).  These

facts "may be derived from the complaint, from documents annexed to or fairly incorporated in it, and from matters susceptible to judicial notice." *Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008).  A court is entitled, however, to disregard "bald assertions, unsupportable conclusions, and opprobrious epithets." *In re Citigroup*, 535 F.3d at 52 (quoting *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 4 (1st Cir. 2007)).

**A.  *Lawson's Claims***

    1.  <u>The Parties</u>

The Defendants in Lawson's suit are three privately held companies involved in the business of mutual fund investments. Defendant FMR LLC is the successor to Defendant FMR Corp., and Defendant Fidelity Brokerage Services, LLC ("Fidelity Brokerage") is its subsidiary.[1]  Together they conduct business under the name "Fidelity Investments."  Their business, according to Lawson, includes acting as investment advisers to the Fidelity family of mutual funds ("Funds"), which are separate investment companies under the Investment Company Act of 1940, 15 U.S.C. § 80a-3(a)(1).  The Funds, which are publicly held companies, have no employees, but are rather overseen by a single Board of Trustees.

---

[1] Lawson names FMR Corp. as a defendant, but according to her Amended Complaint (as well as the Defendants' Memorandum for its Motion to Dismiss) FMR Corp. has been merged into FMR LLC.

Fidelity Management & Research Company ("FMR Co."), not named as a defendant in Lawson's suit, is a subsidiary of FMR Corp. and/or FMR LLC.  FMR Co. serves as the registered investment adviser to the Funds under 15 U.S.C. § 80b-2(a)(11). FMR Co. provides services pursuant to a written contract approved by the Fund's Board of Trustees.  Before approving these contracts, the Board of Trustees reviews the financial data and methodologies that determine the Funds' profitability, as provided by FMR LLC and its subsidiaries.

Lawson began working at Fidelity Investments in 1993 as a contract employee.  She became a full-time employee in 1996, and was promoted to Director of Finance in 1999.  In 2001, she was promoted to Senior Director of Finance.  Her specific employer until 2007 was Fidelity Brokerage.

    2.   <u>Alleged Protected Activities and Retaliation</u>

        a.   Protected Activities

From the face of the Complaint, it is not readily apparent precisely which activities Lawson alleges to be "protected" for purposes of SOX or the common law.  Her brief in Opposition to the Motion to Dismiss, however, identifies seven categories of protected activities.

First, she reported inaccuracies in the expenses for "Guidance Interactions," a new initiative to give investment advice to the public.  She provided information about these

-4-

inaccuracies to Fidelity Investments' counsel and CFO, as well as to Vice President Betty Connolly, in June 2007.

Second, she reported the improper retention of 12b-1[2] fees to Fidelity Investments General Counsel in May 2007.

Third, she challenged the methodology used by PI Finance, a group within Personal Investments, one of the three main companies in Fidelity Brokerage.  In May 2007, she reported to Fidelity Investments General Counsel that stale methodology generated variances and discrepancies for the Funds, which affected Fund Profitability models.

Fourth, she raised questions regarding PI Finance's switch of source system.  She alleges that in March 2005, she advised her manager of discrepancies that had resulted from the use of a new source system, and that the switch to the new system had not been disclosed to or approved by the Board of Trustees.

Fifth, she questioned a methodology for allocating internet expenses.  In the summer of 2005, Lawson presented findings to Senior Vice President Harris Komishane and then to Vice President of PI Finance John Cahill that PI Finance had failed to implement

---

[2] The term "12b-1 fees" refers to fees governed by SEC Rule 12b.1, 17 C.F.R. § 270.12b-1(b), promulgated pursuant to the Investment Company Act of 1940.  If a mutual fund adviser plans to use fund assets to make payments for the marketing and distribution of fund shares, then it must comply with the specific conditions laid out in Rule 12b.1(b).  Lawson's general concern appears to have been that National Financial ("NF"), a group within Fidelity Brokerage, was improperly retaining fees paid by the Funds that were designated for transferral to third-party intermediaries.

the methodology for this allocation, which the Board had approved in 2003.

Sixth, she reported two major errors in a methodology applied to the PI Back Office Group, which services shareholders' accounts.  She reported the errors to Komishane.

Seventh, she filed complaints with OSHA.

b.   Retaliation

The retaliation allegedly suffered by Lawson consists of a series of events: reduction of her performance rating from "exceeds expectation" to "proficient;" selection of another person instead of Lawson for the position of Director of the Board Support Group; charges that Lawson had failed to prepare business partners properly for a meeting with Pricewaterhouse Coopers; reduction in bonus compensation; exclusion from committee meetings regarding her OSHA complaints; denial of approval of an expense report; implication that she was involved in the improper 12b-1 fee retention; an "oral warning" for violating Fidelity Investments rules on insubordination; a statement by a supervisor that it was impossible for Lawson to continue working at Fidelity Investments; and harassing behavior by supervisor Claire Cadogan, including verbal abuse, sabotage of her work, and the imposition of an unrealistic workload.

3.   Procedural History

Lawson filed SOX whistleblower complaints with OSHA on four

-6-

separate dates: December 20, 2006; April 24, 2007; September 14, 2007; and November 9, 2007.  In a letter on January 28, 2008, the DOL consolidated the four complaints into one.  Lawson alleged unlawful retaliation in violation of the SOX provision which makes it unlawful for certain persons and entities to penalize employees for providing information about or assisting an investigation that employees reasonably believe constitute violations of 18 U.S.C. §§ 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission ("SEC"), or any federal law relating to shareholder fraud.  18 U.S.C. § 1514A(a)(1).

On January 3, 2008, Lawson notified the DOL that she intended to seek review in federal court of her SOX claim.  Under SOX, if the DOL has not issued a final decision on the complaint within 180 days of filing, the claimant may seek de novo review in federal district court.  18 U.S.C. § 1514A(b)(1)(B).  The DOL, in its January 28 letter, notified Lawson that over 180 days had passed since she filed her first complaint, and that because of her intention to seek de novo review in federal court, the consolidated complaint before the DOL was closed.  The Plaintiff filed her Complaint in this Court on March 20, 2008.  After a scheduling conference for this litigation, Lawson filed the Amended Complaint on September 19, 2008, to which the Defendants have responded with the instant Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

**B.    *Zang's Claims***

1.   <u>The Parties</u>

The Defendants in Zang's suit, here collectively referred to as Fidelity Management, are privately owned companies whose operations include the management of mutual funds.  Defendant FMR LLC is the parent company of Defendant Fidelity Management & Research Company, which itself is the parent of Defendant FMR Co., Inc.  As noted, FMR LLC is the successor to FMR Corp.  These companies provide investment management services to a group of mutual funds ("Funds"), each of which is a publicly held investment company, registered with the SEC and required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).  A Board of Trustees has oversight capacity for the Funds, but the Defendants perform the management and administrative functions necessary for the Funds' operation. Together, the Defendants manage approximately 350 mutual funds.

The Plaintiff began his employment for Fidelity Management in 1997.  Under Zang's employment agreement, he was employed "by FMR Corp., and/or any entity which is directly or indirectly owned or controlled wholly or in part by FMR Corp."  In 2001, Zang's specific employer changed from Fidelity Management & Research Company to FMR Co., Inc., and remained so until his employment was terminated in 2005.

Zang started at Fidelity Management as an equity research

-8-

analyst in 1997.  Between 1998 and 2005, Zang acted as a
portfolio manager for several mutual funds: Fidelity Select
Utilities Growth, Fidelity Select Chemicals, Fidelity Select
Medical Delivery, and Fidelity Select Natural Gas.  His portfolio
manager duties included selecting the investment securities for
the fund, communicating with outside parties about performance
and investment strategies, and helping prepare or review certain
shareholder reports and disclosures.  During this period, Zang
received positive feedback from trade publications and his
superiors.

    2.   <u>Alleged Protected Activity and Retaliation</u>

        a.   Protected Activity

In February 2005, Fidelity Management internally
distributed, and sent to the SEC, a draft of the revised
registration statement for Fidelity Select Portfolios.  Included
with this statement was a revised Statement of Additional
Information ("SAI"), which was to become effective in April.
Zang contends he informed Fidelity Management that the SAI
disclosures failed to state accurately the extent to which
portfolio managers' compensation was driven by performance as
research analysts providing services to other Fidelity mutual
funds, rather than by performance as portfolio managers of their
respective Select Funds.  Zang's Complaint identifies several
securities laws that he claims he reasonably believed were

violated in the SAI, including Section 17(a) of the Securities
Act of 1933, and Sections 15(c), 34(b), and 36(b) of the
Investment Company Act of 1940.  Zang further alleges that he
informed Fidelity Management that its operation of the Funds
created conflicts of interest that harmed the Funds'
shareholders.

> b.  Retaliation

Zang contends that as a result of his protected activities,
a Fidelity Management supervisor withdrew direction that Zang
attend a Board of Trustees meeting for the Fidelity Select
Medical Delivery fund.

Zang also refers to supervisor complaints of poor job
performance as retaliation for his protected activities.  At one
point, a supervisor also informed Zang that Fidelity Management
was unsure whether it wanted Zang to be a member of "the team,"
despite his performance during this period that outpaced other
Fidelity Select fund managers.

On June 27, 2005, Fidelity Management terminated Zang's
employment effective July 15.  On June 30, 2005, Fidelity
Management offered Zang six months of severance pay, but later
rescinded the severance offer.  At the same time it terminated
Zang, Fidelity Management terminated the employment of two other
portfolio managers, allegedly as a result of the same review that
led to Zang's termination.  Zang claims that these two portfolio

managers, unlike him, received severance pay.

    3.   <u>Procedural History</u>

Zang filed a complaint with OSHA on September 15, 2005. The complaint alleged that the Defendants violated the SOX whistleblower provision when they discharged Zang in July 2005 as unlawful retaliation for activity protected under the statute.

OSHA dismissed the complaint, finding that although Zang was a covered employee within the meaning of the SOX whistleblower provision, 18 U.S.C. § 1514A(a), he had not engaged in protected conduct. Zang requested a hearing before an Administrative Law Judge ("ALJ"). Fidelity Management then filed a motion for summary decision on April 3, 2007, alleging that Zang was not a covered employee within the meaning of § 1514A(a), and that Zang had not engaged in protected conduct within the meaning of § 1514A(a)(1). The ALJ permitted limited discovery concerning Zang's status as a covered employee, and on March 27, 2008, issued a decision granting summary decision to Fidelity Management, and dismissing the complaint. On April 9, 2008, Zang petitioned for review of the ALJ decision by the Department of Labor's Administrative Review Board ("ARB"). However, on April 16, 2008, Zang gave notice of his intention to file an action in federal court, and proceeded to file his Complaint in this Court on May 6, 2008, thereby terminating his appeal with the ARB. The Defendants thereupon filed the Motion to Dismiss Zang's Complaint now before me.

## II.   STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must allege "a plausible entitlement to relief." *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 49 (1st Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1966 (2007)).  On a motion to dismiss, a court examines the record "accepting the complaint's well-pleaded facts as true and indulging all reasonable inferences in the plaintiff's favor." *Cook v. Gates*, 528 F.3d 42, 48 (1st Cir. 2008) (citing *SFW Arecibo, Ltd. v. Rodriguez*, 415 F.3d 135, 138-39 (1st Cir. 2005)).

## III.   ANALYSIS

Both sets of Defendants contend that the two claims in the Plaintiffs' respective Complaints--retaliation in violation of 18 U.S.C. § 1514A (Count I) and wrongful discharge in violation of public policy (Count II)--fail to state a claim upon which relief can be granted.  Before turning to the Defendants' challenge based on the scope of SOX's whistleblower provision, I address at the outset a threshold challenge raised by Fidelity Management with respect to Zang's claim: that the claim is barred by the principles of collateral estoppel.

### A.   *Is Zang Collaterally Estopped from Pursuing His Claim in Federal Court?*

The vitality of Zang's SOX whistleblower claim depends on

whether the principles of collateral estoppel apply to the March 27, 2008 decision by the DOL's ALJ.  The procedures at issue are defined in 18 U.S.C. § 1514A(b).  A claimant may bring an action for de novo review in federal district court "if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant."  § 1514A(b)(1)(B).  The parties dispute whether the statute permits an ALJ decision to have preclusive effect when a claimant has received an adverse ALJ decision, then appeals the decision to the ARB, and then immediately exercises his rights of de novo district court review.

The test for collateral estoppel, or issue preclusion, has four elements: (1) both proceedings involved the same issue of law or fact; (2) the issue was actually litigated in the prior proceeding; (3) the issue was resolved in a final and binding judgment; and (4) the first court's resolution of that issue was essential to its judgment.  *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995).

When a prior judgment issues from an administrative agency, the default assumption is that issue preclusion applies to the agency judgment.  *Global NAPs, Inc. v. Mass. Dep't of Telecomm. & Energy*, 427 F.3d 34, 44 (1st Cir. 2005).  The Supreme Court will give preclusive effect to administrative agency decisions.

-13-

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 103, 107
(1991) ("We have long favored application of the common-law
doctrines of collateral estoppel . . . to those determinations of
administrative bodies that have attained finality."); *Univ. of
Tenn. v. Elliott*, 478 U.S. 788, 797 (1986) (noting the "sound
policy" of applying issue preclusion to the factfinding of
administrative bodies "acting in a judicial capacity"); *United
States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)
(holding that when an agency acts in a judicial capacity, giving
parties an opportunity to litigate and resolving disputed issues
of fact, the courts apply preclusion to the case).  The values
behind collateral estoppel – avoiding costs of repetitive
litigation and conserving judicial resources – apply whether the
prior factfinding was made by a state or federal agency.
*Elliott*, 478 U.S. at 798.

     Before applying this "federal common law of issue
preclusion," however, there is a preliminary question: whether
issue preclusion is inconsistent with the statute under which the
claimant seeks relief.  *Global NAPs*, 427 F.3d at 45 (citing
*Elliott*, 478 U.S. at 796); *see also Astoria*, 501 U.S. at 108
("[W]here a common-law principle is well established, as are the
rules of preclusion, . . . the principle will apply except 'when
a statutory purpose to the contrary is evident.'") (citation
omitted).  The framework for this analysis comes from *Elliott*,

-14-

478 U.S. 788, which involved collateral estoppel against the backdrop of Title VII.  In *Elliott*, a state ALJ had determined that the University of Tennessee was not motivated by racial prejudice when it discharged the claimant.  *Id.* at 791.  The employee did not seek review of that decision in state court, but instead filed a new suit in federal court for violations of Title VII and 42 U.S.C. § 1983.  *Id.* at 792.  The Supreme Court interpreted Title VII to permit de novo review in federal court, reasoning that if under the statute, the Equal Employment Opportunity Commission ("EEOC") had authority to investigate charges previously reviewed by state and local authorities, so too did a district court.  *Id.* at 795.

The First Circuit has observed "*Elliott* controls the structure of the analysis" in this context.  *Global NAPs*, 427 F.3d at 45.  Just as the Court in *Elliott* was required to determine whether Title VII permitted giving preclusive effect to unreviewed state administrative proceedings, the question here is whether the Sarbanes-Oxley whistleblower provision permits giving preclusive effect to DOL administrative proceedings.  *Id.* at 46.

Deciding if issue preclusion applies to the DOL'S ALJ decision therefore requires statutory interpretation of 18 U.S.C. § 1514A(b)(1)(B).  I first turn to the text, "the starting point for interpretation of a statute."  *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 74 (1st Cir. 2002)

(quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990)).  The pertinent language is that "if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant," the claimant can pursue de novo review in federal district court.  § 1514A(b)(1)(B).  The statute clearly identifies three necessary criteria for de novo review in federal court: the lack of a final decision by the DOL; a 180-day waiting period after filing the complaint with the DOL; and the lack of bad faith on the part of the claimant.  The DOL regulations specify several mechanisms for obtaining a final decision from the Department.  The regulation relevant to this case is 29 C.F.R. § 1980.110, which deals with appeals of ALJ decisions to the ARB.  The ALJ determination becomes a final decision if the claimant has *not* timely filed a petition for review with the ARB.  29 C.F.R. § 1980.110(a).  The ALJ decision also becomes a final decision if the claimant has petitioned for ARB review, but the ARB has not issued an order within thirty days, notifying the parties that the case has been accepted for review.  § 1980.110(b).[3]  Therefore, the ALJ decision is not a

---

[3] The regulations identify two other ways in which a determination becomes a final decision.  OSHA's preliminary findings become a final decision if the claimant does not make a timely objection to these findings or the preliminary order.  29 C.F.R. § 1980.106(b)(2).  If the ARB has accepted the case for review, then its determination on the merits of the case, once made, is the final decision of the Department.  § 1980.110(a).

final decision if (1) a claimant has timely filed a petition for ARB review, and (2) either the thirty-day deadline has not yet elapsed and the ARB has yet to take action, or the deadline has elapsed and the ARB has timely accepted the case for review.

It is clear that in this case, Zang had not obtained a final decision from the DOL at the time he filed his case in federal court.  Zang obtained the ALJ's decision on March 27, 2008, and appealed that decision to the ARB on April 9.  On April 16, Zang notified the DOL that he planned to file suit in federal court and indeed did so on May 6. Because the matter was on appeal to the ARB and thirty days had not yet passed, the ALJ's decision was not a "final decision" at the time that Zang filed his complaint in federal district court.  The other two requirements for seeking de novo review in federal court - a 180-day waiting period and a lack of bad faith - are also satisfied.  When Zang notified the ARB of his decision to pursue relief in federal court, two and a half years had passed since Zang filed his complaint at the DOL, thereby easily satisfying the 180-day waiting requirement.  Nor do the Defendants argue that the 180-day delay resulted from bad faith on Zang's part.  Here, all three of the statute's requirements, according to the plain terms of the text, had been satisfied.

A statute's plain meaning governs "unless it would produce an absurd result or one manifestly at odds with the statute's

intended effect." *Seahorse Marine Supplies*, 295 F.3d at 74
(quoting *Parisi by Cooney v. Chater*, 69 F.3d 614, 617 (1st Cir.
1995)); *see also Griffin v. Oceanic Contractors*, 458 U.S. 564,
575 (1982) ("[I]nterpretations of a statute which would produce
absurd results are to be avoided if alternative interpretations
consistent with legislative purpose are available.").  The
Defendants suggest that allowing Zang to proceed would produce an
absurd result that is inconsistent with the administrative
dispute resolution procedures anticipated by the statute.

   The district court in *Hanna v. MCI Communities, Inc.*, voiced
similar concerns, noting that "applying the statute according to
its plain meaning might indeed lead to an absurd result" in cases
where a complainant files a complaint in federal court after
petitioning for review by the ARB.  348 F. Supp. 2d 1322, 1329
(S.D. Fla. 2004).  The Department of Labor has expressed similar
concerns:

>        This provision authorizing a Federal court complaint is
>        unique among the whistleblower statutes administered by
>        the Secretary.  This statutory structure creates the
>        possibility that a complainant will have litigated a
>        claim before the agency, will receive a decision from
>        an administrative law judge, and will then file a
>        complaint in Federal court while the case is pending on
>        review by the Board.

68 Fed. Reg. 31,860, 31,863 (May 28, 2003).  From this, the
Department of Labor concludes "that it would be a waste of the
resources of the parties, the Department, and the courts for
complainants to pursue duplicative litigation."  *Id.*

I do not agree with these somewhat overwrought observations by *Hanna* and the Secretary of Labor that relitigating the issue in district court is either absurd or improperly duplicative. *See Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 249 (4th Cir. 2009) (finding "a literal interpretation of the statute [§ 1514A] does not lead to an 'absurd result'" and "reject[ing] as contrary to the statute the Secretary's 'suggestion' that district courts apply preclusion principles to effectuate a goal of efficiency."). The statute provides a mechanism for administrative proceedings. If the DOL cannot complete the adjudication process in a timely fashion - within 180 days - claimants can either seek review in federal court, or can first pursue further administrative review. To be sure, this may lead to duplication of factfinding by the DOL and the federal courts, but that repetition was clearly contemplated as possible by the statute's general provision for "de novo review." *See id.* at 250 (rejecting "the Secretary's interpretation and invitation to district courts to apply preclusion principles because Congress expressly provided for *de novo* non-deferential review in district court"). And of course, it is entirely within the DOL's control to preclude a claimant from filing in federal court and to avoid the duplication of factfinding - namely, by issuing a final decision within 180 days of the filing of the complaint.

Any charges of absurdity are further undermined when one

considers similar outcomes under other federal statutes.  In the employment context, if 180 days have passed since an employee has filed a discrimination charge with the EEOC, and the EEOC has yet to file a civil action, then the employee can seek de novo review in federal district court.  42 U.S.C. § 2000e-5(f)(1).  Likewise, a federal employee whose discrimination case has been reviewed by the Merit Systems Protection Board can obtain review in federal district court.  5 U.S.C. §§ 7702, 7703(b)(2).  Outside the employment context, a claimant can seek de novo review of a revocation of a federal firearms license by the Bureau of Alcohol, Tobacco, Firearms and Explosives, where the Attorney General has affirmed the revocation after a hearing.  18 U.S.C. § 923(f)(3).  The same opportunity is provided if a naturalization application is denied, and a senior immigration examiner upholds the denial after an administrative hearing.  8 U.S.C. § 1421(c).

In light of these statutes, the text of SOX, and the DOL's own procedural mechanisms, I find that it would not be absurd to permit Zang to proceed with his federal claim.  A necessary requirement of collateral estoppel is that the adjudication body "actually resolved the issue in a final and binding judgment." *Monarch Life Ins.*, 65 F.3d at 978.  The ALJ determination here was on appeal for review by the ARB, and therefore his decision dismissing the Plaintiff's complaint was not final.  I therefore conclude that for the purposes of § 1514A(b), the principles of

collateral estoppel do not apply to ALJ decisions when those decisions are on appeal to the ARB and more than 180 days have passed since the initial filing of the complaint with the Department.

## B.   *Were Lawson and Zang Covered Employees Under the Sarbanes-Oxley Act?*

The Defendants contend that Lawson and Zang, as employees of privately held companies, are not covered by the SOX whistleblower provision.  For their part, Lawson and Zang argue that the statute encompasses not only employees of public companies but also employees of private companies, particularly those that act as investment advisers to public investment companies.  Resolution of this dispute requires interpretation of § 1514A(a), and again I begin with the text.

### 1.   The Text of § 1514A(a)

The whistleblower provision identifies both employers whose retaliation is prohibited and employees whose conduct is protected.  The subsection in question states as follows:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), or **any officer, employee, contractor, subcontractor, or agent of such company**, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against **an employee** in the terms and conditions of employment because of any lawful act done by the employee --
>
> (1) to provide information, cause information to

-21-

> be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by –
>
>     (A)  a Federal regulatory or law enforcement agency;
>
>     (B)  any Member of Congress or any committee of Congress; or
>
>     (C)  a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or
>
> (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

§ 1514A(a) (emphasis added).  The parties do not dispute that "an employee" includes an employee of a public company, i.e., one with a class of securities registered under Section 12 of the Securities Exchange Act or one that files reports with the SEC. But the Plaintiffs argue that "an employee" also includes employees of "any officer, employee, contractor, subcontractor, or agent of such company."

    The statutory text is far from pellucid.[4]  The statute

---

    [4] Courts as well as commentators have criticized SOX as "hastily passed and poorly drafted." *In re Enron Corp. Sec.*

protects "an employee," but does not directly state at which

entity the individual must be employed.  I therefore interpret

the word "employee" by reference to the rest of the language in

the subsection.  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575

(1995) (describing the doctrine of *nascitur a sociis*, whereby a

word is known by the words with which it is associated).  This

requires choosing between two interpretations: the Defendants'

reading ("an employee of a publicly traded company"), or a more

expansive reading ("an employee of a publicly traded company or

of any officer, employee, contractor, subcontractor, or agent of

---

*Litig.*, No. MDL-1446, 2004 WL 405886, at *11 (S.D. Tex. Feb. 25, 2004); *In re Adelphia Comm'cns Corp.*, No. 03-MD-1529, 2005 WL 1278544, at *5 n.8 (S.D.N.Y. May 31, 2005); Roberta Romano, *The Sarbanes-Oxley Act and the Making of Quack Corporate Governance*, 11 YALE L.J. 1521, 1549-68 (2005) (discussing the narrow time frame in which the legislation was developed); Michael A. Perino, *Enron's Legislative Aftermath: Some Reflections on the Deterrence Aspects of the Sarbanes-Oxley Act of 2002*, 76 ST. JOHN'S L. REV. 671, 672 (2002) (observing that speedy drafting resulted in a disorganized statute).  *But see SEC v. Worldcom, Inc.*, No. 02 Civ 4963(JSR), 2003 WL 22004827, at *17 & n.43 (S.D.N.Y. Aug. 26, 2003) ("While Sarbanes-Oxley has been criticized in some quarters, there can be no doubt that it addresses some of the very problems presented by this Company's history. . . . As with other major legislation covering significant new territory, there are provisions of Sarbanes-Oxley that will benefit from either clarifying regulations or from exemptive actions.").

    For instance, ambiguity has emerged as to the statute of limitations in Section 804, *Lieberman v. Cambridge Partners, LLC*, 432 F.3d 482, 489 (3d Cir. 2005), and as to the statute's retroactive application.  *In re ADC Telecomms., Inc. Sec. Litig.*, 409 F.3d 974, 977 (8th Cir. 2005) (concluding that a "literal reading of the Sarbanes-Oxley Act's effective-date clause would lead to a puzzling result").

such company"). The Plaintiffs contend that the statute uses
broad, plain language protecting an employee without regard to
whether he is employed by the public company or the contractor.
Fidelity Investments has suggested that such a construction is
linguistically nonsensical because it would require the words
"any officer, employee, contractor, subcontractor, or agent" to
serve two functions: subject (those who cannot discriminate) and
object (those who cannot be discriminated against). This attempt
at a grammatical attack is not persuasive. Under the Plaintiffs'
construction, the subject and object of the sentence would be
distinct groups: the subject would be a "publicly held company"
or its "officer, employee, contractor, subcontractor, or agent,"
while the object of the sentence would be the "employee" of one
of these discriminating entities. While the entities in the
former group perform two conceptual functions - as discriminating
entities, and as employers of protected individuals - this does
not mean they serve two *grammatical* functions.[5]

    I next consider whether either interpretation makes better
logical sense. The statute contains a list of potential
defendants (a public company, officer, employee, etc.), a list of

---

[5] I note further that even if the Defendants' grammatical
argument were persuasive, it would be equally damaging to the
Defendants' own construction - "employee of a public company."
Under this reading, "public company" would refer both to the
subject of the sentence, as the discriminating entity, and to the
employer of the protected individual.

-24-

prohibited actions (discharge, demotion, suspension, threat, harassment, discrimination), and a definition of the covered employees (employed by either a public company, or a public company and its related entities, depending on one's reading of the statute).  Such variables create a web of potential relationships between the public company, the entities acting on the company's behalf, the conduct involved, and the employees protected by the statute.

Given this potential complexity, I find that both of the opposing interpretations suggest somewhat awkward applications to various business relationships.  For example, under the Plaintiffs' reading, the statute would protect an *employee of an employee* of a public company, and an *employee of an officer* of a public company.  Fidelity Investments suggests that it would be nonsensical for a public company's officers or employees also to have their own employees.  This suggestion perhaps overstates the feasibility of such an arrangement; one could imagine, for example, an officer or employee of a public company with a personal assistant, not employed by the public company, who has access to information about potential corporate fraud. Nevertheless, Fidelity Investments is correct that the statute's suggestion of the potential for such convoluted arrangements should give one pause in fashioning a manageable definition when construing the statute.

On the other hand, the Defendants' own proffered construction also has a puzzling application.  Under this reading of the statute, no contractor or subcontractor is permitted to "discharge, demote, [or] suspend" an employee of a public company.  It is difficult to think of circumstances that would, in any event, enable a subcontractor to discharge, demote, or suspend the employee of a public company, an entity with presumably no direct relationship to the very subcontractor executing the discharge.

Under either construction, then, few circumstances would permit all of the potential defendants to be capable of engaging in all of the prohibited activities against the covered employees.  One should not conclude from the potential for awkward applications that either opposing construction should be rejected.  Rather, one can conceive that under the statute, at least one prohibited activity and one category of covered employees - but not necessarily all activities and covered employees - correspond to at least one of the potential defendant entities.

Given their comparable feasibility as grammatical and logical constructions, neither of the opposing interpretations can be ruled out.  Decisional law has done little to enlighten the issue.  In *Rao v. Daimler Chrysler Corp.*, No. 06-13723, 2007 WL 1424220 (E.D. Mich. May 14, 2007), the plaintiff was an

employee of a private company that was a "thrice-removed"
subsidiary of a public company. *Id.* at *1. The court made
reference to the political backdrop of the enactment of SOX and
speculated that Congress's widespread concerns about accounting
fraud might suggest "the inclusion of a public company's
subsidiaries within SOX's whistleblower protection provision."
*Id.* at *4. In the end, however, the *Rao* court concluded it could
not escape the text of the statute: "[T]he fact remains that
Congress only listed employees of public companies as protected
individuals under § 1514A, and it is not the job of this Court to
rewrite clear statutory text." *Id.* The *Rao* holding is not
itself without ambiguities. Early in the opinion, the court
offered as a summary that "employees of entities with certain
relationships to publicly traded companies, including agents of
such companies, receive whistleblower protection under § 1514A as
well."[6] *Id.* at *3.

A narrow reading of the proper scope of Section 806 is

---

[6] The issue was raised but not decided by the First Circuit in
*Carnero v. Boston Scientific Corp.*, 433 F.3d 1 (1st Cir.
2006). *Carnero* involved an employee of a private company, which
was a subsidiary of a publicly held corporation. *Id.* at 2. The
issue on appeal was whether Section 806 of SOX had
extraterritorial effect, but the court briefly discussed its
applicability to employees of privately held subsidiaries. "An
individual complaining under this section of the Act must . . .
ordinarily be . . . an 'employee' of a publicly traded company
subject to the Act." *Id.* at 5. However, because neither party
contested the plaintiff's status as a covered employee, the First
Circuit merely assumed his covered status without deciding the
issue. *Id.* at 6.

shared by other federal district courts and is found in DOL administrative decisions.

In *Brady v. Calyon Sec. (USA) Inc.*, 406 F. Supp. 2d 307, 318 (S.D.N.Y. 2005), the court found that § 1514A did not cover an employee of a privately held broker-dealer that allegedly acted as an "agent and/or underwriter" for public companies.  The court held that "as an employee of non-publicly traded companies, Brady [the employee] is not covered by Sarbanes-Oxley."  *Id.* at 319. "Nothing in the Act suggests that it is intended to provide general whistleblower protection to the employees of any employer whose business involves acting in the interests of public companies."  *Id.* at 318; *see also Malin v. Siemens Med. Solutions Health Servs.*, 638 F. Supp. 2d 492, 500-01 (D. Md. 2008) ("[T]o hold that non-public subsidiaries are subject to the whistleblower protection provisions simply because their parent company is required by other SOX provisions to report the subsidiary's financial information or to adopt an umbrella compliance policy would widen the scope of the whistleblower protection provisions beyond what Congress appears to have intended.").  In a footnote, the *Brady* court cites DOL ALJ opinions it considered to illustrate the "proper application" of the "agency" provision, focusing on those involving non-public companies that direct and control the employment decisions for the public company.  *See id.* at 318 n.6.

ALJs within the Department of Labor who have addressed this issue have reached similar conclusions.  In *Goodman v. Decisive Analytics Corp.*, No. 2006-SOX-11 (ALJ Jan. 10, 2006), the ALJ determined that limiting whistleblower protection to employees of publicly traded companies was necessary in order to limit the scope of Section 806: "Any other interpretation would extend SOX employee protection far beyond the applicability envisioned by Congress since any private business conducting any contractual transaction with a publicly traded company would be subject to SOX employee protection provisions."  *Id.* at 6.  In *Zang v. Fidelity Mgmt. & Research Co.*, No. 2007-SOX-00027 (ALJ Mar. 28, 2008), involving the Plaintiff in this case, the ALJ concluded in a decision I have found does not have preclusive effect, *see* Section III.A. *supra*, that "[h]ad Congress intended such an expansive application of Sarbanes-Oxley's whistleblower provision it would have plainly said as much."  *Id.* at 7-8; *see also Minkina v. Affiliated Physician's Group*, No. 2005-SOX-00019, at 6 (ALJ Feb. 22, 2005) (concluding that nothing in the statute's language or legislative history suggests that Congress intended to bring the employees of non-public entities under the protection of Section 806).

The ARB of DOL has yet to provide the ALJs with definitive clarification on these matters.  In *Kukucka v. Belfort Instrument Co.*, No. 06-104 (ARB Apr. 30, 2008), the claimant's employer,

Belfort, was a private company that Kukucka argued was reliant on SunTrust, a publicly traded bank.  The ARB stated that "[b]y its terms the SOX provides protection against retaliation only to employees of [public] companies." *Id.* at 4.  But when the ARB ultimately dismissed Kukucka's claim, it did so not because Kukucka failed to show that his employer was a public company, but rather because he "offered no evidence to the ALJ that [Belfort's reliance on the public company] was equivalent to being a contractor, subcontractor, or agent of SunTrust." *Id.*

In another ARB case, *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, No. 04-149 (ARB May 31, 2006), the employee-claimant worked for a company that was a subsidiary (several times removed) of a publicly traded company. *Id.* at 2.  The ARB decided that an employee of a subsidiary, acting as an agent of a publicly traded company, could be protected from retaliatory actions by the subsidiary. *Id.* at 9.  The *Klopfenstein* decision turned on agency theory, and involved the complex task of identifying at what point a far-removed subsidiary becomes the agent of its parent corporation.  Nevertheless, underlying this analysis in *Klopfenstein* was the assumption that if a subsidiary is indeed acting as an "agent," then the subsidiary's employees are covered by Section 806.  The ARB does not explain the reason for making this assumption, and engages in no analysis of the statute's language or purpose with respect to which categories of

-30-

employees are covered.  This omission leaves me with little
reason to find this particular analysis persuasive.

These opinions have engaged in little thorough discussion of
the text of the statute and the different meanings that the word
"employee" could bear.  Left with the plain text of the statute,
I find that the meaning of "employee" in § 1514A(a) is ambiguous.
I therefore turn to other considerations to provide further
guidance.

2.   The Title and Other SOX Provisions

I approach cautiously Defendants' argument that the
provision's title, "Whistleblower Protection for Employees of
Publicly Traded Companies," 18 U.S.C. § 1514A, supports their
position.  According to the Defendants, the title is evidence
that "an employee" is limited exclusively to employees of
publicly traded companies.  A statutory heading, however, is "but
a short-hand reference to the general subject matter involved."
*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331
U.S. 519, 528 (1947).  The heading of the whistleblower provision
could conceivably also act as shorthand for more complicated
clauses and concepts in the statute's actual text.  A section
heading thus "cannot limit the plain meaning of the text."  *Id.*
at 529.  But *Brotherhood* advises that headings "are of use . . .
when they shed light on some ambiguous word or phrase," and are
tools "for the resolution of a doubt."  *Id.*  Because the phrase

"an employee" only indirectly identifies the employer in question, requiring this court to engage in some grammatical reconstruction, there is arguably doubt as to the scope of the word "employee." *See Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (holding that a generic reference to "employment" in the statute's main text was in fact limited to "unauthorized employment," a phrase that appeared in the provision's heading). The heading of the SOX whistleblower provision, though of limited use in statutory interpretation, adds some support to the Defendants' proposed construction.

But this support is limited.  If Section 806 protected not only employees of publicly traded companies, but also employees of their related entities, it would still be reasonable to use the shorthand "Employees of Publicly Traded Companies" in the section's heading, given that even under the Plaintiffs' reading, all protected employees would have some connection to public companies, even if indirectly.  The rationale for the shorthand is even more compelling when one considers that the alternative heading would have been "Employees of Publicly Traded Companies and Their Related Entities," or worse, "Employees of Publicly Traded Companies, Their Officers, Employees, Contractors, Subcontractors, or Agents."  This contrasts with *National Center for Immigrants Rights*, where the alternative heading would have

-32-

merely used the relatively concise phrase "Authorized and Unauthorized Employment" rather than "Unauthorized Employment," thereby weakening any claim that the heading functioned as a mere shorthand. *See Nat'l Ctr. for Immigrants' Rights*, 502 U.S. at 189.

Another consideration is the treatment of company-related entities in other provisions of SOX. Section 307, for instance, discusses the obligation of attorneys to report evidence of a material breach of securities law or a breach of a fiduciary duty by a company or its agent. 15 U.S.C. § 7245. The provision states explicitly that these rules apply to "attorneys appearing and practicing before the Commission *in any way* in the representation of issuers." § 7245 (emphasis added). This definition could indicate that Congress was aware of how to broaden the scope of individuals affected by the statute, and chose to do so in Section 307, and did not choose to do so in Section 806.

On the other hand, one could also infer from Section 307 that Congress knew how to define the scope of the affected persons in the provision, and neglected to provide such definition - whether narrow or broad - to the scope of employees protected by Section 806. I find that the other SOX provisions provide limited insight as to the scope of Section 806.

3.   <u>Legislative History</u>

Given the ambiguity of the text, I may turn to legislative history to shed light on the statute's meaning.  *United States v. Commonwealth Energy Sys. & Subsidiary Cos.*, 235 F.3d 11, 16 (1st Cir. 2000).  But the legislative history on this provision of SOX is notably unhelpful in answering the particular question before me because the congressional debates do not speak directly to whether employees of privately held companies can be covered by the whistleblower provision.

For instance, the Senate Judiciary Committee's Report on Sarbanes-Oxley states that Section 806 "would provide whistleblower protection to employees of publicly traded companies."  S. Rep. No. 107-146, at *13 (2002).  It is unclear whether this constitutes a statement that employees of non-public companies are specifically excluded, or are instead limited shorthand generalizations about Section 806.  Similarly, in Senator Sarbanes's introduction to the Senate Conference Report, he stated that the Act "applies exclusively to public companies," *see* 148 Cong. Rec. S7350, 7351 (July 25, 2002) which could mean that it applies to public companies and those parties that act on their behalf (such as officers, employees, and contractors), rather than to private companies that provide no services to public companies at all.

The Senate Report also describes the consequences that would

-34-

occur "[i]f the *employer* does take illegal action in retaliation for lawful and protected conduct." S. REP. No. 107-140 at *13 (emphasis added).  If the Defendants are correct that Section 806 protects only employees of publicly traded companies, then the term "employer" here must refer exclusively to publicly traded companies.  The status of other non-public entities as *employers* would be irrelevant because as their actions against their own employees would not be covered.  But it then becomes unclear why the Report's language would use the term "employer" at all, given that the other non-public entities - even though not acting as employers - are also prohibited from engaging in retaliatory conduct.

In short, the particular phrases used in the legislative history of Section 806 provide little guidance on the scope of the covered employees.[7]  What is helpful, however, is evaluating the purpose of Sarbanes-Oxley more generally, which was "to prevent and punish corporate fraud, protect the victims of such fraud, preserve evidence of such fraud and crime, and hold wrongdoers accountable for their actions."  S. REP. No. 107-146,

---

[7] The Defendants also make reference to a piece of legislation that never became law, the Mutual Fund Reform Act, S. 2059, 108th Cong. § 116(b) (2004).  This bill, which would have extended whistleblower protection to employees of investment advisers explicitly, provides no reliable guidance here.  *United States v. Craft*, 535 U.S. 274, 287 (2002) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute . . . .").

at *1 (2002).  The fraud targeted by the statute was fraud
involving public companies.  *Id.* at *10 ("Congress must act now
to restore confidence in the integrity of the public markets . .
. .").  When Senator Sarbanes stated that the provision "applies
exclusively to public companies," he may not have shed light on
the definition of "employee," but he did indicate the focus of
the statute, including Section 806.  148 Cong. Rec. S7350, 7351
(July 25, 2002).

When considering whether a particular interpretation of
Section 806 leads to any problematic application that would run
counter to this purpose, I find that the two interpretations
diverge.  The Plaintiffs' reading might permit the SOX
whistleblower provision to have a notably expansive scope
untethered to the purpose of the statute.  Any employee of an
entity that acts as an officer, employee, contractor,
subcontractor or agent of a public company, who involves himself
in the reporting of fraud by his own employer, would be a covered
employee.  This reading suggests that an employee could be
protected even when his whistleblowing does not directly involve
fraud against public shareholders.  The Plaintiffs maintain that
this application would be narrowed by the fact that Section 806
only protects those whistleblowing activities directed to the
protection of shareholder interests.  But the language of the
statute itself does not plainly provide such a limiting

-36-

principle, cabining its scope in the manner suggested by the
Plaintiffs.

The only possible limitation I can find is in the phrase
"relating to fraud against shareholders."  The statute protects
employees who report activities that may constitute "a violation
of [18 U.S.C.] section 1341, 1343, 1344, or 1348, any rule or
regulation of the Securities and Exchange Commission, or any
provision of Federal law **relating to fraud against shareholders** .
. . ."  18 U.S.C. § 1514(a)(1) (emphasis added).  There is
arguably some ambiguity here as to whether "relating to fraud
against shareholders" modifies (1) the phrase "any provision of
federal law," or instead (2) the entire clause, "a violation of
[18 U.S.C.] section 1341, 1343, 1344, or 1348, any rule or
regulation of the Securities and Exchange Commission, or any
provision of Federal law."  If the latter, then each of the six
categories of possible violations would have to relate to fraud
against shareholders, providing the limiting principle necessary
to keep the Plaintiffs' construction from expanding beyond the
purpose of SOX.

Principles of statutory construction direct courts to
construe a statute such that no word is superfluous, *Duncan v.
Walker*, 533 U.S. 167, 174 (2001), and to "give all language in a
statute operative effect."  *Morales v. Sociedad Espanola de
Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 59 (1st Cir. 2008).

If the phrase "relating to fraud against shareholders" did not modify "any provision of Federal law," one could argue that this would render the listing of the five other statutory and regulatory categories superfluous.  After all, the statute could have protected just reasonable belief in a "violation of any federal law relating to fraud against shareholders," without citing any particular statutes or regulations.

As one district court has observed, the few courts that have asked whether the violations enumerated in § 1514A are limited by the phrase "relating to fraud against shareholders" have not been consistent.  *O'Mahoney v. Accenture Ltd.*, 537 F. Supp. 2d 506, 516 (S.D.N.Y. 2008) (citing cases).  The court in *O'Mahoney*, after a thorough discussion of the statutory text, concluded that the phrase modified only the clause "any provision of federal law."  *Id.* at 517.  The alternative construction, whereby the phrase would modify all six categories of statutes and regulations, violates the "doctrine of the last antecedent."  *Id.*  This doctrine states that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  To be sure, this is not an "absolute" rule, *id.*, but here it may prove useful if there are no countervailing indications that the phrase modifies each of the covered violations.

In the case of Section 806, however, there are in fact indications that a relation to shareholder fraud is imperative for each of the six categories of violations listed.  The legislative history makes clear that Congress passed SOX to address the problems of shareholder fraud that had gone unreported in the past - not to address any and all infractions committed by a public company or its related entities giving rise to actions under the six categories of violation.  According to the Senate Report, "[a]lthough current law protects many government employees who act in the public interest by reporting wrongdoing, there is no similar protection for employees of publicly traded companies who blow the whistle *on fraud and protect investors*." *See, e.g.*, S. REP. No. 107-146, at 19 (2002) (emphasis added).

The Fourth Circuit came to the same conclusion in *Livingston v. Wyeth, Inc.*, 520 F.3d 344 (4th Cir. 2008), when faced with the question of whether the fifth category of violations, "any rule or regulation of the Securities and Exchange Commission," had to be related to fraud in order to trigger whistleblower protection. *Id.* at 351 n.1.  The court decided that even though the text of the statute was ambiguous as to which violations were modified by the phrase "relating to fraud against shareholders," the limitation had to apply to SEC rules and regulations as well:

> To conclude otherwise would absurdly allow a
> retaliation suit for an employee's complaints about

>       administrative missteps or inadvertent omissions from
>       filing statements.  Moreover, the ambiguity is fully
>       clarified by the context of the whistleblower provision
>       in the Sarbanes-Oxley Act and by the legislative
>       history that indicates that whistleblowing is protected
>       by § 1514A when it relates to "fraud."

*Id.*

Likewise, I find that to come within the scope of Sox when an employee provides information about conduct that he reasonably believes constitutes a violation of the categories of law and regulations listed in 18 U.S.C. § 1514A(a)(1), this whistleblowing activity must "relat[e] to fraud against shareholders."  Consequently, protecting employees of a public company's related entities would not result in an overly broad application of the statute that would be counter to the statute's purpose.  I am left then with a compelling limiting principle for the Plaintiffs' reading of the statute.

The Defendants' construction, while not inconsistent with the text, would result in an excessively forced and formalistic reading.  The legislative history indicates that Congress was concerned with failures to report instances of fraud against shareholders, failures not only on the part of public company employees, but also employees of those institutions working with the public company.  The Senate Report, discussing the collapse of Enron, observed that "Enron apparently, *with the approval or advice of its accountants, auditors and lawyers*, used thousands of off-the-book entities to overstate corporate profits,

-40-

understate corporate debts and inflate Enron's stock price." S.
REP. No. 107-146, at *2 (2002) (emphasis added). The Report goes
on to state that "when corporate employees at both Enron and
Andersen attempted to report or 'blow the whistle' on fraud, but
they were discouraged at nearly every turn." *Id.* at *5. The
legislative history of SOX makes clear that Congress was
concerned about the related entities of a public company becoming
involved in performing or disguising fraudulent activity, and
wanted to protect employees of such entities who attempt to
report such activity.

The Defendants' strongest argument in terms of legislative
purpose seems to be that the Plaintiffs' construction would
extend the statute to an unbounded and vague scope of protected
individuals. But because my construction of the statute protects
only that whistleblowing activity that relates to fraud against
shareholders, I find the Defendants' concerns unfounded.

### 4. DOL Regulations

Another potential source on the meaning of Section 806 is a
regulation issued by OSHA defining "employee" as "an individual
presently or formerly working for a company or company
representative, an individual applying to work for a company or
company representative, or an individual whose employment could
be affected by a company or company representative." 29 C.F.R. §
1980.101. In promulgating the regulation, OSHA commented that

this definition of "employee" is consistent with Section 806(a)
because the statute "protects the employees of publicly traded
companies as well as the employees of contractors,
subcontractors, and agents of those publicly traded companies."
*Procedures for the Handling of Discrimination Complaints Under
Section 806*, 69 Fed. Reg. 52104, 52106 (Aug. 24, 2004).

Where a statute is ambiguous, as I have determined Section
806(a) to be, an agency's regulations may merit deference under
*Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467
U.S. 837, 843-43 (1984).  But to justify such deference, Congress
must have delegated authority to the agency to interpret the
statute, and the agency must have invoked that authority.  *United
States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *Navarro v.
Pfizer Corp.*, 261 F.3d 90, 99 (1st Cir. 2001).

I find no provision of SOX that delegates rule-making
authority to OSHA or the Department of Labor, although a
provision of the act explicitly delegates such authority to the
SEC.  15 U.S.C. § 7202(a).  OSHA did not invoke any authority to
interpret the statute in promulgating 29 C.F.R. § 1980.101.
Moreover, OSHA summarized the rule as establishing "the
procedures and time frames for the handling of discrimination
complaints" under SOX.  69 Fed. Reg. 52,104, 52,104.  OSHA goes
on to state that "[t]hese rules are procedural in nature and are
not intended to provide interpretations of the Act."  *Id.* at

52,105.  OSHA was apparently defining the terms used in its own regulations for the procedures involved in Section 806 complaints.  OSHA's regulation and comments do not constitute an exercise of authority to interpret the statute, and warrant no deference under *Chevron*.

If an agency's interpretation of a statute has no claim to *Chevron* deference, then it merits respect insofar as it is has the "power to persuade."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Mead*, 533 U.S. at 234.  The weight given to an agency's judgment "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking in control."  *Skidmore*, 323 U.S. at 140.

There is little indication here of the thoroughness of OSHA's consideration of the meaning of "employee."  OSHA's general approach is not a model of administrative consistency.  The regulation is, after all, inconsistent with determinations made by ALJs and the ARB when applying Section 806 to particular claimants.  *See, e.g.*, *Goodman*, No. 2006-SOX-11, at 6; *Zang*, No. 2007-SOX-00027, at 7-8; *Minkina*, No. 2005-SOX-00019, at 6.  I nevertheless have concluded that the reasoning underlying the interpretation is valid, given the purpose of the statute and the plausible reading of the text, *see* Part III.B.1-3 *supra*.

However, OSHA's interpretation of "employee," standing alone, is not particularly persuasive under *Skidmore*, despite the fact that it is consistent with my own reading of the statute's text and purpose.

5. Application to Investment Advisers for Mutual Funds

Having determined that Section 806 protects employees of any related entity o a public company, the final step in the analysis is to determine whether Lawson and Zang fall into this category. To do so, the Plaintiffs' employer must be an "officer, employee, contractor, subcontractor, or agent," or rather, have a plausible claim to being one of these entities.

Lawson and Zang have sufficiently pleaded facts indicating that the Defendants are either contractors, subcontractors, or agents of publicly held investment companies. The Plaintiffs' employers perform a wide variety of administrative and executive tasks for the Funds, including making fundamental decisions as to how the Funds' assets will be invested. If the Funds did not have investment advisers as their agents, the only activity that could take place on the Funds' behalf would be actions taken by the Board of Trustees. Indeed, the unique relationship between mutual funds and their investment advisers has often been noted by the courts. *See Daily Income Fund v. Fox*, 464 U.S. 523 (1984); *Burks v. Lasker*, 441 U.S. 471 (1979). Mutual funds are supervised and operated by separately owned organizations, the

investment advisers.  *Daily Income Fund*, 464 U.S. at 536; *Burks*, 441 U.S. at 481.  Because of the "potential conflicts of interest" created by this close relationship, *Daily Income Fund*, 464 U.S. at 536, Congress has imposed a fiduciary duty on investment advisers and managers with regards to compensation paid by the investment company.  15 U.S.C. § 80a-35(b); *see Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 354 (D. Mass. 2005).  This fiduciary duty remains subject to oversight by the courts, although the particular role of the courts in the enforcement process continues to be refined, as demonstrated by the issues raised in a case decided today by the Supreme Court, *Jones v. Harris Assocs. L.P.*, 2010 WL 1189560 (U.S. Mar. 30, 2010) *rev'g* 527 F.3d 627 (7th Cir. 2008).[8]

---

[8] The question addressed by the Supreme Court in *Jones v. Harris Assocs., L.P.*, 2010 WL 1189560 (U.S. Mar. 30, 2010) is the deference owed to the decisions of a mutual fund's board regarding the level of fees paid to its investment adviser, pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).  As the competition between mutual funds has increased, some courts have become more reluctant to interfere with an investment company's compensation for investment advisers, on the assumption that market forces will help prevent advisers' fees from becoming excessive or disproportionate.  *See Jones v. Harris Assocs. L.P.*, 527 F.3d 627, 633 (7th Cir. 2008) (noting that "[a] lot has happened in the last 38 years" and that the market for mutual funds is more competitive, and presumably less prone to abuse) *rev'd*, 2010 WL 1189560 (U.S. Mar. 2010).  Other observers, however, have underscored the pervasive "structural impediments to arm's-length bargaining" between fund and adviser, justifying continued caution over the extent to which a fund's board becomes "captive" to the fund's investment adviser.  Brief for United States as Amicus Curiae Supporting Petitioners at 12, *Jones v. Harris Assocs. L.P.*, No. 08-586 (U.S. June 15, 2009).  What is clear from the Supreme Court's decision today in *Jones v. Harris*

These dimensions to the mutual fund industry inform my treatment of this case.  For the goals of SOX to be met, contractors and subcontractors, when performing tasks essential to insuring that no fraud is committed against shareholders, must not be permitted to retaliate against whistleblowers.  These concerns are especially strong for mutual funds, which have no employees and implement the funds' management through contractual arrangements with investment advisers.  If Section 806 only protected employees of public companies, then any reporting of fraud involving a mutual fund's shareholders would go unprotected, for the very simple reason that no "employee" exists for this particular type of public company.  I find that Lawson and Zang, as employees of investment advisers to mutual funds, are covered by Section 806.

I will briefly touch on the Plaintiffs' alternative statutory argument regarding the special status of mutual funds. Apart from the argument that investment advisers have contracts with public companies, Zang, in particular, presses "the very narrow argument that investment advisers and sub-advisers to public investment companies are themselves covered under Section 806." Even if the statute does not cover employees of non-public entities more generally, the Plaintiffs contend courts have

---

*Assocs. L.P.* is that courts must continue to respond to both the structural and circumstantial factors that affect the degree of independence between mutual fund and investment adviser.

applied Section 806 to employees of companies that act on behalf
of publicly held affiliates and that are almost inseparable from
them.

Case law and federal regulations have described the singular
importance of the investment adviser in managing mutual fund
affairs. *See Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir.
1977) ("Control of a mutual fund . . . lies largely in the hands
of the investment adviser."); Investment Company Act Release No.
24082 (Oct. 14, 1999), 64 Fed. Reg. 59,826, 59,827 (Nov. 3, 1999)
("[I]nvestment advisers typically dominate the funds they
advise."). According to Zang, "all or substantially all" of
Fidelity Management's activities are performed on behalf of the
Funds, and all of the Funds' "day-to-day" functions and decisions
are made by Fidelity Management. The Funds and Fidelity
Management are thus "inextricably intertwined." The implication
of this argument is that any employment action taken by Fidelity
Management can be attributed to the Funds, and is therefore
covered by SOX.

Because I have concluded that employees of agents,
contractors, and subcontractors of public companies are protected
by Section 806, and because investment advisers to mutual funds
fall in this category of employees, I need not reach this
alternative statutory argument proffered by the Plaintiffs. But
I will note that Zang's characterization of mutual funds and

their investment advisers runs counter to the overall legal framework for mutual funds, as defined by the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*, and the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*  This framework defines investment companies and investment advisers distinctly, *see* 15 U.S.C. § 80a-3(a)(1), (11), and identifies their interests as distinct.  *See* 15 U.S.C. § 80a-1(b)(2) (stating that the public interest and investors are harmed when investment companies are organized in the interest of investment advisers).  This legal distinction is in keeping with case law on liability for securities law violations.  In *In re Fidelity/Micron Sec. Litig.*, 964 F. Supp. 539 (D. Mass. 1997), the issue was whether a mutual fund shared primary liability, under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), for statements made by FMR Corp.  Judge Stearns concluded that FMR Corp., through contractual delegation, was responsible for all of the mutual fund's trading decisions and communications; consequently, the statements of the investment adviser's employees could not be imputed to the mutual fund.  *Id.* at 544. Given the legal distinctions between mutual funds and the companies that provide investment services to them, I find unpersuasive the argument that the employees of these investment services companies are intertwined with and indistinguishable from mutual funds.

**C.   *Do the Allegations Satisfy the Requirements of § 1514A?***

Fidelity Investments and Fidelity Management make the additional contention that even if Lawson and Zang were covered "employees" for purposes of 18 U.S.C. § 1514A(a), they nonetheless failed to engage in protected activity under § 1514A(a)(1).  The Defendants argue that Lawson and Zang failed to satisfy the "reasonable belief" requirement, and failed to communicate with sufficient particularity their suspicions of fraudulent activity.

1.   <u>The Meaning of Reasonable Belief</u>

The whistleblower provision protects employees who provide information "which the employee reasonably believes constitutes a violation" of federal laws and SEC rules covered by the statute. 18 U.S.C. § 1514A(a)(1).  The First Circuit has recently concluded that the term "reasonable belief" has both a subjective and objective component.  *Day v. Staples, Inc.*, 555 F.3d 42, 54 (1st Cir. 2009).

To demonstrate an objectively reasonable belief, the plaintiff does not need to cite a particular code provision, but the plaintiff "must show that his communications to the employer *specifically related* to one of the laws listed in § 1514A." *Id.* at 55 (emphasis added); *see also Platone v. U.S. Dep't of Labor*, 548 F.3d 322, 327 (4th Cir. 2008) (concluding that a plaintiff must state with sufficient particularity why she believes the

-49-

actions would violate securities laws and constitute fraud).  In

other words, the employee's theory of fraud "must at least

approximate the basic elements of a claim of securities fraud."

*Day*, 555 F.3d at 55; *cf. O'Mahony,* 537 F. Supp. 2d at 517

(stating that § 1514A protects a whistleblower's reporting of

fraud "under any of the enumerated statutes regardless of whether

the misconduct relates to 'shareholder' fraud").  A disagreement

with management about a company's internal procedures is not

actionable.  *Day*, 555 F.3d at 56.

    2.  <u>Lawson's Allegations</u>

    I find that the Plaintiffs have alleged facts concerning

reasonable belief sufficient to survive a motion to dismiss.  In

the case of Lawson, she has alleged that she had a reasonable

belief that her employers were facilitating fraud against mutual

fund investors.  For example, she has alleged that she believed a

group within Fidelity Brokerage had improperly retained $10

million in 12b-1 fees paid by the Funds. Federal securities laws

regulate the payment of 12b-1 fees, and taking Lawson's

allegations as true, her belief that Fidelity Brokerage's

retention of fees constituted a securities violation could have

been both objectively and subjectively reasonable.  She has also

alleged that her employer provided incorrect information to the

Funds' Board of Trustees that had a relation to the Funds'

contracts with Fidelity Investments.  Section 15 of the ICA

obligates the investment adviser to provide a mutual fund's board
of trustees with the information necessary to evaluate the terms
of an investment adviser contract, 15 U.S.C. § 80a-15(c), and
Lawson may have had a reasonable belief that Fidelity Investments
was violating this provision.  The Defendants have challenged the
objective and subjective reasonableness of Lawson's beliefs, but
I am satisfied that Lawson's pleadings have alleged sufficient
facts to support her belief that fraudulent activity may have
been taking place.

Fidelity Investments challenges the sufficiency of her
pleadings on two additional bases.  First, the Defendants argue
that Lawson has not alleged any reports that "specifically
related" to one of the six categories of violations listed in the
statute.  *Day*, 555 F.3d at 55.  Lawson has alleged, however, that
she reported her concerns about the improper 12b-1 fee retention
to Vice President Komishane (Am. Compl. ¶ 37.1), and reported her
concerns regarding the inaccurate reports that were allegedly
made to the Board of Trustees (Am. Compl. ¶ 54).  Generalized
complaints or complaints of administrative missteps are not
protected activity.  *See Livingston*, 520 F.3d at 352 n.1
(commenting that Section 806 does not protect the reporting of
"administrative missteps and inadvertent omissions"); *Harvey v.
Home Depot USA, Inc.*, No. 04-144, at 15 (ARB June 2, 2006)
(noting that protected activity does not include reporting that

-51-

could adversely affect the corporation's financial condition, when no fraudulent or deceptive activity is suspected). Here, however, Lawson allegedly reported specific problems in corporate conduct which - because they involved the delicate and regulated relationship between mutual fund and investment adviser - she may have had reason to believe constituted fraudulent activity.

Fidelity Investments next argues that any communications that did take place were merely part of her job, rather than a reporting of fraud for whistleblower purposes. The legal principle cited to support this charge comes not from SOX, but rather from the federal Whistleblower Protection Act, 5 U.S.C. § 1211 *et seq.* *See Huffman v. Office of Personnel Mgmt.*, 263 F.3d 1341, 1352 (Fed. Cir. 2001) (finding that protected activity did not include "reporting in connection with assigned normal duties"). Even if SOX incorporates such a rule, however, it would be a matter of fact, not law, whether or not Lawson's activities were performed as part of her regular duties.

    3.  Zang's Allegations

In the case of Zang, the alleged protected activity was the distribution of the March 2005 memorandum that conveyed his concerns about the SAI's disclosures regarding portfolio manager compensation. Fidelity Management argues that the March memorandum never expressed concern about a violation of federal law relating to shareholder fraud. According to the Defendants,

Zang's missive was merely an expression of his own personal views about the conduct of Fidelity's business, not about potential securities violations.

As with Lawson's claims, I cannot dispose of Zang's complaint before the factfinding stage of litigation. Zang has alleged facts supporting his belief that Fidelity's compensation scheme was not transparent. As I have discussed, compensation of investment advisers generally is a matter that has received considerable attention from both Congress and the federal courts. Whether or not the SAI disclosures were in fact fraudulent statements that violated federal law is not at issue. Rather, the issue is one of belief, and I find that Zang has alleged facts relating to improper communications to the SEC regarding manager compensation. These allegations are sufficient to support a claim of objectively and subjectively reasonable belief that Fidelity was failing to meet its obligations under the ICA or SEC rules and regulations.

The Defendants maintain that Zang's comments amounted to a "quibbling" over the technically correct description of the analyst compensation formula. How to characterize Zang's comments is a matter for factual development, not legal resolution on a motion to dismiss. It is adequate at this stage to conclude that Zang's characterizations of his communication could be supported by the allegations in his Complaint.

### D.   Plaintiffs' State Wrongful Discharge Claims

Both Plaintiffs allege wrongful discharge in violation of
public policy, but they identify different public policies in
play.  Zang points to the protection of investors in mutual funds
from fraud, and protecting the reporting of such fraud by
employees, while Lawson points more broadly to the protection of
whistleblowing concerning potential violations of federal laws
concerning fraud against shareholders.

Massachusetts recognizes the "at-will termination" doctrine,
which permits either party, the employer or employee, to
terminate employment at any time "without notice, for almost any
reason or for no reason at all." *Wright v. Shriners Hosp. for
Crippled Children*, 589 N.E.2d 1241, 1244 (Mass. 1992).
Massachusetts courts have permitted, however, an exception to
this rule when based on public policy. *Smith-Pfeffer v.
Superintendent of the Walter E. Fernald State School*, 533 N.E.2d
1368, 1371 (Mass. 1989).  But the public policy exception to the
at-will termination rule is "quite narrow." *Mitchell v. TAC
Technical Servs., Inc.*, 734 N.E.2d 1198, 1201 (Mass. 2000).  For
a claimant to proceed, he or she must identify "a statute or
regulation which clearly expresses a legislative policy" of
Massachusetts. *Tighe v. Career Sys. Dev. Corp.*, 915 F. Supp.
476, 484 (D. Mass. 1996); *see also Wright*, 589 N.E.2d at 1244-46
(finding no claim for wrongful discharge when the court could not

-54-

find a statute that "clearly expresse[d] a legislative policy" that protected or encouraged the plaintiff's activity).  To identify a termination that is unlawful on public policy grounds, one must find that "the Massachusetts] Legislature has expressed a policy position concerning the rights of employees." *Mello v. Stop & Shop Cos., Inc.*, 524 N.E.2d 105, 106 (Mass. 1988).

Neither Plaintiff identifies a public policy expressed by Commonwealth lawmakers that is at risk in this situation.  The only statute to which Zang refers is "federal whistle-blower provisions," presumably Section 806 of SOX.  Lawson likewise does not provide sources supporting her claim that Massachusetts has a public policy protecting whistleblowing that involves federal SEC violations and shareholder fraud.

There is case law, however, acknowledging a Massachusetts public policy to protect whistleblowers more generally.  *See Smith v. Mitre Corp.*, 949 F. Supp. 943, 950 (D. Mass. 1997) (concluding that the Supreme Judicial Court would apply the public policy exception to include protection for whistleblowers); *Tighe*, 915 F. Supp. at 484 (acknowledging "a legislative policy encouraging persons such as [the plaintiff] to inform the DOL of possible contractual or statutory violations by their employers"); *Shea v. Emmanuel College*, 682 N.E.2d 1348, 1350 (Mass. 1997) (holding that an employer can be liable for discharges based on an employee's internal complaints of alleged

criminal violations); *Mello*, 524 N.E.2d at 108 n.6 ("We assume .
. . that an at-will employee who 'blew the whistle' within his
company on wrongdoing is entitled to protection . . . .").

It is therefore conceivable that a plaintiff may plead
wrongful discharge based on retaliation for whistleblowing
activity generally.  Such pleading is not sufficient in these
cases, however, to give the Plaintiffs a cause of action.  A
plaintiff cannot seek common law remedies for wrongful discharge
when a statutory scheme already provides remedies for the same
conduct.  In *Melley v. Gillette Corp.*, 475 N.E.2d 1227 (Mass.
App. 1985) ("*Melley I*"), whose reasoning was adopted by the
Supreme Judicial Court, 491 N.E.2d 252, 253 (Mass. 1986), the
Appeals Court held that for a common law remedy of wrongful
discharge to apply, there must be no other way to vindicate the
public policy at stake.  *Melley I*, 475 N.E.2d at 1228.  If the
public policy "is already protected by a comprehensive
legislative scheme," there is no warrant for the creation of a
new common law remedy.  *Id.*  The *Melley* court expressed concerns
that the common law action would permit claimants to circumvent
the preferred legislative remedy, and would create "duplicative
remedies" disfavored by the Supreme Judicial Court.  *Id.* at 1229.
SOX, which expresses a public policy of protecting shareholders
from fraud and the whistleblowers who report this fraud, has an
explicit remedy for dealing with terminations that run contrary
to this public policy.

Zang responds to this legal analysis by crying foul: The Defendants cannot simultaneously argue that SOX does not cover investment adviser employees such as the Plaintiffs, while also arguing that investment adviser employees are barred from common law relief by nature of the SOX statutory scheme.  Zang's position misconstrues the application of a statutory scheme to the common law of wrongful discharge.  SOX does not preclude relief at common law because employees are entitled to relief through SOX; rather, the SOX statutory scheme precludes relief at common law because Congress has already spoken on how (and to whom) remedies should be made available.

Lawson argues that even if a federal statute does address a public policy, a claimant can still seek common law relief for wrongful discharge if the policy precedes the statute.  *See Norris v. Lumbermen's Mut. Cas. Co.*, 881 F.2d 1144, 1153 (1st Cir. 1989) (permitting a plaintiff to pursue wrongful discharge when it involved a strong public policy favoring the reporting of safety hazards, "independent of" and "regardless of" the statute that addressed the same policy).  I am not persuaded that the protection of employees who report violations of federal shareholder rules is a "strong public policy" of the same magnitude as maintaining safety at nuclear energy plants, such that it warrants independent enforcement through the common law.  *See id.*  Nor am I persuaded that this public policy existed in

any articulable form before the Enron scandal and subsequent congressional response through SOX.

Having found no public policy articulated by the Massachusetts legislature that is violated by the Plaintiffs' discharge (or alleged "constructive discharge," in Lawson's case), and having concluded that the public policy articulated at the federal level is already protected through an adequate remedial scheme, I dismiss Count II of the Complaint.

## IV. CONCLUSION

For the reasons stated more fully above, I DENY Fidelity Investments' Motion to Dismiss Lawson's Amended Complaint (Doc. No. 24 in Civil Action No. 08-10466-DPW), and I DENY Fidelity Management's Motion to Dismiss Zang's Complaint (Doc. No. 25 in Civil Action No. 08-10758-DPW) as to the SOX claims (Count I).  I GRANT the Defendants' motions as to the state wrongful discharge claims (Count II).

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE